# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2023AP1399-OA |

COMPLETE TITLE:

Rebecca Clarke, Ruben Anthony, Terry Dawson, Dana Glasstein, Ann Groves-Lloyd, Carl Hujet, Jerry Iverson, Tia Johnson, Angie Kirst, Selika Lawton, Fabian Maldonado, Annemarie McClellan, James McNett, Brittany Muriello, Ela Joosten (Pari) Schils, Nathaniel Slack, Mary Smith-Johnson, Denise Sweet and Gabrielle Young,
    Petitioners,
Governor Tony Evers in his official capacity, Nathan Atkinson, Stephen Joseph Wright, Gary Krenz, Sarah J. Hamilton, Jean-Luc Thiffeault, Somesh Jha, Joanne Kane and Leah Dudley,
    Intervenors-Petitioners,
  v.
Wisconsin Elections Commission, Don Millis, Robert F. Spindell, Jr., Mark L. Thomsen, Ann S. Jacobs, Marge Bostelmann, Carrie Riepl, in their official capacities as Members of the Wisconsin Election Commission;, Meagan Wolfe in her official capacity as the Administrator of the Wisconsin Elections Commission;, Andre Jacque, Tim Carpenter, Rob Hutton, Chris Larson, Devin LeMahieu, Stephen L. Nass, John Jagler, Mark Spreitzer, Howard Marklein, Rachael Cabral-Guevara, Van H. Wanggaard, Jesse L. James, Romaine Robert Quinn, Dianne H. Hesselbein, Cory Tomczyk, Jeff Smith and Chris Kapenga in their official capacities as Members of the Wisconsin Senate,
    Respondents,
Wisconsin Legislature, Billie Johnson, Chris Goebel, Ed Perkins, Eric O'Keefe, Joe Sanfelippo, Terry Moulton, Robert Jensen, Ron Zahn, Ruth Elmer and Ruth Streck,
    Intervenors-Respondents.

---

ORIGINAL ACTION

| | |
|---|---|
| OPINION FILED: | December 22, 2023 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | November 21, 2023 |

SOURCE OF APPEAL:
    COURT:
    COUNTY:
    JUDGE:

JUSTICES:
KAROFSKY, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, DALLET and PROTASIEWICZ, JJ., joined. ZIEGLER, C.J., filed a dissenting opinion. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion. HAGEDORN, J., filed a dissenting opinion.
NOT PARTICIPATING:

ATTORNEYS:

For the petitioners, there were briefs filed by *Daniel S. Lenz, T.R. Edwards, Elizabeth M. Pierson, Scott B. Thompson,* and *Law Forward, Inc., Madison; Douglas M. Poland, Jeffrey A. Mandell, Rachel E. Snyder,* and *Stafford Rosenbaum LLP, Madison; Elisabeth S. Theodore (pro hac vice), John A. Freedman (pro hac vice),* and *Arnold & Porter Kaye Scholer LLP, D.C.; Mark P. Gaber (pro hac vice), Brent Ferguson (pro hac vice), Hayden Johnson (pro hac vice), Benjamin Phillips (pro hac vice),* and *Campaign Legal Center, D.C.; Annabelle E. Harless (pro hac vice),* and *Campaign Legal Center, Chicago; Ruth M. Greenwood (pro hac vice), Nicholas O. Stephanopoulos (pro hac vice),* and *Election Law Clinic at Harvard Law School, Cambridge.* There was an oral argument by *Mark Gaber.*

For the intervenor-petitioner, Governor Tony Evers in his official capacity, there were briefs filed by *Anthony D. Russomanno,* assistant attorney general, *Faye B. Hipsman,* assistant attorney general, *Brian P. Keenan,* assistant attorney general, with whom on the brief was *Joshua L. Kaul,* attorney

2

general; *Mel Banes, and Office of Governor Tony Evers, Madison; Christine P. Sun (pro hac vice), Dax L. Goldstein (pro hac vice), and States United Democracy Center, Los Angeles; John Hill (pro hac vice), and States United Democracy Center, DuBois.* There was an oral argument by *Anthony D. Russomanno,* assistant attorney general.

For the intervenor-petitioner, Nathan Atkinson, Stephen Joseph Wright, Gary Krenz, Sarah J. Hamilton, Jean-Luc Thiffeault, Somesh Jha, Joanne Kane and Leah Dudley, there were briefs filed by *Sarah A. Zylstra, Tanner G. Jean-Louis,* and *Boardman Clark LLP, Madison; Sam Hirsch (pro hac vice), Jessica Ring Amunson (pro hac vice), Elizabeth B. Deutsch (pro hac vice), Arjun R. Ramamurti, (pro hac vice),* and *Jenner & Block LLP, D.C.* There was an oral argument by *Sam Hirsch.*

For the respondents, Tim Carpenter, Chris Larson, Mark Spreitzer, Dianne H. Hesselbein, and Jeff Smith, in there official capacities as Members of the Wisconsin Senate, there were briefs filed by *Tamara B. Packard, Eduardo E. Castro,* and *Pines Bach LLP, Madison.* There was an oral argument by *Tamara B. Packard.*

For the intervenors-respondents, Wisconsin Legislature, and respondents, Andre Jacque, Rob Hutton, Devin LeMahieu, Stephen L. Nass, Howard Marklein, John Jagler, Rachael Cabral-Guevara, Van H. Wanggaard, Jesse L. James, Romaine Robert Quinn, Cory Tomczyk, and Chris Kapenga, in there official capacities as Members of the Wisconsin Senate, there were briefs filed by *Kevin M. St. John,* and *Bell Giftos St. John LLC, Madison; Jessie Augustyn,* and *Augustyn Law LLC, Appleton; Adam K. Mortara,* and *Lawfair LLC, Nashville; Taylor A.R. Meehan (pro hac vice), Rachael C. Tucker (pro hac vice), Daniel M. Vitagliano (pro hac vice), C'Zar D. Bernstein (pro hac vice),* and *Consovoy McCarthy*

3

*PLLC, Arlington; Scott A. Keller (pro hac vice), Shannon Grammel (pro hac vice), Gabriela Gonzalez-Araiza (pro hac vice),* and *Lehotsky Keller Cohn LLP, D.C.; Matthew H. Frederick (pro hac vice),* and *Lehotsky Keller Cohn, LLP, Austin.* There was an oral argument by *Taylor A.R. Meehan.*

For the intervenors-respondents, Billie Johnson, Chris Goebel, Ed Perkins, Eric O'Keefe, Joe Sanfelippo, Terry Moulton, Robert Jensen, Ron Zahn, Ruth Elmer and Ruth Streck, there were briefs filed by *Richard M. Esenberg, Luke N. Berg, Nathalie E. Burmeister,* and *Wisconsin Institute for Law & Liberty, Inc., Milwaukee.* There was an oral argument by *Richard M. Esenberg.*

An amicus curiae brief was filed by *Nathan J. Kane,* and *WMC Litigation Center,* Madison, on behalf of the Wisconsin Manufacturers and Commerce, Inc.

An amicus curiae brief was filed by *Margo S. Kirchner*, and *Wisconsin Justice Initiative, Inc*, Milwaukee; Daniel J. Schneider, and *Wisconsin Fair Maps Coalition*, Chicago, on behalf of the Wisconsin Justice Initiative, Inc. & Wisconsin Fair Maps Coalition.

An amicus curiae brief was filed by *Matthew W. O'Neill*, and *Fox, O'Neill & Shannon, S.C.*, Milwaukee, on behalf of Matthew Petering, PhD.

An amicus curiae brief was filed by *Nicholas E. Fairweather*, and *Hawks Quindel S.C.*, Madison; *Jonathan B. Miller* (pro hac vice), *Michael Adame* (pro hac vice), and *Public Rights Project*, Oakland, on behalf of Local Elected Officials.

4

An amicus curiae brief was filed by *Robert Yablon*, *Bryna Godar*, and *State Democracy Research Initiative, University of Wisconsin Law School*, Madison, on behalf of Legal Scholars.

An amicus curiae brief was filed by *Samuel T. Ward-Packard*, and *Elias Law Group LLP*, D.C.; *Abha Khanna (pro hac vice),* and *Elias Law Group LLP,* Seattle; *William K. Hancock (pro hac vice), Julie Zuckerbrod (pro hac vice*), and *Elias Law Group LLP*, D.C., on behalf of Jo Ellen Burke, Jennie Tunkieicz and John Persa.

An amicus curiae brief was filed by *Tony Wilkin Gibart*, *Adam Voskuil*, *Daniel P. Gustafson*, and *Midwest Environmental Advocates*, Madison, on behalf of Coalition on Lead Emergency.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2023AP1399-OA

STATE OF WISCONSIN                    :        IN SUPREME COURT

**Rebecca Clarke, Ruben Anthony, Terry Dawson, Dana Glasstein, Ann Groves-Lloyd, Carl Hujet, Jerry Iverson, Tia Johnson, Angie Kirst, Selika Lawton, Fabian Maldonado, Annemarie McClellan, James McNett, Brittany Muriello, Ela Joosten (Pari) Schils, Nathaniel Slack, Mary Smith-Johnson, Denise Sweet and Gabrielle Young,**

          Petitioners,

**Governor Tony Evers, in his official capacity; Nathan Atkinson, Stephen Joseph Wright, Gary Krenz, Sarah J. Hamilton, Jean-Luc Thiffeault, Somesh Jha, Joanne Kane and Leah Dudley,**

          Intervenors-Petitioners,

     v.

**Wisconsin Elections Commission, Don Millis, Robert F. Spindell, Jr., Mark L. Thomsen, Ann S. Jacobs, Marge Bostelmann, Joseph J. Czarnezki in their official capacities as Members of the Wisconsin Election Commission;, Meagan Wolfe in her official capacity as the Administrator of the Wisconsin Elections Commission;, Andre Jacque, Tim Carpenter, Rob Hutton, Chris Larson, Devin LeMahieu, Stephen L. Nass, John Jagler, Mark Spreitzer, Howard Marklein, Rachael Cabral-Guevara, Van H. Wanggaard, Jesse L. James, Romaine Robert Quinn, Dianne H. Hesselbein, Cory Tomczyk, Jeff Smith and Chris Kapenga  in their official capacities as Members of the Wisconsin Senate,**

          Respondents,

**FILED**

**DEC 22, 2023**

Samuel A. Christensen
Clerk of Supreme Court

**Wisconsin Legislature; Billie Johnson, Chris Goebel, Ed Perkins, Eric O'Keefe, Joe Sanfelippo, Terry Moulton, Robert Jensen, Ron Zahn, Ruth Elmer and Ruth Streck,**

**Intervenors-Respondents.**

---

KAROFSKY, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, DALLET and PROTASIEWICZ, JJ., joined. ZIEGLER, C.J., filed a dissenting opinion. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion. HAGEDORN, J., filed a dissenting opinion.

---

ORIGINAL ACTION. *Rights declared.*

¶1  JILL J. KAROFSKY, J.  In Wisconsin the number of state legislative districts containing territory completely disconnected from the rest of the district is striking.  At least 50 of 99 assembly districts and at least 20 of 33 senate districts include separate, detached territory.  A particularly stark example is the Madison-area 47th Assembly District (shown in yellow below).  This district contains more than a dozen separate, detached parts that are home to thousands of people who must cross one or more other districts before reaching another part of the 47th.[1]

---

[1] The following images of assembly and senate districts are from the Legislative Technology Services Bureau's Geographic Information Services website.  Legislative Technology Services Bureau, Geographic Information Services, Wisconsin District Maps (https://gis-ltsb.hub.arcgis.com/pages/district-maps).  This court "take[s] judicial notice of the location of the various political subdivisions of the state," including the location of legislative districts.  See Ryan v. State, 168 Wis. 14, 15, 168 N.W. 566 (1918).

2



¶2    Here we are asked to determine whether these districts violate Article IV, Sections 4 and 5 of the Wisconsin Constitution, which provide that state legislative districts must consist of "contiguous territory." Wis. Const. art. IV, §§ 4-5. Two groups of Wisconsin voters (the Clarke Petitioners[2]

---

[2] The Clarke Petitioners are Rebecca Clarke, Ruben Anthony, Terry Dawson, Dana Glasstein, Ann Groves-Lloyd, Carl Hujet, Jerry Iverson, Tia Johnson, Angie Kirst, Selika Lawton, Fabian Maldonado, Annemarie McClellan, James McNett, Brittany Muriello, Ela Joosten (Pari) Schils, Nathaniel Slack, Mary Smith-Johnson, Denise (Dee) Sweet, and Gabrielle Young.

and Wright Petitioners[3]), the Governor, and a group of state senators[4] (collectively, Petitioners), argue that the current districts are non-contiguous, and therefore violate the Wisconsin Constitution. Petitioners ask us to enjoin their use in future elections and to order the adoption of remedial maps. Additionally, they ask us to issue a writ quo warranto declaring the November 2022 state senate elections unlawful, and to order special elections for these offices that would otherwise not be on the ballot until November 2026. The Legislature, several senators elected in 2022,[5] and a group of Wisconsin voters[6] (collectively, Respondents)[7] argue that the current state

---

[3] The Wright Petitioners are Nathan Atkinson, Stephen Joseph Wright, Gary Krenz, Sara J. Hamilton, Jean-Luc Thiffeault, Somesh Jha, Joanne Kane, and Leah Dudley, several of whom participated in the Johnson litigation. See Johnson v. Wis. Elections Comm'n, 2021 WI 87, 399 Wis. 2d 623, 967 N.W.2d 469 ("Johnson I"); Johnson v. Wis. Elections Comm'n, 2022 WI 14, 400 Wis. 2d 26, 971 N.W.2d 402 ("Johnson II"); Johnson v. Wis. Elections Comm'n, 2022 WI 19, 401 Wis. 2d 198, 972 N.W.2d 559 ("Johnson III"). After we denied their petition for leave to commence an original action, see Wright v. Wis. Elections Comm'n, 2023 WI 71, 409 Wis. 2d 417, 995 N.W.2d 771, they subsequently filed a motion to intervene in this case, which the Court granted.

[4] They are Senators Carpenter, Larson, Spreitzer, Hesselbein, and Smith.

[5] They are Senators Cabral-Guevara, Hutton, Jacque, Jagler, James, Kapenga, LeMahieu, Marklein, Nass, Quinn, Tomczyk, and Wanggaard.

[6] Four of these voters——Billie Johnson, Eric O'Keefe, Ed Perkins, and Ronald Zahn——were petitioners in Johnson. They intervened in this case along with Chris Goebel, Robert Jensen, Ruth Elmer, Ruth Streck, and Terry Moulton, who were not parties to Johnson.

[7] One of the named Respondents, Wisconsin Elections Commission, takes no position on the issues presented.

4

legislative districts comply with the Wisconsin Constitution's contiguity requirements. Respondents also contend that Petitioners' claims are barred by various defenses, and that the relief the Petitioners seek is otherwise unavailable.

¶3 We hold that the contiguity requirements in Article IV, Sections 4 and 5 mean what they say: Wisconsin's state legislative districts must be composed of physically adjoining territory. The constitutional text and our precedent support this common-sense interpretation of contiguity. Because the current state legislative districts contain separate, detached territory and therefore violate the constitution's contiguity requirements, we enjoin the Wisconsin Elections Commission from using the current legislative maps in future elections.[8] We also reject each of Respondents' defenses. We decline, however, to issue a writ quo warranto invalidating the results of the 2022 state senate elections.

¶4 Because we enjoin the current state legislative district maps from future use, remedial maps must be drawn prior to the 2024 elections. The legislature has the primary authority and responsibility to draw new legislative maps. See Wis. Const. art. IV, § 3. Accordingly, we urge the legislature to pass legislation creating new maps that satisfy all requirements of state and federal law. We are mindful, however, that the legislature may decline to pass legislation creating

---

[8] Because we determine that non-contiguous districts violate the constitution, we need not address Petitioners' alternative argument that the process by which the current state legislative districts were adopted violated the Wisconsin Constitution's separation-of-powers doctrine. Md. Arms Ltd. P'ship v. Connell, 2010 WI 64, ¶48, 326 Wis. 2d 300, 786 N.W.2d 15 ("Issues that are not dispositive need not be addressed." (citation omitted)).

5

new maps, or that the governor may exercise his veto power. Consequently, to ensure maps are adopted in time for the 2024 election, we will proceed toward adopting remedial maps unless and until new maps are enacted through the legislative process. At the conclusion of this opinion, we set forth the process and relevant considerations that will guide the court in adopting new state legislative districts——and safeguard the constitutional rights of all Wisconsin voters.

## I. BACKGROUND

¶5 Following the 2020 census, the legislature passed legislation creating new state legislative district maps, the governor vetoed the legislation, and the legislature did not attempt to override his veto. Because the legislature and the governor reached an impasse, the 2011 maps remained in effect, even though they no longer complied with the Wisconsin or United States Constitutions due to population shifts.

¶6 Billie Johnson and other Wisconsin voters asked this court to redraw the unconstitutional 2011 maps. See Johnson v. Wis. Elections Comm'n, 2021 WI 87, ¶2, 399 Wis. 2d 623, 967 N.W.2d 469 ("Johnson I"). In that case, we first confirmed that the 2011 maps no longer complied with the state and federal requirement that districts be equally populated. See id. Next, we identified the principles that would guide the court in adopting new maps, including the proposition that remedial maps "'should reflect the least change' necessary for the maps to comport with relevant legal requirements." Id., ¶72 (quoting Wright v. City of Albany, 306 F. Supp. 2d 1228, 1237 (M.D. Ga. 2003)). We then invited the parties to submit proposed state

6

legislative maps for our review. See id., ¶87 (Hagedorn, J., concurring). Of the proposed maps, we adopted the Governor's. See Johnson v. Wis. Elections Comm'n, 2022 WI 14, ¶52, 400 Wis. 2d 626, 971 N.W.2d 402 ("Johnson II"). The United States Supreme Court summarily reversed that decision, holding that the Governor's proposed legislative maps violated the Equal Protection Clause of the Fourteenth Amendment because they increased the number of majority-Black districts in the Milwaukee area without sufficient justification. Wis. Legis. v. Wis. Elections Comm'n, 595 U.S. 398, 403, 406 (2022) (per curiam). On remand, we adopted the legislative maps proposed by the Legislature. See Johnson v. Wis. Elections Comm'n, 2022 WI 19, ¶3, 401 Wis. 2d 198, 972 N.W.2d 559 ("Johnson III").

¶7 In this case, the Clarke Petitioners filed a petition for leave to commence an original action challenging the maps adopted in Johnson III, arguing that they: (1) are an extreme partisan gerrymander; (2) do not comply with the contiguity requirements contained in Article IV, Sections 4 and 5 of the Wisconsin Constitution; and (3) were created via a process that violated the separation of powers. We granted leave in part, allowing Petitioners' contiguity and separation-of-powers claims to proceed, while declining to review the issue of extreme partisan gerrymandering. We explained that although Petitioners' extreme-partisan-gerrymandering claim presented an important and unresolved legal question, we declined to address it due to the need for extensive fact-finding. See Clarke v. Wis. Elections Comm'n, 2023 WI 70, 409 Wis. 2d 372, 995 N.W.2d 779.

7

¶8    After granting the petition in part, we permitted several parties to intervene.  We ordered the parties to provide briefing on the following four questions:

> 1.) Do the existing state legislative maps violate the contiguity requirements contained in Article IV, Sections 4 and 5 of the Wisconsin Constitution?
>
> 2.) Did the adoption of the existing state legislative maps violate the Wisconsin Constitution's separation of powers?
>
> 3.) If the court rules that Wisconsin's existing state legislative maps violate the Wisconsin Constitution for either or both of these reasons and the legislature and the governor then fail to adopt state legislative maps that comply with the Wisconsin Constitution, what standards should guide the court in imposing a remedy for the constitutional violation(s)?
>
> 4.) What fact-finding, if any, will be required if the court determines there is a constitutional violation based on the contiguity clauses and/or the separation-of-powers doctrine and the court is required to craft a remedy for the violation?  If fact-finding will be required, what process should be used to resolve questions of fact?

Id.  After all parties submitted initial briefs, Respondents filed a motion to dismiss, asserting various defenses.  Oral argument was held on November 21, 2023.

¶9    In this opinion, we first address whether the existing state legislative districts violate the Wisconsin Constitution's contiguity requirements.  We determine that a substantial number of districts do so.  Next, we turn to Respondents' motion to dismiss and the defenses asserted therein.  Because none of Respondents' proffered defenses apply here, we deny Respondents' motion to dismiss.  Finally, we enjoin the Wisconsin Elections Commission from using the maps in future elections, and we

8

explain the process and relevant considerations that will guide the court in adopting remedial maps.

## II.  CONTIGUITY

¶10  We begin by determining the meaning of "contiguous territory" set out in Article IV, Sections 4 and 5 of the Wisconsin Constitution.  To do so, we examine the constitutional text, our precedent interpreting that text, and other jurisdictions' interpretations of similar provisions.  Next, we apply that meaning to the current legislative districts to determine whether the districts violate the contiguity requirements.  We conclude that the current legislative maps contain districts that are not composed of "contiguous territory" and therefore violate the Wisconsin Constitution.

### A.  Text

¶11  We start our analysis with Article IV, Section 4 of the Wisconsin Constitution, which sets the ground rules for how Wisconsin Assembly members are elected and how their districts are to be established.  That section reads in full as follows:

> The members of the assembly shall be chosen biennially, by single districts, on the Tuesday succeeding the first Monday of November in even-numbered years, by the qualified electors of the several districts, <u>such districts to be bounded by county, precinct, town or ward lines, to consist of contiguous territory and be in as compact form as practicable.</u>

Wis. Const. art. IV, § 4 (emphasis added).  The underlined portion of Section 4 imposes three separate requirements for establishing assembly districts.  The districts must: (1) "be bounded by county, precinct, town or ward lines;" (2) "consist

of contiguous territory;" and (3) "be in as compact form as practicable."

¶12 Article IV, Section 5 sets out rules for how senators are elected and how their districts are established:

> The senators shall be elected by <u>single districts of convenient contiguous territory, at the same time and in the same manner as members of the assembly are required to be chosen; and no assembly district shall be divided in the formation of a senate district.</u> The senate districts shall be numbered in the regular series, and the senators shall be chosen alternately from the odd and even-numbered districts for the term of 4 years.

Wis. Const. art. IV, § 5 (emphasis added). The underlined portion of Section 5 imposes three requirements on senate districts. The senate districts must (1) be "single districts;" (2) be "of convenient contiguous territory;" and (3) not divide any assembly districts.

¶13 Sections 4 and 5 both impose a contiguity requirement on districts—specifically, assembly and senate districts must consist of "contiguous territory." Given the language in the constitution, the question before us is straightforward. When legislative districts are composed of separate, detached parts, do they consist of "contiguous territory"? We conclude that they do not.

¶14 Much of the Wisconsin Constitution is set out in broad terms, the interpretation of which may lead to difficult questions and require a complex balancing of interests. For instance, at what point does a search or seizure become unreasonable? See Wis. Const. art. I, § 11. What does it mean for a person to be "entitled to a certain remedy in the laws for all injuries"? See Wis. Const. art. I, § 9. Or even, how

10

compact does a district have to be in order to be in "as compact form as practicable"? See Wis. Const. art. IV, § 4.

¶15 In other places, however, our constitution imposes specific requirements whose meaning is immediately apparent from the words themselves. For instance, assembly elections must be held "on the Tuesday succeeding the first Monday in November in even-numbered years." See Wis. Const. art. IV, § 4. And judges must have been licensed to practice law for "5 years immediately prior to appointment." See Wis. Const. art. VII, § 24.

¶16 The contiguous territory requirement fits squarely into the latter category. It is immediately apparent, using practically any dictionary, that contiguous means "touching" or "in actual contact." See, e.g., Contiguous, Black's Law Dictionary, (11th ed. 2019) ("Touching at a point or along a boundary."); Contiguous, Oxford English Dictionary (2d ed. 1989) ("touching, in actual contact, next in space; meeting at a common boundary, bordering, adjoining"); Contiguous, Merriam Webster Dictionary (11th ed. 2019) ("being in actual contact: touching along a boundary or at a point"). These definitions make clear that contiguous territory is territory that is touching, or in actual contact. In other words, a district must be physically intact such that a person could travel from one point in the district to any other point in the district without crossing district lines. See Bernard Grofman, Criteria for Districting: A Social Science Perspective, 33 UCLA L. Rev. 77, 84 (1985) ("A district may be defined as contiguous if every part of the district is reachable from every other part without crossing the district boundary.").

11

¶17 We find additional support for this understanding of contiguity in historical definitions and early Wisconsin districting practices. In examining historical definitions of the word "contiguous," we see that the definition has not changed since the Wisconsin Constitution was adopted. See Contiguous, A Dictionary of the English Language (1756) ("meeting so as to touch; bordering upon each other; not separate"); Contiguous, An American Dictionary of the English Language (1828) ("touching: meeting or joining at the surface or border"). Turning to early districting practices, the first state legislative districts, set forth in the Wisconsin Constitution, were all physically contiguous. See Wis. Const. art. XIV, § 12 (1848). Additionally, the constitution specified that if existing towns were split or new towns were created, the districts had to remain physically intact. See id. In short, historical definitions and practices related to contiguity bolster our conclusion that contiguity does indeed require "touching," or "actual contact."

¶18 Respondents assert that a district with separate, detached territory can still be contiguous——so long as the detached territory is a "municipal island"[9] and the main body of

_____

[9] Municipal islands are portions of a municipality separated from the main body of the municipality. Municipal islands are created via annexation, either because a municipality has annexed the island, or because a municipality has annexed territory in such a way as to isolate a portion of another municipality. No party disputes that municipal islands created by annexation are themselves permissible. This court said as much in Town of Blooming Grove v. City of Madison, 275 Wis. 342, 347-48 81 N.W.2d 721 (1957), when it held that the City of Madison was not prohibited from annexing portions of the Town of Blooming Grove in such a way that separated unincorporated portions of Blooming Grove from one another.

12

the municipality is located elsewhere in the district. The Legislature refers to this as "political contiguity." Adopting the concept of political contiguity would essentially require us to read an exception into the contiguity requirements—that district territory must be physically touching, except when the territory is a detached section of a municipality located in the same district.

¶19 We decline to read a political contiguity exception into Article IV's contiguity requirements. The text contains no such exception. Both Section 4 and Section 5 include the discrete requirement that districts be composed of contiguous territory. There are no exceptions to contiguity in the constitution's text, either overt or fairly implied. True, assembly districts must also be "in as compact form as practicable" and "bounded by county, precinct, town or ward lines," but the existence of additional requirements does not constrain or limit the separate requirement that district territory be contiguous.

¶20 Contiguity is binary: territory is either contiguous (touching, in contact) or it is not (separate, detached). See Johnson v. State, 366 S.W.3d 11, 24, 30 (Mo. 2012) (en banc) (describing contiguity as "an absolute standard that either is satisfied or not satisfied by the challenged map" because it is "free of any phrase that could broaden the meaning of 'contiguous.'"). In this respect, the contiguity requirements are unlike, for example, the provision of Article IV, Section 4 that requires districts be "in as compact form as practicable."

13

Contiguity is not required only when it is practicable——it is a constitutional imperative for all districts.

### B. Precedent

¶21 This straightforward understanding of contiguity has been twice confirmed by this court: first in Chicago & Northwest Railway Co. v. Town of Oconto, 50 Wis. 189, 196, 6 N.W. 607 (1880), and then twelve years later in State ex rel. Lamb v. Cunningham, 83 Wis. 90, 148, 53 N.W. 35 (1892). In Oconto, we determined that "separate, detached" territory was not contiguous:

> To so construe the constitution as to [allow towns to] be composed of separate, detached, and non-contiguous territory, would most unquestionably restrict the sovereign power of the legislature in the organization of assembly districts 'consisting of contiguous territory, and bounded by county, precinct, town, or ward lines.' Article 4, § 4, Const.[10]

50 Wis. at 196. In Lamb, we addressed the question of district contiguity head on, stating that Article IV, Section 4 "requires that each assembly district must consist of contiguous territory; that is to say, it cannot be made up of two or more pieces of detached territory." Lamb, 83 Wis. at 148. Simply put, this court understood the contiguity requirement to mean just what it says: Districts must be made up of contiguous

---

[10] This court later clarified that Oconto's holding on town contiguity did not prohibit municipalities from annexing territory in a way that created municipal islands, reasoning in part that annexation of some areas within a town did not change town boundaries, which stretched across both incorporated and unincorporated areas. Thus, all parts of the town remained contiguous. Town of Blooming Grove v. City of Madison, 275 Wis. 342, 346-47, 81 N.W.2d 721 (1957). Blooming Grove expressly declined to address the impact of town contiguity on legislative districts, and did not revise our underlying definition of contiguity itself. Id. at 346-48.

14

territory——i.e., territory that is not separate or detached, but physically touching.

¶22 Respondents argue that this court's Johnson decisions support their position——that the contiguity requirements are satisfied even when a district includes detached territory, so long as that territory is a municipal island.  The following is the full extent of our municipal island analysis in Johnson I:

> Article IV, Section 4 of the Wisconsin Constitution further commands assembly districts be "contiguous," which generally means a district "cannot be made up of two or more pieces of detached territory." State ex rel. Lamb v. Cunningham, 83 Wis. 90, 148, 53 N.W. 35 (1892).  If annexation by municipalities creates a municipal "island," however, the district containing detached portions of the municipality is legally contiguous even if the area around the island is part of a different district.  Prosser v. Elections Bd., 793 F. Supp. 859, 866 (W.D. Wis. 1992).

Johnson I, 399 Wis. 2d 623, ¶36.  We twice repeated our cursory treatment of contiguity in Johnson II and Johnson III.  See Johnson II, 400 Wis. 2d 626, ¶36; Johnson III, 401 Wis. 2d 198, ¶70.

¶23 We take a moment to briefly examine Prosser v. Elections Board, 793 F. Supp. 859 (W.D. Wis. 1992), the source of Johnson I's proposition that districts can be legally contiguous if they include detached portions of a municipality.  In Prosser, a federal district court determined that lack of contiguity in legislative maps was not "a serious demerit," and noted that the Wisconsin Legislature "treat[ed] islands as contiguous with the cities or villages to which they belong." Prosser, 793 F. Supp. at 866.  The Prosser court did not examine

15

this court's precedent, but instead cited to two statutes,[11] one of which had been repealed by the time of our <u>Johnson I</u> decision. <u>Id.</u>

¶24 Our reliance on <u>Prosser</u> was in error. To the extent that <u>Johnson</u>'s passing statements about the contiguity requirements of Article IV, Sections 4 and 5 represent binding precedent, we overrule them. As a court, "we have repeatedly recognized the importance of stare decisis to the rule of law." <u>State v. Johnson</u>, 2023 WI 39, ¶19, 407 Wis. 2d 195, 990 N.W.2d 174. But one situation in which we may depart from stare decisis is when a decision is "unsound in principle" because it "misapplies the Wisconsin Constitution." <u>State v. Roberson</u>, 2019 WI 102, ¶51, 389 Wis. 2d 190, 935 N.W.2d 813. <u>Johnson</u> is unsound in principle because it misapplied the constitution in three ways. First, <u>Johnson</u> failed to analyze the contiguity requirements evident in the text of the constitution. Second, <u>Johnson</u> did not attempt to square its view of contiguity with the court's precedential decisions regarding the constitution's contiguity requirements in <u>Oconto</u> or <u>Lamb</u>. Third, <u>Johnson I</u> relied entirely upon <u>Prosser</u>[12] which itself ignored the ordinary meaning of the constitutional text and instead pointed to two statutes, one of which had been repealed by the time of the <u>Johnson I</u> decision. Under these circumstances, we would "do

---

[11] Namely, Wis. Stat. §§ 4.001(3); 5.15(1)(b) (1991–92). Neither statute defines what the constitution requires, and in any event, § 4.001(3) was repealed in 2011. 2011 Wis. Act 43. § 2.

[12] We note that "federal district court cases are not binding authority on this court." <u>State v. Wood</u>, 2010 WI 17, ¶18, 323 Wis. 2d 321, 780 N.W.2d 63.

16

more damage to the rule of law by obstinately refusing to admit [our] error, thereby perpetuating injustice, than by" overruling this part of Johnson. Roberson, 389 Wis. 2d 190, ¶49. We therefore hold that, notwithstanding any statements to the contrary in Johnson, Article IV, Sections 4 and 5 mean what they say——districts must be composed of contiguous territory; i.e., territory that is touching, not separate or detached.

### C. Persuasive Authority

¶25 Although we are not bound by other states' interpretations of district contiguity requirements, we are persuaded by their near-uniform acceptance that "contiguous territory" does indeed mean territory that is touching, not separate or detached.[13] See, e.g., Below v. Gardner, 963 A.2d 785, 792 (N.H. 2002) ("Courts generally agree that contiguous territory is territory that touches, adjoins or is connected, as distinguished from territory that is separated by other territory."); In re Legislative Districting of State, 475 A.2d 428, 437 (Md. 1982) ("[C]ontiguous territory is territory touching, adjoining and connected, as distinguished from territory separated by other territory."); Hickel v. Se. Conf., 846 P.2d 38, 45 (Alaska 1992) ("Contiguous territory is

---

[13] See Yunsieg P. Kim & Jowei Chen, Gerrymandered by Definition: The Distortion of "Traditional" Districting Criteria and A Proposal for Their Empirical Redefinition, 2021 Wis. L. Rev. 101, 167 (noting that 49 states have imposed contiguity requirements on their legislative maps); Richard G. Niemi, The Relationship Between Votes and Seats: The Ultimate Question in Political Gerrymandering, 33 UCLA L. Rev. 185, 187 (1985) ("That political districts should be contiguous——that all parts of a district should be connected——is not likely to be important in gerrymandering cases because it is relatively noncontroversial.").

territory which is bordering or touching."); <u>Sherill v. O'Brien</u>, 81 N.E. 124, 131 (N.Y. 1907) ("The ordinary and plain meaning of the words 'contiguous territory' is not territory nearby, in the neighborhood or locality of, but territory touching, adjoining, and connected, as distinguished from territory separated by other territory."). This understanding of contiguous remains the same even for states, like ours, that allow non-contiguous municipal annexation. <u>See, e.g.,</u> <u>Stephenson v. Bartlett</u>, 582 S.E.2d 247, 254 (N.C. 2003) (upholding a lower court decision holding that contiguity means sharing "a common boundary", even though N.C. Gen. Stat. § 160A-58.1 allows for non-contiguous municipal annexation). Clearly, the holding of this court is not novel. We are simply giving effect to a constitutional contiguity requirement as so many other courts have done.

¶26 The few contiguity-related issues that other courts have genuinely grappled with are edge cases that arise when district territory is connected only by water, or when contiguity is technically achieved, but barely (for example, when territory is connected only at a single point). When edge cases arise, courts still understand that parts of a district may not be separated by other districts. <u>See</u> <u>Wilkins v. West</u>, 571 S.E.2d 100, 109 (Va. 2002) (holding a district was contiguous over water, while noting that "clearly, a district that contained two sections completely severed by another land mass would not meet this constitutional requirement [of contiguity]."). In other words, the existence of edge cases does not justify abandoning the requirement that territory must

18

indeed be touching to be contiguous. To clarify matters for the remedial process, we discuss these ancillary issues next.

### D. Ancillary Issues: Water Contiguity and Touch-Point Contiguity

¶27 Like many other states, Wisconsin's geography is such that certain districts span bodies of water.[14] This does not, by itself, violate the contiguity requirement. A district can still be contiguous if it contains territory with portions of land separated by water. See Johnson v. State, 366 S.W.3d at 31 (noting that "the dictionary definition of 'territory' references a geographic area without regard to whether the portions of the land within the geographic area are split by large rivers or other bodies of water."). This understanding of water contiguity is common in states that include or border bodies of water. See, e.g., Wilkins, 571 S.E.2d at 109 ("[N]o one disputes that the geography and population of this Commonwealth necessitate that some electoral districts include water, and that land masses separated by water may nevertheless satisfy the contiguity requirement in certain circumstances."); Hickel, 846 P.2d at 45 ("Absolute contiguity of land masses is impossible in Alaska, considering her numerous archipelagos. Accordingly, a contiguous district may contain some amount of open sea."); Parella v. Montalbano, 899 A.2d 1226, 1255 (R.I. 2006) ("In the instant matter, while the districts are not contiguous on land, this Court finds that the districts are

---

[14] For instance, Madeline Island in Ashland County does not have sufficient population to constitute its own district, so any district that includes it will have to span across a portion of Lake Superior.

19

contiguous on the basis of shore-to-shore contiguity."). As in these states, the fact that a district's territory includes land separated by water will not, by itself, defeat the contiguity requirements in Article IV, Sections 4 and 5.

¶28 In addition to water-contiguity, we must also address the issue of "touch-point contiguity." Touch-point contiguity occurs when territory is contiguous only because it is joined at a single point. Some states allow touch-point contiguity, and some do not. Compare Stephenson, 582 S.E.2d at 254 (affirming a trial court's finding that "a district whose parts are 'held together' by the mathematical concept of 'point contiguity' does not meet the . . . criteria for contiguity."), with In re 1983 Legislative Apportionment of House, Senate, & Cong. Districts, 469 A.2d 819, 831 (Me. 1983) (holding that a district that was contiguous only at a single point "approach[ed] the limits of what is constitutionally permissible," but still met the contiguity requirement).

¶29 For our purposes, since territory that touches at a single point is indeed touching, touch-point contiguity alone does not violate the contiguity requirement. Although touch-point contiguity can be a "sign that traditional districting criteria were compromised," Covington v. North Carolina, 316 F.R.D. 117, 141 (M.D.N.C. 2016), aff'd, 581 U.S. 1015 (2017) (citing Shaw v. Reno, 509 U.S. 630, 636 (1993)), such concerns are better addressed by examining redistricting criteria as a

20

whole rather than complicating the otherwise simple contiguity requirement.[15]

E.  The Current Maps' Non-Contiguity

¶30  Having determined that "contiguous territory" means that the territory must be actually touching, we now turn to the current legislative maps.  We examine the current maps and conclude that the non-contiguous districts violate the requirements set out in Article IV, Sections 4 and 5 of the Wisconsin Constitution.

¶31  None of the parties disputes that the current legislative maps contain districts with discrete pieces of territory that are not in actual contact with the rest of the district.  We again look at the example of Assembly District 47 which plainly includes separate, detached parts:

_____

[15] A district with only touch-point contiguity may not be as compact as reasonably practicable, for example.  See Wis. Const. art. IV, §§ 4-5.

21



¶32 Assembly district 53 in the Oshkosh area is another such example, with multiple separate, detached parts:

22



Assembly district 68 in the Eau Claire area (in yellow below) is another:



¶33 Many senate districts also contain separate, detached parts. District 22 in the Racine area, shown in orange and purple below, is one example:



District 27, shown in orange, purple, and green below, is another:



¶34 In total, at least 50 assembly districts and at least 20 senate districts include separate, detached parts. That is to say, a majority of the districts in both the assembly and the senate do not consist of "contiguous territory" within the meaning of Article IV, Section 4, nor are they "of convenient contiguous territory" within the meaning of Article IV, Section 5. Therefore, we hold that the non-contiguous legislative districts violate the Wisconsin Constitution.

¶35 We would be remiss to end our discussion on contiguity without emphasizing that contiguity is "not just a gracenote in the score of democracy; it is crucial, both practically and theoretically." Daniel D. Polsby & Robert D. Popper, The Third Criterion: Compactness as a Procedural Safeguard Against Partisan Gerrymandering, 9 Yale L. & Pol'y Rev. 301, 330 (1991). The contiguity requirement (along with compactness) helps make for districts that are more geographically cohesive——and therefore more likely to reflect a reasonably homogeneous slate of interests than districts with scattered pockets of isolated communities. Additionally, drafters of contiguity requirements have viewed contiguity as no mere technical requirement, but as an important tool to constrain districting practices they consider undesirable. See Rucho v. Common Cause, 588 U.S. ___, 139 S. Ct. 2484, 2495 (2019) (noting that the Apportionment Act of 1842 required contiguity "in an attempt to forbid the practice of the gerrymander"); Pearson v. Koster, 359 S.W.3d 35, 38 (Mo. 2012) (stating that the purpose of a contiguity requirement was "to guard, as far as practicable, under the system of representation adopted, against a legislative evil,

25

commonly known as the gerrymander" (citation omitted)); <u>Hickel</u>, 846 P.2d at 45 ("[T]he requirements of contiguity, compactness and socio-economic integration were incorporated by the framers of the reapportionment provisions to prevent gerrymandering"). We decline to chip away at such a consequential districting requirement by approving an exception not found in our constitution's text.

### III. DEFENSES

¶36 Having determined that the non-contiguous legislative districts violate the Wisconsin Constitution, we now turn to Respondents' motion to dismiss and explain why none of their proffered defenses preclude us from holding in favor of Petitioners on the merits.

¶37 In their motion to dismiss and other briefing, Respondents maintain that Petitioners lack standing to challenge the contiguity of the current legislative districts, and that their claims are barred by laches, preclusion, and estoppel. Additionally, Respondents contend that this case is an impermissible collateral attack on this court's judgment in <u>Johnson III</u>, and that, as a result, neither the declaratory nor the injunctive relief Petitioners seek is available.[16] We conclude that Respondents' defenses do not apply, and that

---

[16] Respondents also make a brief argument that adjudicating this case in Petitioners' favor will violate Respondents' due process rights under the Fourteenth Amendment of the United States Constitution. These arguments are underdeveloped, and as such, we do not address them. <u>See</u> <u>Casanova v. Polsky</u>, 2023 WI 19, ¶44, 406 Wis. 2d 247, 986 N.W.2d 780 ("[W]e need not address underdeveloped arguments.").

26

declaratory and injunctive relief are available.  Accordingly, we deny the motion to dismiss.[17]

## A.  Standing

¶38  At the outset, we deny Respondents' motion to dismiss for lack of standing.  The Governor indisputably has standing, and that is all that is required for this case to proceed.

¶39 Respondents do not argue that the Governor lacks standing, nor could they.  Our cases make clear that "the state, <u>acting either through the Governor or the Attorney General</u>, may challenge the constitutionality of a state reapportionment plan as a violation of state constitutional rights of the citizens." <u>State ex rel. Reynolds v. Zimmerman</u>, 22 Wis. 2d 544, 552, 126 N.W.2d 551 (1964) (emphasis added).[18]  Importantly, as long as

---

[17] The Clarke and Wright Petitioners assert that the motion to dismiss is procedurally improper because the rules governing original actions do not permit it, <u>see</u> Wis. Stat. § (Rule) 809.70, and because we implicitly rejected these arguments when we granted in part leave to commence this original action. Since we reject Respondents' arguments on the merits, we need not address the procedural propriety of the motion.

[18] <u>State ex rel. Reynolds v. Zimmerman</u>, 22 Wis. 2d 544, 126 N.W.2d 551 (1964) involved a challenge based on equal population, but it supported its proposition that the governor had standing by pointing to cases in which the executive branch challenged maps on other state constitutional grounds, including contiguity. <u>Id.</u> at 552 n.3 (citing <u>State ex rel. Att'y Gen. v. Cunningham</u>, 81 Wis. 440, 51 N.W. 724 (1892)). Therefore, it is difficult to see why <u>Reynolds</u>' holding would be limited to equal population challenges, particularly given <u>Reynolds</u>' broad language referring to "violation[s] of state constitutional rights of the citizens." <u>Id.</u> at 552.

one of the Petitioners has standing, this case may proceed.[19] See City of Madison v. Town of Fitchburg, 112 Wis. 2d 224, 232, 332 N.W.2d 782 (1983) ("Having determined that one party has standing to maintain this action, we next turn to the merits."); see also Chi. Joe's Tea Room, LLC v. Vill. of Broadview, 894 F.3d 807, 813 (7th Cir. 2018) ("As long as there is at least one individual plaintiff who has demonstrated standing to assert these rights as his own, a court need not consider whether the other plaintiffs . . . have standing to maintain the suit." (quoting Bond v. Utreras, 585 F.3d 1061, 1070 (7th Cir. 2009)) (quotation marks omitted)). Accordingly, we need not address Respondents' standing arguments further.

## B. Laches, Issue Preclusion, Claim Preclusion, and Judicial Estoppel

¶40 For a myriad of reasons, Respondents have failed to demonstrate that Petitioners' claims are barred by laches, issue preclusion, claim preclusion, or judicial estoppel.

### 1. Laches

¶41 Laches is an affirmative defense that applies when the failure to promptly bring a claim prejudices the party defending against that claim. See Wis. Small Bus. United, Inc. v. Brennan, 2020 WI 69, ¶12, 393 Wis. 2d 308, 946 N.W.2d 101. A laches defense has three elements: "(1) a party unreasonably delays in bringing a claim; (2) a second party lacks knowledge

---

[19] The fact that the Governor is an intervenor-petitioner is immaterial. When a party intervenes, they become "a full participant in the proceedings, having all the same rights as all other parties to the action." Democratic Nat'l Comm. v. Bostelmann, 2020 WI 80, ¶9, 394 Wis. 2d 33, 949 N.W.2d 423.

28

that the first party would raise that claim; and (3) the second party is prejudiced by the delay." Id. (citing State ex rel. Wren v. Richardson, 2019 WI 110, ¶15, 389 Wis. 2d 516, 936 N.W.2d 587).

¶42 Respondents have failed to demonstrate two necessary elements of laches: unreasonable delay and prejudice. Taking unreasonable delay first, this case was filed less than a year-and-a-half after Johnson III adopted the state legislative district maps at issue in this case. Johnson III was decided on April 15, 2022, the last possible day for districts to be established prior to the 2022 fall elections. See Johnson III, 401 Wis. 2d 198, ¶138 (Rebecca Grassl Bradley, J., concurring) (explaining that "Wisconsin law authorizes candidates to begin circulating nomination papers for [the fall] primary on April 15."). Petitioners ran out of time and could not obtain relief prior to the 2022 elections. As a result, Petitioners decided to request relief in time for the 2024 elections——the soonest elections for which relief could be granted. Given the timing of legislative elections, filing this case in August of 2023 is not unreasonable delay. See also State ex rel. Lopez-Quintero v. Dittmann, 2019 WI 58, ¶28 387 Wis. 2d 50, 928 N.W.2d 480 ("'[T]he overriding responsibility of [the Supreme] Court is to the Constitution of the United States' and of this court, to the Wisconsin Constitution as well, 'no matter how late it may be that a violation of the Constitution is found to exist.'" (quoting Chessman v. Teets, 354 U.S. 156, 165 (1957))).

¶43 As for prejudice, Respondents have not demonstrated any relevant prejudice stemming from Petitioners' delay. The

29

only harms Respondents cite are litigation costs (both in Johnson and in this case) and vague assertions about disruption to the status quo. But litigation costs alone cannot constitute prejudice for laches purposes, and any disruption to the current state legislative districts is necessary to serve the public's interest in having districts that comply with each of the requirements of the Wisconsin Constitution. See, e.g., Goodman v. McDonnell Douglas Corp., 606 F.2d 800, 808 (8th Cir. 1979) (rejecting the argument that "the cost of litigation . . . by itself could constitute prejudice within the contemplation of a laches defense."). Accordingly, we hold that laches does not apply.[20]

## 2. Issue Preclusion

¶44 Issue preclusion is an equitable defense that "is designed to limit the relitigation of issues that have been actually litigated in a previous action." Dostal v. Strand, 2023 WI 6, ¶22, 405 Wis. 2d 572, 984 N.W.2d 382 (quoting Aldrich v. LIRC, 2012 WI 53, ¶88, 341 Wis. 2d 36, 814 N.W.2d 433). In an issue preclusion analysis, we determine: (1) whether issue preclusion can be applied as a matter of law, and (2) if so, whether applying issue preclusion would be "fundamentally fair." Id., ¶23. Issue preclusion can be applied as a matter of law

---

[20] We also note that this case is distinguishable from Trump v. Biden, 2020 WI 91, Wis. 2d 629, 951 N.W.2d 568, where we were asked to overturn the results of a legally conducted election, and we held that several of the claims failed under the doctrine of laches. Here we are asked to determine whether state legislative maps are constitutional, and because we determine they are not, we establish a process going forward so that constitutional maps are adopted in time for the next election.

30

when a factual or legal issue was "actually litigated and determined in the prior proceeding by a valid judgment in a previous action" and "the determination was essential to the judgment."  Id., ¶24; see also N. States Power Co. v. Bugher, 189 Wis. 2d 541, 550-51, 525 N.W.2d 723 (1995).

¶45  Issue preclusion does not bar Petitioners' contiguity claims because contiguity was not actually litigated in Johnson.[21]  In Johnson, all agreed that the state legislative districts enacted in 2011 were unconstitutional due to population shifts that occurred prior to the 2020 census. Johnson I, Wis. 2d 623, ¶2.  The sole claim in Johnson was malapportionment.  Of import, none of the parties argued that either the 2011 state legislative districts or any of the parties' proposed remedial district maps violated the constitution's contiguity requirements.  Indeed, in their briefing, the Johnson parties scarcely mentioned contiguity at all.  As discussed above, when the parties did mention contiguity, they primarily cited Prosser, 793 F. Supp. at 866, a non-binding federal district court decision, which said (contrary to this court's prior precedent), the Wisconsin

---

[21] Since we determine that issue preclusion cannot be applied because Petitioners' contiguity claim was not actually litigated, we do not reach the second question of whether the application of issue preclusion is "fundamentally fair."  See Dostal v. Strand, 2023 WI 6, ¶23, 405 Wis. 2d 572, 984 N.W.2d 382.

constitution does not require "literal contiguity."[22]   Under these circumstances, we hold that no party in <u>Johnson</u> "actually litigated" whether the current state legislative districts satisfy Article IV, Sections 4 and 5's contiguity requirements.[23] Therefore, issue preclusion does not apply in this case.

---

[22] Moreover, before we decided <u>Johnson I</u>, we ordered the parties to submit a joint stipulation of facts and law.  In that joint stipulation, the parties agreed that "[c]ontiguity for state assembly districts is satisfied when a district boundary follows municipal boundaries.  Municipal 'islands' are legally contiguous with the municipality to which the 'island' belongs." This further underscores the fact that no party in <u>Johnson</u> actually litigated the issue of contiguity.  <u>See also</u> <u>City of Sheboygan v. Nytsch</u>, 2006 WI App 191, ¶12, 296 Wis. 2d 73, 722 N.W.2d 626 (quoting <u>Restatement (Second) of Judgments</u> § 27 cmt. e (1982)) (explaining an issue is not actually litigated for issue-preclusion purposes when the issue is resolved by stipulation of the parties), <u>vacated in part on other grounds</u> 2008 WI 64, ¶5, 310 Wis. 2d 337, 750 N.W.2d 475.  Such an agreement also undermines Respondents' argument that judicial estoppel should bar the Petitioners' contiguity claim, as will be explained later.

[23] Even if contiguity were actually litigated, the Clarke Petitioners (and several of the Wright Petitioners) were not parties in <u>Johnson</u>, nor do they have a "sufficient identity of interest" with any of the <u>Johnson</u> parties to preclude them from litigating the issue here.  <u>See</u> <u>Paige K.B. ex rel. Peterson v. Steven G.B.</u>, 226 Wis. 2d 210, 223, 594 N.W.2d 370 (1999).  The United States Supreme Court has emphasized that applying "issue preclusion to nonparties" raises due process issues and "runs up against the 'deep-rooted historic tradition that everyone should have his [or her] own day in court.'"  <u>Taylor v. Sturgell</u>, 553 U.S. 880, 892-93 (2008) (quoting <u>Richards v. Jefferson County</u>, 517 U.S. 793, 798 (1996)).  Respondents' only argument regarding the Clarke Petitioners is that they have sufficient identity of interest with the parties in Johnson since some of the Clarke Petitioners' attorneys represented other parties in Johnson. But the identity of the lawyers hired by the Clarke Petitioners is irrelevant to whether the Clarke Petitioners' due process rights were protected.  <u>See</u> <u>Taylor</u>, 553 U.S. at 892-93.  Thus, our decisions in <u>Johnson</u> cannot preclude the Clarke Petitioners from raising the contiguity issue here.

### 3. Claim Preclusion

¶46 We also reject Respondents' argument that the Governor's and the Wright Petitioners' contiguity claims are barred by claim preclusion. Unlike issue preclusion, which applies only to issues that were actually litigated in a prior proceeding, claim preclusion prevents relitigation of "all matters 'which were litigated or which might have been litigated in the former proceedings.'" Kruckenberg v. Harvey, 2005 WI 43, ¶19, 279 Wis. 2d 520, 694 N.W.2d 879 (quoting Sopha v. Owens-Corning Fiberglas Corp., 230 Wis. 2d 212, 233, 601 N.W.2d 627 (1999)). Claim preclusion has three requirements: "(1) identity between the parties or their privies in the prior and present suits; (2) prior litigation resulted in a final judgment on the merits by a court with jurisdiction; and (3) identity of the causes of action in the two suits." Sopha, 230 Wis.2d at 233-34.

¶47 Claim preclusion does not apply to the Governor's or the Wright Petitioners' claims because this case and Johnson involve different causes of action. In determining whether causes of action are identical for claim-preclusion purposes, Wisconsin applies the "transactional approach," which views claims "in factual terms and coterminous with the transaction, rather than in terms of legal theories." Fed. Nat'l Mortg. Ass'n v. Thompson, 2018 WI 57, ¶¶33-34, 381 Wis. 2d 609, 912 N.W.2d 364. Put another way, we look to whether there is a shared set of operative facts at issue in the two proceedings, not whether the two cases involved similar or related legal theories. See id., ¶34.

33

¶48 Applying the transactional approach, we conclude that the causes of action in Johnson and here are fundamentally different. Johnson involved claims regarding the legislatively enacted 2011 state legislative maps which became unconstitutionally malapportioned after the 2020 census. Everyone agreed that the maps were unconstitutionally malapportioned. The operative facts in Johnson thus concerned only the 2011 maps and the 2020 census results. In this case, by contrast, the Governor and the Wright Petitioners argue that the Johnson remedy was unconstitutional on grounds not raised in Johnson. None of the apportionment facts underlying Johnson are relevant to that remedy question; only the maps the court adopted at the conclusion of that case are pertinent. Therefore, the judgment in Johnson does not preclude either the Governor's or Wright Petitioners' contiguity claims.[24]

### 4. Judicial Estoppel

¶49 Respondents also contend that the Governor and Wright Petitioners are judicially estopped from asserting contiguity

---

[24] Additionally, because claim preclusion requires "identity between the parties or their privies in the prior and present suits," it cannot apply to Wright Petitioners Atkinson, Kane, and Dudley, who were not parties in Johnson. Kruckenberg v. Harvey, 2005 WI 43, ¶21, 279 Wis. 2d 520, 694 N.W.2d 879. Although the Legislature argues that these individuals may be precluded based on their "identity of interest" with the other Wright Petitioners, the case they cite involves issue preclusion, not claim preclusion. See Paige K.B., 226 Wis. 2d at 226. In the claim-preclusion context, privity or an "absolute identity of interest," such as successorship-in-interest, is required. Pasko v. City of Milwaukee, 2002 WI 33, ¶18, 252 Wis. 2d 1, 643 N.W.2d 72. Because Respondents have not established such a relationship, claim preclusion cannot be applied to these individuals.

34

arguments inconsistent with those asserted in Johnson. See Mrozek v. Intra Fin. Corp., 2005 WI 73, ¶22, 281 Wis. 2d 448, 699 N.W.2d 54 ("Judicial estoppel precludes a party from asserting one position in a legal proceeding and then subsequently asserting an inconsistent position."). There are three requirements for applying judicial estoppel: "(1) the later position must be clearly inconsistent with the earlier position; (2) the facts at issue should be the same in both cases; and (3) the party to be estopped must have convinced the first court to adopt its position." Salveson v. Douglas County, 2001 WI 100, ¶38, 245 Wis. 2d 497, 630 N.W.2d 182. Even when all of these elements are met, the court applies judicial estoppel at its discretion. See State v. Harrison, 2020 WI 35, ¶21, 391 Wis. 2d 161, 942 N.W.2d 310. Because judicial estoppel is meant to prevent "cold manipulation and not unthinking or confused blunder, it has never been applied where plaintiff's assertions were based on fraud, inadvertence, or mistake." State v. Petty, 201 Wis. 2d 337, 347, 548 N.W.2d 817 (1996) (citing State v. Fleming, 181 Wis. 2d 546, 558, 510 N.W.2d 837 (Ct. App. 1993)).

¶50 We decline to exercise our discretion to apply judicial estoppel here. Even assuming the elements of judicial estoppel were met, there are compelling public policy reasons why this court should not exercise its discretion to apply estoppel in this case. As for the Governor, "[a]s a general rule the doctrine of estoppel will not be applied against the public, the United States government, or the state governments, where the application of that doctrine would encroach upon the

35

sovereignty of the government and interfere with the proper discharge of governmental duties." Park Bldg. Corp. v. Indus. Comm'n, 9 Wis. 2d 78, 88, 100 N.W.2d 571 (1960) (quoting P.H. Vartanian, Comment Note, Applicability of Doctrine of Estoppel Against Government and its Governmental Agencies, 1 A.L.R.2d 338, 340-41 (1948)). Additionally, given the parties' stipulation in Johnson, it is difficult to view any inconsistency in position as "cold manipulation" which judicial estoppel seeks to deter. Instead any inconsistency is more easily explained as "inadvertence" or "mistake," which does not merit judicial estoppel. Given our past case law on contiguity, as well as the primacy of our constitution, preventing parties from litigating this issue would not serve the goals of this doctrine. Therefore, we decline to apply judicial estoppel.

## C. Availability of Relief

¶51 Respondents contend that this case should be dismissed because it is an impermissible collateral attack on this court's judgment in Johnson III. According to the Respondents, the relief Petitioners seek is unavailable as a result.

¶52 This argument comes in two parts. First, Respondents argue that a declaratory judgment is unavailable because the Declaratory Judgments Act, Wis. Stat. § 806.04 (2021-22),[25] does not allow the court to declare its own prior judgment

---

[25] All subsequent references to the Wisconsin Statutes are to the 2021-22 version unless otherwise indicated.

36

unconstitutional.[26] Second, Respondents assert that in order to challenge this court's judgment in Johnson III, Petitioners must either: (a) demonstrate that the judgment was either issued without jurisdiction or procured by fraud; or (b) move to reopen or modify the judgment under Wis. Stat. § 806.07. Respondents urge that since Petitioners have done neither, the judgment in Johnson III may not be disturbed.

¶53 Respondents first argue that declaratory judgment is unavailable under the Declaratory Judgments Act. Respondents point to Wis. Stat. § 806.04(2), which provides that courts may issue declarations resolving "any question of construction or validity arising under" a "deed, will, written contract, or other writings constituting a contract" or "a statute, municipal ordinance, contract or franchise." Because prior judgments of this court are absent from this list, Respondents reason that we cannot declare the state legislative districts adopted in Johnson III unconstitutional. But Respondents ignore Wis. Stat. § 806.04(1) and (5), which together make clear that we "have power to declare rights, status and other legal relations" and that sub. (2) "does not limit or restrict the exercise of" that

---

[26] In a single sentence in both its opening brief and motion to dismiss, the Legislature additionally asserts that declaratory relief is unavailable because Petitioners have not complied with Wis. Stat. § 806.04(11), which requires that "all persons shall be made parties who have or claim any interest which would be affected by the declaration." This argument is underdeveloped. The Legislature cites no authority suggesting that dismissal is the proper remedy for failing to comply with § 806.04(11) and, in any event, the prevailing parties in Johnson are parties to this case. Accordingly, we decline to address this argument further. See Casanova v. Polsky, 2023 WI 19, ¶44, 406 Wis. 2d 247, 986 N.W.2d 780 ("[W]e need not address underdeveloped arguments.").

37

general power. See § 806.04(5) (emphasis added). For this reason, the non-exhaustive list in § 806.04(2) does not prohibit the court from issuing the declaratory relief Petitioners request.

¶54 Respondents' assertion that injunctive relief is not available in this case is similarly unavailing. The argument that injunctive relief is available only by "reopening" Johnson and modifying its injunction under Wis. Stat. § 806.07 flies in the face of decades of practice in redistricting cases. The court-ordered redistricting plan adopted by the federal court in Prosser, 793 F. Supp. 859, was enjoined by the federal court in Baumgart v. Wendelberger, Nos. 01-C-0121, 02-C-0366, 2002 WL 34127471, at *8 (E.D. Wis. May 30, 2002). And Johnson itself enjoined the use of a court-ordered plan adopted by the federal courts in Baldus v. Members of Wis. Gov't Accountability Bd., 862 F. Supp. 2d 860 (E.D. Wis. 2012). Yet neither the Johnson nor Baumgart courts "reopened" these prior cases or modified the injunctions issued in them. Instead, those courts simply issued their own injunctions, superseding the previously issued injunctions.

¶55 In summary, we determine that none of Respondents' defenses preclude us from deciding this case on the merits. We now turn to remedy.

IV. REMEDY

¶56 As we declared above, the current legislative maps contain districts that violate Article IV, Sections 4 and 5 of the Wisconsin Constitution. At least 50 of 99 assembly districts and at least 20 of 33 senate districts contain

38

territory completely disconnected from the rest of the district. Given this pervasiveness, a remedy modifying the boundaries of the non-contiguous districts will cause a ripple effect across other areas of the state as populations are shifted throughout. Consequently, it is necessary to enjoin the use of the legislative maps as a whole, rather than only the non-contiguous districts. We therefore enjoin the Wisconsin Elections Commission from using the current legislative maps in all future elections. Accordingly, remedial legislative district maps must be adopted. We recognize that next year's legislative elections are fast-approaching, and that remedial maps must be adopted in time for the fall primary in August 2024. With that in mind, the following section first describes the role of the court in the remedial process. Second, we articulate the principles the court will follow when adopting remedial maps. Third, we explain why the court is denying Petitioners' quo warranto claim. We conclude with the next steps in the remedial process.

A. This Court's Role in Redistricting

¶57 It is essential to emphasize that the legislature, not this court, has the primary authority and responsibility for drawing assembly and senate districts. Jensen v. Wisconsin Elections Board, 2002 WI 13, ¶6, 249 Wis. 2d 706 (citing Wis. Const. art. IV, § 3). Therefore, when an existing plan is declared unconstitutional, it is "appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure." Wise v. Lipscomb, 437 U.S. 535, 540 (1978). There may be exceptions to this general rule, but we

39

decline Petitioners' request to apply one here. Should the legislative process produce a map that remedies the contiguity issues discussed above, there would be no need for this court to adopt remedial maps.

¶58 We remain cognizant, however, of the possibility that the legislative process may not result in remedial maps. In such an instance, it is this court's role to adopt valid remedial maps. Zimmerman, 22 Wis. 2d at 571 ("[W]e do not abdicate our power to draft and execute a final plan of apportionment which conforms to the requirements of art. IV, Wis. Const., should the other arms of our state government be unable to resolve their differences and adopt a valid plan."). The United States Supreme Court has specifically recognized the ability of a state judiciary to remedy unconstitutional legislative districts by crafting new remedial maps. Growe v. Emison, 507 U.S. 25, 33 (1993) ("[S]tate courts have a significant role in redistricting. 'The power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan has not only been recognized by this Court but appropriate action by the States in such cases has been specifically encouraged.'" (quoting Scott v. Germano, 381 U.S. 407, 409 (1965))). And this court has exercised such authority in the past when faced with unconstitutional maps. See, e.g., Zimmerman, 22 Wis. 2d at 571; Johnson III, 401 Wis. 2d 198, ¶73. If the legislative process does not result in remedial legislative maps, then it will be the job of this court to adopt remedial maps.

40

¶59 It is important (though perhaps obvious) to note that although we enjoin the Wisconsin Elections Commission's use of the present maps because they contain districts that are non-contiguous, this court must consider other districting requirements, in addition to contiguity, when adopting remedial maps. Just as a court fashioning a remedy in an apportionment challenge must ensure that remedial maps comply with state and federal law, so too must this court in remedying a different constitutional violation.

¶60 Before laying out the principles this court will use in adopting remedial maps, we pause to address the "least change" approach articulated by this court in Johnson I. The parties differ over the extent to which this court should rely on least change in our evaluation of remedial maps. In Respondents' view, least change should not just serve as one principle among others, but as the predominant principle driving the court's process in adopting new maps. Petitioners, by contrast, offer various rationales for why least change should not be applied at all. For the reasons set forth below, this court will not consider least change when adopting remedial maps.

¶61 At first glance, the concept of least change might appear simple. At its most basic level, it is the idea that our remedial maps "'should reflect the least change'" from the prior maps "necessary . . . to comport with relevant legal requirements." See Johnson I, 399 Wis. 2d 623, ¶72 (quoting Wright, 306 F. Supp. 2d at 1237). But as this court learned during the Johnson litigation, what appeared simple in theory

41

was far more complicated in reality. The fundamental problem in Johnson was the inability of this court to agree upon the actual meaning of "least change" in practice. Some members of the court argued that least change simply meant "core retention—a measure of voters who remain in their prior districts." Johnson II, 400 Wis. 2d 626, ¶7 (explaining that core retention is "the best metric of least change"). Others, who had initially endorsed the least-change approach, insisted that core retention was "a previously unknown[] judicial test" and an "extra-legal criterion," and that least change actually meant minimizing population deviations or splits of local government units. See id., ¶¶67, 74-75 (Ziegler, C.J., dissenting); id., ¶211 (Rebecca Grassl Bradley, J., dissenting). Because no majority of the court agreed on what least change actually meant, the concept amounted to little more than an unclear assortment of possible redistricting metrics. The Johnson majority opinions never fully enumerated these metrics or explained their relative importance, let alone defined a least-change approach in a coherent way. See Johnson III, 401 Wis. 2d 198, ¶¶71-72.

¶62 Additionally, least change did not fit easily or consistently into the balance of other requirements and considerations essential to the mapmaking process. As will be discussed below, we must consider numerous constitutional requirements when adopting remedial maps. We cannot allow a judicially-created metric, not derived from the constitutional text, to supersede the constitution. Conceivably, least change (if actually agreed upon) could be relevant to traditional districting criteria, commonly considered in redistricting but

42

not constitutionally or statutorily mandated. See infra, ¶68. In that instance, least change would be secondary to the constitutional requirements and balanced with other factors, such as "preserving communities of interest." However, Johnson I did not adopt a cabined approach to least change. Instead, Johnson I declared that the overarching approach to adopting remedial maps was for them to "reflect the least change necessary" from the previous maps. See Johnson I, 399 Wis. 2d 623, ¶72.

¶63 As illustrated across the course of the Johnson litigation, "least change" is unworkable in practice. As such, we overrule any portions of Johnson I, Johnson II, and Johnson III that mandate a least change approach. See Johnson Controls, Inc. v. Emps. Ins. of Wausau, 2003 WI 108, ¶¶98-99, 264 Wis. 2d 60, 665 N.W.2d 257 (explaining that the unworkability of a decision is one justification for departing from precedent). It is impractical and unfeasible to apply a standard that (1) is based on fundamentals that never garnered consensus, and (2) is in tension with established districting requirements. Here we must first focus on established districting requirements set out in state and federal law, and only then on other districting criteria. With that in mind, we set out the following principles that will guide the court's process in adopting remedial maps.

B. Redistricting Principles

¶64 The following principles will guide our process in adopting remedial legislative maps. First, the remedial maps must comply with population equality requirements. State and

43

federal law require a state's population to be distributed equally amongst legislative districts with only minor deviations. Wis. Const. art. IV, § 3; Zimmerman, 22 Wis. 2d at 555-56; U.S. Const. amend XIV; Reynolds v. Sims, 377 U.S. 533, 577-79 (1964). When it comes to population equality, courts are held to a higher standard than state legislatures as we have a "judicial duty to 'achieve the goal of population equality with little more than de minimis variation.'" Connor v. Finch, 431 U.S. 407, 420 (1977) (quoting Chapman v. Meier, 420 U.S. 1, 26-27 (1975)); see Wis. State AFL-CIO v. Elections Bd., 543 F. Supp. 630, 637 (E.D. Wis. 1982) (allowing a deviation of 1.74% for assembly districts); Prosser, 793 F. Supp. at 866, 870 (formulating a map with a total deviation of 0.52% and noting that "[b]elow 1 percent, there are no legally or politically relevant degrees of perfection"); Baumgart, 2002 WL 34127471, at *7 (1.48% deviation for assembly districts); Baldus, 849 F. Supp. 2d at 851 (0.62% deviation for senate districts and 0.76% for assembly districts); Johnson II, 400 Wis. 2d 626, ¶36 (1.20% for senate districts and 1.88% for assembly districts); Johnson III, 401 Wis. 2d 198, ¶61 (0.57% deviation for senate districts and 0.76% deviation for assembly districts).

¶65 Second, districts must meet the basic requirements set out in Article IV of the Wisconsin Constitution. Assembly districts must be (a) bounded by county, precinct, town or ward lines; (b) composed of contiguous territory; and (c) in as compact form as practicable. Wis. Const. art. IV, § 4. Senate districts must be composed of "convenient contiguous territory." Wis. Const. art. IV, § 5  Additionally, districts must be

44

single-member districts that meet the numbering and nesting[27] requirements set out in Article IV, Sections 2, 4, and 5.

¶66 The contiguity requirement for assembly and senate districts was discussed at length above. To reiterate, for a district to be composed of contiguous territory, its territory must be touching such that one could travel from one point in the district to any other point in the district without crossing district lines. As to the "bounded" requirement, this court considers the extent to which assembly districts split counties, towns, and wards[28] (particularly towns and wards as the smaller political subdivisions), although we no longer interpret the requirement to entirely prohibit any splitting of the enumerated political subdivisions, as we once did. See Johnson I, 399 Wis. 2d 623, ¶35; AFL-CIO, 543 F. Supp. 630, 635-36 (E.D. Wis. 1982); Baumgart, 2002 WL 34127471, at *3. Compactness is generally defined as "closely united in territory," see AFL-CIO 543 F. Supp. at 634, although this court has never adopted a particular measure of compactness. See Johnson I, 399 Wis. 2d 23, ¶37.

¶67 Third, remedial maps must comply with all applicable federal law. In addition to the population equality requirement

---

[27] Assembly districts must be "nested" within a senate district——that is, "no assembly district shall be divided in the formation of a senate district." Wis. Const. art. IV, § 5. Additionally, Wis. Stat. § 4.001 requires that there be "33 senate districts, each composed of 3 assembly districts."

[28] The "bounded" requirement also refers to precincts, but "the precinct of the constitution disappeared when the uniform system of town and county government prescribed by the constitution (article 4, § 23) became fully operative." Cunningham, 81 Wis. at 520 (Lyon, C.J., concurring).

45

discussed above, maps must comply with the Equal Protection Clause and the Voting Rights Act of 1965. See Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. 398, 401 (2022) (explaining that race-conscious districting is permitted by the Equal Protection Clause only if strict scrutiny is satisfied).

¶68 Fourth, the court will consider other traditional districting criteria not specifically outlined in the Wisconsin or United States Constitution, but still commonly considered by courts tasked with formulating maps. These other traditional districting criteria include reducing municipal splits[29] and preserving communities of interest. See AFL-CIO, 543 F. Supp. at 636 (comparing the number of municipal splits across maps); Baldus, 849 F. Supp. 2d at 856-57 (considering whether district lines were disruptive to a community of interest). These criteria will not supersede constitutionally mandated criteria, such as equal population requirements, but may be considered when evaluating submitted maps. AFL-CIO, 543 F. Supp. at 636 (considering the number of municipal splits, but acknowledging that "the splitting of municipal boundaries is necessary to adhere to the one person, one vote, principle.").

¶69 Fifth, we will consider partisan impact when evaluating remedial maps. When granting the petition for original action that commenced this case, we declined to hear

---

[29] Municipalities include towns, cities, and villages. Although Article IV, Section 4's "bounded by" requirement refers to towns, it does not refer to city or village boundaries, or "municipal" boundaries in general. As such, consideration of municipal splits does not derive from our constitution. Nonetheless, this court has still considered the number of municipal splits when evaluating maps. See Johnson III, 401 Wis. 2d 198, ¶69.

46

the issue of whether extreme partisan gerrymandering violates the Wisconsin Constitution. As such, we do not decide whether a party may challenge an enacted map on those grounds.

¶70 However, that does not mean that we will ignore partisan impact in adopting remedial maps. Unlike the legislative and executive branches, which are political by nature, this court must remain politically neutral. We do not have free license to enact maps that privilege one political party over another. Our political neutrality must be maintained regardless of whether a case involves an extreme partisan gerrymandering challenge. As we have stated, "judges should not select a plan that seeks partisan advantage——that seeks to change the ground rules so that one party can do better than it would do under a plan drawn up by persons having no political agenda——even if they would not be entitled to invalidate an enacted plan that did so." Jensen, 249 Wis. 2d 706, ¶12 (quoting Prosser, 793 F. Supp. at 867). Other courts have held the same. See Baumgart, 2002 WL 34127471, at *3 (also quoting Prosser, 793 F. Supp at 867); Burling v. Chandler, 804 A.2d 471, 483 (N.H. 2002) (devising its own redistricting plan because "[e]ach plan ha[d] calculated partisan political consequences"); Peterson v. Borst, 786 N.E.2d 668, 673 (Ind. 2003) ("Whatever role politics may legitimately play in the decisions and maneuverings of the legislative and executive branches, if those branches cannot reach a political resolution and the dispute spills over into an Indiana court, the resolution must be judicial, not political."); Maestas v. Hall, 274 P.3d 66, 76 (N.M. 2012) ("A court's adoption of a plan that represents one

47

political party's idea of how district boundaries should be drawn does not conform to the principle of judicial independence and neutrality.").

¶71 It bears repeating that courts can, and should, hold themselves to a different standard than the legislature regarding the partisanship of remedial maps. As a politically neutral and independent institution, we will take care to avoid selecting remedial maps designed to advantage one political party over another. Importantly, however, it is not possible to remain neutral and independent by failing to consider partisan impact entirely. As the Supreme Court recognized in Gaffney v. Cummings, 412 U.S. 735, 753 (1973), "this politically mindless approach may produce, whether intended or not, the most grossly gerrymandered results." As such, partisan impact will necessarily be one of many factors we will consider in adopting remedial legislative maps, and like the traditional districting criteria discussed above, consideration of partisan impact will not supersede constitutionally mandated criteria such as equal apportionment or contiguity.

C. Petitioners' Quo Warranto Claim

¶72 Before we explain the process by which the court will adopt remedial maps, we turn to the Petitioners' request for us to order special elections in 2024 for senators in odd-numbered districts who would otherwise not be up for reelection until 2026. The Petitioners ground this request in a request for a writ quo warranto, arguing that state senators have "usurp[ed], intrud[ed] into or unlawfully [held] or exercise[d] any public office" and therefore should be "excluded from the office"

48

because they took office in unconstitutionally configured districts. Wis. Stat. §§ 784.04(1)a; 784.13.

¶73 As a preliminary matter, quo warranto actions may be brought by private individuals under Wis. Stat. § 784.04, but the action must be in the name of the state. Wis. Stat. § 784.04(2); Boerschinger v. Elkay Enterprises, Inc., 26 Wis. 2d 102, 110, 132 N.W.2d 258 (1965). The Petitioners have not brought a quo warranto action in the name of the state; therefore, Wis. Stat. § 784.04 does not provide us the authority to determine whether any party has a right to hold office, much less to order any special elections. Boerschinger, 26 Wis. 2d at 110 ("In quo warranto brought under the statute . . . the action must be in the name of the state.").

¶74 Although the quo warranto statute does not apply in this case, we acknowledge that a party's right to a public office can also be determined in a declaratory judgment action when the right "is only ancillary to the principal cause of action in the complaint." See id. at 114. However, as the Petitioners acknowledge, courts tasked with remedying unconstitutional maps in Wisconsin have not ordered special elections as a remedy. Nor are special elections the standard remedy elsewhere. See North Carolina v. Covington, 581 U.S. 486, 488 (2017) (noting that the Supreme Court has never addressed whether a special election may be a proper remedy for an unconstitutional racial gerrymander, and reversing a federal district court that ordered special elections without adequately weighing the interests at stake). We decline to implement such a drastic remedy here.

49

## D. Remedial Process

¶75 The process by which the court will adopt remedial maps will be set out in an order issued concurrently with this opinion. In broad strokes, all parties will be given the opportunity to submit remedial legislative district maps to the court, along with expert evidence and an explanation of how their maps comport with the principles laid out in this opinion. The court will appoint one or more consultants who will aid in evaluating the remedial maps. Parties will have the opportunity to respond to each other, and to the consultant's report.

¶76 We set out this process in order to afford all parties a chance to be heard, while bearing in mind the need for expediency given that next year's elections are fast-approaching. We begin our process now instead of waiting to see whether the legislative process results in new maps. In other words, both the legislative process (should there be one) and our process will proceed concurrently. This will allow the court to adopt remedial legislative maps in time for the upcoming elections if legislation creating remedial maps is not enacted.

## V. CONCLUSION

¶77 Article IV, Sections 4 and 5 of the Wisconsin Constitution mean what they say: state legislative districts must be composed of "contiguous territory." At least 50 of 99 assembly districts and at least 20 of 33 senate districts violate this mandate, rendering them unconstitutional. We therefore enjoin the Wisconsin Elections Commission from using the current maps in all future elections. As such, remedial

maps must be adopted prior to the 2024 elections. We are hopeful that the legislative process will produce new legislative district maps. However, should that fail to happen, this court is prepared to adopt remedial maps based on the criteria, process, and dates set forth in this opinion and the concurrent order.

*By the Court.*—Rights declared.

¶78 ANNETTE KINGSLAND ZIEGLER, C.J. *(dissenting).* This deal was sealed on election night. Four justices remap Wisconsin even though this constitutional responsibility is to occur every ten years, after a census, by the other two branches of government.[1] The public understands this.[2] Nonetheless, four justices impose their will on the entire Assembly and half of the Senate, all of whom are up for election in 2024. Almost every legislator in the state will need to respond, with lightning speed, to the newly minted maps, deciding if they can or want to run, and scrambling to find new candidates for new districts.[3] All of this remains unknown until the court of four, and its hired "consultants," reveal the answer. The parties' dilatory behavior in bringing this suit at this time should not

---

[1] The Legislature exercises its constitutional authority to redistrict per Wis. Const. art. IV, § 3 ("At its first session after each enumeration made by the authority of the United States, the legislature shall apportion and district anew the members of the senate and assembly, according to the number of inhabitants."). The Governor exercises his constitutional authority to either sign the legislature's maps into law or veto them per Wis. Const. art. V, § 10(2)a.

[2] See Marquette Law School Poll: Oct. 26-Nov.2, 2023, https://law.marquette.edu/poll/wp-content/uploads/2023/11/ MLSP76Toplines.html#E8:_SCOWIS_map_case (51% of registered voters surveyed want to "keep [current] maps in place").

[3] Neither citizens nor legislators will know if they will have the same representation or constituency, whether the legislator still lives in the district they once represented, whether legislators will be pitted against one another in newly combined districts, or whether the district even resembles its former self. We will not know implications of dual representation for citizens who may have new and old representation, as they may have just elected their senator under the existing maps.

1

be rewarded by the court's granting of such an extreme remedy, along such a constrained timeline. Big change is ahead. The new majority seems to assume that their job is to remedy "rigged" maps which cause an "inability to achieve a Democratic majority in the state legislature."[4] These departures from the judicial role are terribly dangerous to our constitutional, judicial framework. No longer is the judicial branch the least dangerous in Wisconsin. See The Federalist No. 78, (Alexander Hamilton) (Clinton Rossiter ed., 1961).

¶79 Redistricting was just decided by this court in the Johnson litigation.[5] This court was saddled with the responsibility to adopt maps because the legislative and executive branches were at an impasse, and absent court action,

---

[4] Pet. to Take Juris. of Original Action, at 8; Aug. 2, 2023, https://acefiling.wicourts.gov/document/eFiled/2023AP001399/687203

[5] The phrase "Johnson litigation" (and "Johnson") throughout this dissent refers to the redistricting original action, Johnson v. Wisconsin Elections Commission, No. 2021AP1450-OA, which this court decided during the 2021-22 term. See Johnson v. Wis. Elections Comm'n, 2021 WI 87, 399 Wis. 2d 623, 967 N.W.2d 469 ("Johnson I"); Johnson v. Wis. Elections Comm'n, 2022 WI 14, 400 Wis. 2d 626, 971 N.W.2d 402 ("Johnson II"), summarily rev'd sub nom. Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. 398, 142 S Ct. 1245 (2022) (per curiam); and Johnson v. Wis. Elections Comm'n, 2022 WI 19, 401 Wis. 2d 198, 972 N.W.2d 559 ("Johnson III").

2

there would be a constitutional crisis.[6] _Johnson v. Wisconsin Elections Comm'n_, 2021 WI 87, ¶68, 399 Wis. 2d 623, 967 N.W.2d 469 ("_Johnson I_"). As a result of _Johnson_, there are census-responsive maps in place. Nonetheless, the four robe-wearers grab power and fast-track this partisan call to remap Wisconsin. Giving preferential treatment to a case that should have been denied smacks of judicial activism on steroids. The court of four takes a wrecking ball to the law, making no room, nor having any need, for longstanding practices, procedures, traditions, the law, or even their co-equal fellow branches of government. Their activism damages the judiciary as a whole. Regrettably, I must dissent.

¶80 The court of four's outcome-based, end-justifies-the-means judicial activist approach conflates the balance of governmental power the people separated into three separate branches, to but one: the judiciary. Such power-hungry activism is dangerous to our constitutional framework and undermines the judiciary. When four members of this court "throw off constraints, revise the rules of decision, and set

---

[6] _Clarke_ presents none of the time constraints this court faced in _Johnson I_, where "judicial action [became] appropriate to prevent a constitutional crisis." _Johnson I_, 399 Wis. 2d 623, ¶68. Nonetheless, the court of four rushes ahead, making every attempt to evade judicial review, crafting the selection of only one, not both petitions for original action, and only two, not all, issues having no need for traditional practice and procedure. _See Clarke v. Wis. Elections Comm'n_, 2023 WI 70, 409 Wis. 2d 372, 995 N.W.2d 779 (granting petition for original action, but only with respect to issues 4 and 5); _Wright v. Wis. Elections Comm'n_, 2023 WI 71, 409 Wis. 2d 417, 995 N.W.2d 771 (denying petition for leave to commence original action).

3

the law on a new course," it is prudent for all of us to "question whether that power has been exercised judiciously" or whether it is instead an exercise in judicial activism.[7]  Today is the latest in a series of power grabs by this new rogue court of four, creating a pattern of illicit power aggregation which disrupts, if not destroys, stability in the law.

¶81  This pattern of conduct is entrenched even further to achieve particular political outcomes regardless of principles fundamental to the constitution and the law.  The court of four accepted and now begin to decide a procedurally and legally flawed original action in order to "take a fresh look at the gerrymandering question"[8] over maps one of them has repeatedly called "absolutely, positively rigged."[9]  What other settled areas of law might be next?  Without all four members of this court acting in lockstep, there could be no such overreach and disrespect for the law.  To be clear, it is sheer will, not the law, which drives the decision of Justices Ann Walsh Bradley, Rebecca Dallet, Jill Karofsky, and Janet Protasiewicz.  They may

---

[7] Diane S. Sykes, Reflections on the Wisconsin Supreme Court, 89 Marq. L. Rev. 723, 725-26 (2006).

[8] Jessie Opoien and Jack Kelly, Protasiewicz would "enjoy taking a fresh look" at Wisconsin voting Maps, The Cap Times (Mar. 2, 2023), https://captimes.com/news/government/protasiewicz-would-enjoy-taking-a-fresh-look-at-wisconsin-voting-maps/article_d07fbe12-79e6-5c78-a702-3de7b444b332.html

[9] Paul Fanlund, Supreme Court election is a chance to beat the far right at its long game, The Cap Times (Jan. 13, 2023), https://captimes.com/opinion/paul-fanlund/opinion-supreme-court-election-is-a-chance-to-beat-the-far-right-at-its-long/article_af9b5d76-a584-54ad-9226-7c9d7a806d12.html.

please a particular constituency, but it is at great cost to the judicial institution. Any one of the four could change the trajectory set, with the courage to change their seemingly preordained vote. But instead, each fall in line, and, like the past, allow pure will, instead of the law, to drive and guide the outcomes they invent.

¶82 Unfortunately, this latest unlawful power grab is not an outlier, but is further evidence of a bold, agenda-driven pattern of conduct. To set the stage, recall that these four members of the court came out swinging, when they secretly and unilaterally planned and dispensed with court practices, procedures, traditions, and norms.[10] Preordained and planned even before day one of the new justice's term on August 1, 2023, but unknown to the other members of the court, the four acted to aggregate power, meeting in secret as a "super-legislature." They met behind closed doors, at a rogue, unscheduled and illegitimate meeting, over the protestations of their colleagues, in violation of longstanding court rules and procedures. Even before day one of the newest justice's term, and before the court term started in September, they met, in secret, to carry out their plan, only known to them, to dispense with over 40 years of court-defined precedent. They even took the unprecedented action to strip the constitutional power of the chief justice, which had been understood for decades of chief justices and different court membership, instead usurping

---

[10] Press Release, Chief Justice Annette Kingsland Ziegler (Aug. 4, 2023), https://www.wispolitics.com/wp-content/uploads/2023/08/230804SCOWIS.pdf

that role through an administrative committee.  For nearly four decades and five chief justices, every member of the court had respected the power the people of Wisconsin constitutionally vested in the chief justice to administrate the court system.[11]

¶83 Not content with taking over the chief justice's power, they secretly pre-planned the firing of, for admittedly no reason, then-Director of State Courts Randy Koschnick before the official court term had begun and before our newest justice's term began on August 1.[12]  The court of four presumed to hire a sitting circuit court judge, Audrey Skwierawski, as the Interim Director of State Courts even though that decision violated the public trust doctrine as set forth in the

---

[11] It is noteworthy that for the first time in 26 years, since 1996, our court released to the public all of its opinions from the 2022-23 term by June 30, 2023.  In addition, the court did not have a backlog of cases entering into the 2023-24 term.

[12] This was another shameful incident in this raw judicial power pattern, as Justice Jill Karofsky made it known before Justice Protasiewicz was even sworn in that the yet-to-be-officially-formed court of four would fire Director Koschnick. Molly Beck and Daniel Bice, New Liberal Majority on State Supreme Court fires Director of State Court System, Milwaukee Journal Sentinel (Aug. 1, 2023), https://www.jsonline.com/story/news/politics/2023/08/01/new-majority-on-supreme-court-to-fire-director-of-state-court-system/70502650007/

constitution, statutes, and case law.[13] Judge Audrey Skwierawski was recently permanently hired as Director of State Courts despite these significant issues.[14] The court should have hired a fully qualified candidate who did not have any of these legal impediments.

¶84 But wait: there's more. Also in an underhanded and unprecedented manner, these four members of the court met in secret, before the court term began, conniving and then implementing a plan to eliminate the court of its longstanding

---

[13] See Wis. Const. art. VII, § 10(1) ("No . . . judge of any court of record shall hold any other office of public trust, except a judicial office, during the term for which elected."); Wis. Stat. § 757.02(2) ("The judge of any court of record in this state shall be ineligible to hold any office of public trust, except a judicial office, during the term for which he or she was elected or appointed."); see also Wagner v. Milwaukee Cnty. Election Comm'n, 2003 WI 103, ¶2, 263 Wis. 2d 709, 666 N.W.2d 816 (holding that the Wisconsin Constitution prohibits a judge or justice from holding a non-judicial position of public trust during the entire term for which he or she was originally elected).

[14] I requested to see and have input on the contents of the press release announcing the hiring of Judge Skwierawski as the Director before its release. However, the court of four issued it on December 14, 2023, without that occurring. Interestingly, they use the words "transparency and accountability" in the press release, but those words must mean something else to them. See "The Supreme Court of Wisconsin announces Judge Audrey K. Skwierawski as the next Director of State Courts" (Dec. 14, 2023), https://www.wicourts.gov/news/view.jsp?id=1604#:~:text=MADISON%2C%20Wis.,is%20effective%20December%2031%2C%202023.

In addition, aside from the public trust doctrine's constitutional and statutory roadblocks to her serving as Director, Judge Skwierawski is supposed to be on the bench, in Milwaukee, serving the citizens as a duly elected, full-time judicial officer. The court could have hired a fully qualified candidate who did not have any of these impediments.

practices and procedures in violation of the existing internal operating procedures and rules. The four conjured up new rules and procedures that are designed to ensure complete control over, and no speed bumps to, their preferences.

¶85 We all know that the Johnson litigation definitively decided all issues, including contiguity. Nonetheless, the four eagerly received this original action which the parties filed to coincide with Justice Protasiewicz's swearing in, ensuring that she would sit in judgment.[15] And because the four had met previously to attempt to grab all the power they could find, this case was set to be fast-tracked and skip to the front of the line.

¶86 The court of four conduct themselves in a manner that lacks accountability and transparency. They exhibit a striking pattern of disrespect for their colleagues, court practices and procedures, the law, and the constitution. They upend the

---

[15] The majority opinion fails to mention or even acknowledge this glaring fact, that this petition was intentionally brought the day after the court composition changed. Why is this? Steve Schuster, Lawsuit to challenge Wisconsin's legislative maps to be filed, Wis. Law Journal (Apr. 6, 2023), https://wislawjournal.com/2023/04/06/lawsuit-to-challenge-wisconsins-legislative-maps-to-be-filed/ ("A Madison-based law firm is planning to challenge the state's gerrymandered legislative maps . . . . The lawsuit will be filed after Justice-elect Janet Protasiewicz is sworn in on Aug. 1, Nicole Safar, executive director of Madison-based Law Forward, said . . . ."); see also Jack Kelly, Liberal law firm to argue gerrymandering violates Wisconsin Constitution, The Cap Times (Apr. 6, 2023), https://captimes.com/news/government/liberal-law-firm-to-arguegerrymandering-violates-wisconsin-constitution/article_2dfb9757-6d2d-58ba-9461-10b3d20d5f00.html.

8

constitutional call for a court of seven, not a court of four.[16] Historically, our court of seven has always met at agreed upon dates and times, with ample notice of the issues to be discussed, and the opportunity to hear respective, knowing positions, only then reaching determinations. Traditions, practices, procedures, and constitutional mandates were long respected over many decades. Regardless of the fact that these have been time-honored through many variations and machinations of court membership, and over a span of five chief justices, four rogue members of the court nonetheless brazenly seized all the power they can find. Power at any cost is the new normal for this crew. So, in true form to the new court of four, the law will not stand in the way of what they wish to accomplish.

¶87 This original action, filed to coincide with the change in court membership,[17] requests this court to remedy an "inability to achieve a Democratic majority in the state legislature" which in turn, "harms their ability to see laws and

---

[16] Wis. Const. art. VII, § 4(1) ("The supreme court shall have 7 members. . . .").

[17] Steve Schuster, Lawsuit to challenge Wisconsin's legislative maps to be filed, Wis. Law Journal (Apr. 6, 2023), https://wislawjournal.com/2023/04/06/lawsuit-to-challenge-wisconsins-legislative-maps-to-be-filed/ ("A Madison-based law firm is planning to challenge the state's gerrymandered legislative maps . . . . The lawsuit will be filed after Justice-elect Janet Protasiewicz is sworn in on Aug. 1, Nicole Safar, executive director of Madison-based Law Forward, said . . . ."); see also Jack Kelly, Liberal law firm to argue gerrymandering violates Wisconsin Constitution, The Cap Times (Apr. 6, 2023), https://captimes.com/news/government/liberal-law-firm-to-arguegerrymandering-violates-wisconsin-constitution/article_2dfb9757-6d2d-58ba-9461- 10b3d20d5f00.html.

policies they favor enacted."[18]  As much as the majority and others like to call this case "redistricting," it is not. Redistricting occurs once every ten years and that fact was just conclusively decided.[19]  They know contiguous maps, responsive to the census, were fully litigated in Johnson.  The people of Wisconsin, through their constitution, placed the partisan officeholders——the legislature, with oversight by the governor—— in charge of the partisan process of redistricting.[20]  The constitution does not call for maps to be redrawn every time a

---

[18] Pet. to Take Juris. of Original Action supra note 4, at 8.

[19] Wis. Const. art. IV, § 3 ("At its first session after each enumeration made by the authority of the United States, the legislature shall apportion and district anew the members of the senate and assembly, according to the number of inhabitants."); see also State ex rel. Smith v. Zimmerman, 266 Wis. 307, 312, 63 N.W.2d 52 (1954) ("It is now settled that without a constitutional change permitting it no more than one legislative apportionment may be made in the interval between two federal [censuses].")

[20] The legislature exercises its constitutional authority to redistrict per Wis. Const. art. IV, § 3, and the governor exercises his constitutional authority to either sign the legislature's maps into law or veto them per Wis. Const. art. V, § 10(2)a.

new justice is elected.[21] This court of four abandons its judicial responsibility and instead reimagines the law to achieve an outcome.

¶88 More specifically, just last year in Johnson, the court determined, and all agreed, that the maps complied with the contiguity requirement. "Contiguity for state assembly districts is satisfied when a district boundary follows the municipal boundaries. Municipal 'islands' are legally contiguous with the municipality to which the 'island' belongs." Joint Stip. of Facts & Law, at ¶20 (Nov. 4, 2021) https://acefiling.wicourts.gov/document/uploaded/2021AP001450/450892. Even the parties now arguing that the maps are not contiguous recognize that the contiguity requirement has been deemed satisfied not only in the maps the parties submitted in

---

[21] As the new court of four knows, this court just conclusively addressed redistricting in the Johnson litigation, observing that "[t]he Wisconsin Constitution's 'textually demonstrable constitutional commitment' to confer the duty of redistricting on the state legislature evidences the non-justiciability of partisan gerrymandering claims" under Article IV, Section 3. Johnson I, 399 Wis. 2d 623, ¶51 (quoting Baker v. Carr, 369 U.S. 186, 217 (1962)). It is only natural——in fact, it is inevitable——that a partisan body engaging in a partisan process will reach a result that is in some measure partisan. See Whitford v. Gill, 218 F. Supp. 3d 837, 939 (W.D. Wis. 2016) (Griesbach, J., dissenting) ("[P]artisan intent is not illegal, but is simply the consequence of assigning the task of redistricting to the political branches of government."), rev'd sub nom., Gill v. Whitford, 585 U.S. ___, 138 S. Ct. 1916 (2018).

11

the _Johnson_ litigation, but also in the maps the state has relied on for the last 60 to 70 years.[22]

¶89 Moreover, every person who wished to have a say or participate in the _Johnson_ litigation was welcome to do so and did. No one sought reconsideration of the _Johnson_ litigation while it was within their power to do so. _Johnson_ went all the way to the United States Supreme Court and back. Some of the litigants now were part of the _Johnson_ litigation, some chose not to engage. But the law imposes consequences for those who choose to sit out of litigation entirely, and for those who stipulate to or do not make an argument in litigation. Finality of litigation does not endow one with the authority to wait to see what happens in that litigation cycle, forego timely filing a motion for reconsideration, and then bring arguments years after the fact, with the only intervening change being the court's composition. Four members of this court choose to not let pesky parameters like finality or other foundational judicial principles, or even the constitution, stand in the way of the predetermined political outcome which they seem preordained to deliver. Given the new court of four's conduct so far, we can expect more such judicial mischief in the future. On their watch, Wisconsin is poised to become a litigation nightmare. What is next?

---

[22] Oral argument in _Clarke v. Wis. Elections Comm'n_, No. 2023AP1399-OA, held Nov. 21, 2023, available on WisconsinEye https://wiseye.org/2023/11/21/wisconsin-supreme-court-rebecca-clarke-v-wisconsin-elections-commission/ (Rebuttal arguments of Attorneys Sam Hirsch and Mark Gaber at 2:53:00 and 3:01, respectively.)

12

¶90 The processes normally required in litigation before the supreme court seem nothing more than window dressing in this case. Briefing and oral argument occurred, but the conclusion seemed preordained. It seems all that is left are the words to be written in a fast-tracked, handpicked case wherein the issues were chosen in an effort to evade any judicial review.[23] Apparently process is now unimportant to the court of four.[24]

¶91 It is the parties who are required to develop the facts and a full record for the court to review. We are not a factfinding court. One would think that the very justices who previously believed factfinding critically important in Johnson,[25] would pause and allow factfinding to occur by the parties instead of handpicking their hired "consultants." Factfinding in this case should occur utilizing traditional process, as there are no time constraints which would otherwise drive the need for a legal determination by original action.

---

[23] Clarke v. Wis. Elections Comm'n, 2023 WI 70, 409 Wis. 2d 372, 995 N.W.2d 779 (granting petition for original action, but only with respect to issues 4 and 5); Wright v. Wis. Elections Comm'n, 2023 WI 71, 409 Wis. 2d 417, 995 N.W.2d 771 (denying petition for leave to commence original action).

[24] Recently, members of the majority declined to hear "hot" issues because process was important. But now, members of the majority decide to hear "hot" issues because process is not important. Have they changed their position on process? See Doe 1 v. Madison Metro. Sch. Dist., 2022 WI 65, ¶39, 403 Wis. 2d 369, 976 N.W.2d 584 ("Litigation rules and processes matter to the rule of law just as much as rendering ultimate decisions based on the law."); see also Trump v. Biden, 2020 WI 91, 394 Wis. 2d 629, 951 N.W.2d 568.

[25] Johnson III, 401 Wis. 2d 198, ¶161 (Karofsky, J., dissenting).

Particularly for something as important as "redistricting," why be afraid of developing a full record and considering all legal principles subjecting the decision to further review? What of the fact that the citizens of Wisconsin and the litigants are forced, by judicial fiat, to have out-of-state, not stipulated to, unreviewable "consultants" who are seemingly unaccountable to anyone but the court of four. In fact, the idea of hiring "consultant map drawers" was sprung on counsel at oral arguments. The court of four has now hired these "consultants" who will presumably affect the outcome of the case. We have no idea what, if any, parameters exist to guide the "consultants," the litigants, or the court. Will they have free reign to do whatever they see fit, to achieve the requested remedy of making the state legislature more Democratic? Deference to these "consultants" and a hidden, unreviewable process smacks of outcome-based decision making. What gives them that authority? They rely on no statutes to give them that authority.[26] It is

---

[26] What are the parameters of the consultant's responsibilities, and under what constitutional or statutory authority do they operate? Are they and their decisions reviewable and subject to cross-examination, as court-appointed expert witnesses are? Wis. Stat. § 907.06. Can they make findings of fact and conclusions of law as referees can? Wis. Stat. § 805.06(5)(a). Additionally, the majority fails to answer, in either its order appointing these "consultants" or its majority opinion, how the parties are to consider and implement the majority's newly contrived "partisan impact" factor in their proposed maps. How will these "consultants" measure "partisan impact" in the parties' proposed maps, or their own submissions? It is hard to say, given the majority's painstaking efforts to avoid providing any such clarity or methodology. The majority cites no statutory authority these "consultants" are appointed under, because none exists: this court does not hire third-party "consultants" to assist it in decision making. Wis. Stat. § 751.09 ("In actions where the

14

not normal process for our court to hire experts to present new evidence and influence decision making with information outside the record. The "consultants," unchecked by the parties, will most certainly influence, if not decide, the outcome of this litigation. The parties do not stipulate to proceeding with this forced factfinding map drawing method. Is the procedure the court imposes on the litigants even constitutional as applied? Reaching for evidence outside of the record is highly unusual. The court should not require it here. Yet, the court of four imposes its will to rush to an outcome. This is completely unnecessary and violative of every notion of traditional factfinding, fairness and judicial decision making. The constitution certainly does not call for "consultants" to redistrict anew; instead the constitution vests that power in the legislative branch as approved by the executive branch. In fact, the constitution makes no room for unreviewable "consultants" to be arbiters of the state's maps. These consultants sure do seem like hand-picked cover for the court of four's decision to throw out "rigged maps" and remedy the parties' "inability to achieve a Democratic majority in the state legislature."[27]

_____

supreme court has taken original jurisdiction, the court may refer issues of fact or damages to a circuit court or referee for determination.") See also Justice Rebecca Grassl Bradley's dissent to order appointing Dr. Bernard Grofman and Dr. Jonathan Cervas as court "consultants," Clarke v. Wis. Elections Comm'n, No. 2023AP1399-OA, unpublished order at 5-7 (Wis. Dec. 22, 2023) (Rebecca Grassl Bradley, J., dissenting).

[27] Pet. to Take Juris. of Original Action supra note 4, at 8.

15

¶92 Turning to the text and content of this opinion, fully joined by all four, it clearly lacks in legal discourse and analysis that should accompany such an important determination. The opinion is a sea change in the law. While a picture may generally be worth a thousand words, pictures do not replace the need to properly conduct the required legal analysis. Yet, the new rogue court of four continues its pattern of being quick to engage in partisan political power grabs, while short on respecting legal traditions, practices, procedures, and the law. It is the law, not personal preference, that should be the judicial lodestar. In short, the opinion is sorely lacking in sound jurisprudential analysis.

¶93 More specifically, this original action is wrongly taken and decided for a host of heretofore understood and respected legally-binding tenets. However, the court of four glosses right over them.

- For starters, this original action fails as it amounts to nothing more than an untimely motion for reconsideration of this court's decision in Johnson, which is now time-barred. Wis. Stat. (Rule) § 809.64.

- The proponents of this case and the majority fail to meaningfully address stare decisis. This legal principle demands a "respect for prior decisions" such as this court's decisions throughout the Johnson litigation "[as] fundamental to the rule of law." Johnson Controls, Inc. v. Emps. Ins. of Wausau, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257.

16

- It overlooks that parties such as the Governor and the Citizen Mathematicians and Scientists[28] are judicially estopped from advancing different positions now from the positions they took in the Johnson litigation. State v. Petty, 201 Wis. 2d 337, 347, 548 N.W.2d 817 (1996) (citing Coconate v. Schwanz, 165 Wis. 2d 226, 231, 477 N.W.2d 74 (Ct. App. 1991)) ("[A] party [is precluded] from asserting [one] position in a legal proceeding and then subsequently asserting an inconsistent position.").

- Similarly, laches bars these claims, as "equity aids the vigilant, not those who sleep on their rights." Kenosha Cnty. v. Town of Paris, 148 Wis. 2d 175, 188, 434 N.W.2d 801 (Ct. App. 1988).

- The majority's analysis turns a blind eye to the fact that "[i]n order to have standing to sue, a party must have a personal stake in the outcome of the controversy," a personal stake not met by those who do not reside in these alleged municipal islands and especially for those who merely border these "municipal islands" of which more than a third contain zero residents. City of Madison v. Town of Fitchburg,

---

[28] Gary Krenz, Sarah J. Hamilton, Stephen Joseph Wright, Jean-Luc Thiffeault, and Somesh Jha were labeled the "Citizen Mathematicians and Scientists" in the Johnson litigation. They are each intervenors-petitioners in this case. For ease of reference, I refer to them collectively as "Citizen Mathematicians and Scientists" in this writing.

17

112 Wis. 2d 224, 228, 332 N.W.2d 782 (1983) (emphasis added).

- And, this case is barred by claim and issue preclusion principles, which "are designed to limit the relitigation of issues that have been actually litigated in a previous action," Aldrich v. LIRC, 2012 WI 53, ¶88, 341 Wis. 2d 36, 814 N.W.2d 433, and "extends to all claims that either were or could have been asserted in the previous litigation." Dostal v. Strand, 2023 WI 6, ¶24, 405 Wis. 2d 572, 984 N.W.2d 382.

¶94 But the court of four gives little consideration to that jurisprudence. Instead of letting the law get in the way, they proceed to the task at hand: to redraw the "rigged" maps and remedy an "inability to achieve a Democratic majority in the state legislature."[29]

¶95 To be clear, this case is nothing more than a now time-barred motion to reconsider Johnson.[30] An honest look at the plain law would require that this petition be dismissed. Instead, the creative legal machinations engaged in by the masters of this lawsuit, emboldened and encouraged by the new court of four, requires mind-boggling contortion of the law to

---

[29] Pet. to Take Juris. of Original Action supra note 4, at 8.

[30] Wis. Stat. (Rule) § 809.64 ("A party may seek reconsideration of the judgment or opinion of the supreme court by filing a motion under s. 809.14 for reconsideration within 20 days after the date of the decision of the supreme court.")

achieve a particular political outcome. Sadly, judicial activism is once again alive and well in Wisconsin, creating great instability.

¶96 In addition, the demanding legal analysis of stare decisis is completely absent from the majority opinion. Stare decisis, the requirement to follow legal precedent, means this case ends before it even starts, since the Johnson litigation already declared what the law is. This petition is a political quest masquerading as a legal query, filed to coincide with the seating of the parties' "judge of choice" and not coincidently, filed the day after she assumed the bench.[31] Judge shopping should be verboten to all. Allowing this sham experiment to continue under a nebulous guise of "fairness," should be beneath my colleagues.[32] In any court, but especially a court of last resort, sound legal principles, including stare decisis, should

---

[31] Steve Schuster, Lawsuit to Challenge Wisconsin's Legislative Maps to Be Filed, Wis. L.J. (Apr. 6, 2023), https://wislawjournal.com/2023/04/06/lawsuit-to-challenge-wisconsins-legislative-maps-to-be-filed/ ("A Madison-based law firm is planning to challenge the state's gerrymandered legislative maps . . . . The lawsuit will be filed after Justice-elect Janet Protasiewicz is sworn in on Aug. 1, Nicole Safar, executive director of Madison-based Law Forward, said . . . ."); see also Jack Kelly, Liberal Law Firm to Argue Gerrymandering Violates Wisconsin Constitution, The Cap Times (Apr. 6, 2023), https://captimes.com/news/government/liberal-law-firm-to-arguegerrymandering-violates-wisconsin-constitution/article_2dfb9757-6d2d-58ba-9461- 10b3d20d5f00.html.

[32] Wis. Stat. § 757.02(1) ("I . . . . do solemnly swear that I will support the constitution of the United States and the constitution of the state of Wisconsin; that I will administer justice without respect to persons and will faithfully and impartially discharge the duties of said office to the best of my ability. So help me God.") (emphasis added).

19

prevail over political and personal preferences, even when one might not like the results. Numerous jurisprudential tenets require that this matter now be deemed improvidently granted, as application of the law so clearly dictates that this original action never should have been granted in the first instance.[33] It fails legal scrutiny. Any remedy which this court might now conjure up to justify this preordained outcome is devoid of legal merit.

¶97 In no small measure, Justice Ann Walsh Bradley, the most senior member of the court, knows better than to join this judicial mischief. She used to respect the doctrine of stare decisis.[34] And, if the shoe were on the other foot——much like when some on the court previously tried to usurp the role of Chief Justice Abrahamson——she would be raucously objecting.[35] Then, she declared that this court should "call a spade a spade. . . . This is about personal ambition, politics and

---

[33] Clarke v. Wis. Elections Comm'n, 2023 WI 70, 409 Wis. 2d 372, 995 N.W.2d 779 (order granting petition for original action) (Ziegler, C.J., dissenting).

[34] See Mayo v. Wis. Injured Patients & Fams. Comp. Fund, 2018 WI 78, ¶110, 383 Wis. 2d 1, 914 N.W.2d 678 (Ann Walsh Bradley, J., dissenting) ("The decision to overturn a prior case must not be undertaken merely because the composition of the court has changed."); Johnson Controls, Inc. v. Empr's Ins. of Wausau, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257 ("Stare decisis is fundamental to the rule of law. Indeed, this court follows the doctrine of stare decisis scrupulously because of our abiding respect for the rule of law.")

[35] In 1998, Justice Ann Walsh Bradley was convinced that the creation of an administrative committee, which would take over the role of the chief justice, was unconstitutional. She threatened to sue her colleagues over the matter. What changed? Shirley Abrahamson is no longer the chief justice.

20

pettiness. . . . [The four] justices are interested in toppling the chief."[36] Her fondness for sound legal principles like stare decisis seems to vary depending on whether she is in the majority or the minority.

¶98 Justice Ann Walsh Bradley's former colleague, now federal Seventh Circuit Judge Diane Sykes, reminded us all of the inherent institutional and reputational dangers the court faced when it previously departed from its constitutional role. History teaches us that when the balance of power on the court shifted for the 2004-2005 court term, making then a new majority consisting of Ann Walsh Bradley and three others, the newly constituted court majority of four, issued a series of blatantly activist decisions. See Diane S. Sykes, Reflections on the Wisconsin Supreme Court, 89 Marq. L. Rev. 723 (2006). In one of many such activist-driven decisions from that new majority, she and three others appeared to yield to political pressure and abrogated its barely two year-old decision in Panzer v. Doyle, 2004 WI 52, 271 Wis. 2d 295, 680 N.W.2d 666, with Dairyland Greyhound Park, Inc. v. Doyle, 2006 WI 107, 295 Wis. 2d 1, 719 N.W.2d 408. Similarly, though the court a year prior had upheld noneconomic damage caps for medical malpractice in personal injury cases in Maurin v. Hall, 2004 WI 100, 274 Wis. 2d 28, 682 N.W.2d 866, the new court abruptly changed course and undermined the notion of judicial deference to legislative policy choices

---

[36] Statement of Justice Ann Walsh Bradley, printed in, Cary Segall, Justice Lay Bare Problems with Abrahamson; Four Upset They're Left Out of Decisions, Wis. State Journal (Feb. 14, 1999).

21

in Ferdon, justifying their unprecedented move by declaring that "a statute may be constitutionally valid when enacted but may become constitutionally invalid because of changes in the conditions to which the statute applies." Ferdon v. Wis. Patients Comp. Fund, 2005 WI 125, ¶114, 284 Wis. 2d 573, 701 N.W.2d 440. In yet another instance, the court expanded its supervisory role beyond the permissible bounds of saying what the law is, to endow themselves with a "broad authority to mandate desirable policy ostensibly related to judicial proceedings" in the vein of the executive branch, which then "extend[ed] far beyond the litigants in [that] specific case."[37] The activism that took over that new court majority's decision-making coursed through virtually every area of the law: civil, criminal, juvenile, and even rule-making. Throughout that time, members of the court lay aside their robes of judicial independence to affix their campaign pins of judicial activism and tipped the scales of the court's independent decision making power in their favor. Here we go again.

¶99 Will this redistricting original action be the first in a series of outcome-based legal decisions of the new court of four? In the 2004-2005 term, when Justice Ann Walsh Bradley was

---

[37] Rick Esenberg, A Court Unbound? The Recent Jurisprudence of the Wisconsin Supreme Court 10 (Federalist Society White Paper Mar. 2007), https://fedsoc-cms-public.s3.amazonaws.com/update/pdf/IhZ6cE38iAto3CRWgllVqKrbM9j2I kM6y7zNZE56.pdf.

22

then in the new majority,[38] the court "signaled a dramatic shift in [their] jurisprudence." Sykes, supra ¶98 at 725. With Ann Walsh Bradley in tow, that iteration of the court of four throughout the 2004-2005 term and beyond, "depart[ed] from some familiar and long-accepted principles that normally operate as constraints on the court's use of power" including such principles as "the presumption that statutes are constitutional, judicial deference to legislative policy choices, respect for precedent and authoritative sources of legal interpretation, and the prudential institutional caution that counsels against imposing broad-brush judicial solutions to difficult social problems." Sykes, supra ¶98 at 725-26. The 2004-2005 court majority proceeded to make a mockery of the law, throwing wide open the door of judicial activism in cases that ranged from criminal law to civil law to torts to juvenile to rulemaking and everything in between. As Judge Sykes recounts in her Hallows lecture[39] reflecting on the court's activist missteps from that term, that court of four:

- "rewrote the rational basis test for evaluating challenges to state statutes under the Wisconsin Constitution, striking down the statutory limit on noneconomic damages in medical malpractice cases;[40]

---

[38] The new majority consisted of Shirley Abrahamson, Ann Walsh Bradley, N. Patrick Crooks, and Louis Butler (who filled the vacancy created by Diane Sykes' appointment to the Seventh Circuit Court of Appeals).

[39] Case summary excerpts taken from Sykes, Reflections on the Wisconsin Supreme Court, supra note 7.

[40] Ferdon v. Wisconsin Patients Comp. Fund, 2005 WI 125, 284 Wis. 2d 573, 701 N.W.2d 440.

23

- eliminated the individual causation requirement for tort liability in lawsuits against manufacturers of lead-paint pigment, expanding "risk contribution" theory, a form of collective industry liability;[41]

- expanded the scope of the exclusionary rule under the state constitution to require suppression of physical evidence obtained as a result of law enforcement's failure to administer Miranda warnings;[42]

- declared a common police identification procedure inherently suggestive and the resulting identification evidence generally inadmissible in criminal prosecutions under the state constitution's due process clause;[43] and

- invoked its supervisory authority over the state court system to impose a new rule on law enforcement that all juvenile custodial interrogations be electronically recorded."[44]

Sykes, supra ¶98 at 725.

¶100 Most of our current court composition knows about the historic missteps of that court second-hand. But Justice Ann Walsh Bradley knows about it first-hand, as she was one of the then court of four. She has the benefit of having been a justice on the Wisconsin Supreme Court for about three decades,

---

[41] Thomas v. Mallett, 2005 WI 129, 285 Wis. 2d 236, 701 N.W.2d 523.

[42] State v. Knapp, 2005 WI 127, 285 N.W.2d 86, 700 N.W.2d 899.

[43] State v. Dubose, 2005 WI 126, 285 Wis. 2d 143, 699 N.W.2d 582.

[44] State v. Jerrell C.J., 2005 WI 105, 283 Wis. 2d 145, 699 N.W.2d 110.

24

since 1995, and a member of the bench for nearly 40 years.[45] Past error should counsel her to depart from lending her name to the activism embraced by the new majority.

¶101 Instead, all of Justice Ann Walsh Bradley's years of collective judicial experience takes the majority right back full-circle to the 2004-2005 court and its penchant for judicial activism. Any one of the current court of four could refrain from lending her vote to the exploration of such judicial mischief. The 2004-2005 court term became irrevocably branded, which should serve as a cautionary tale against justices engaging in judicial activism. Activism is destructive to the institution of the court, whether to achieve liberal or conservative outcomes. That is the point. The court's role is only to declare what the law is.[46] The Johnson litigation declared what the law is.

¶102 Does anyone wonder how Wisconsin became a nationwide hotbed for political spending, a record holder for the most

---

[45] For added perspective, at the time Ann Walsh Bradley first started serving as a judge, her three other colleagues were not even lawyers yet: Justice Rebecca Dallet was in high school, Justice Jill Karofsky was just starting out as a freshman at Duke University, and Justice Janet Protasiewicz was wrapping up her undergraduate studies at U.W.-Milwaukee.

[46] In doing so, as United States Supreme Court Chief Justice John Roberts reminds us, "[j]udges are [to be] like umpires. Umpires don't make the rules; they apply them. . . . ." Confirmation Hearing on the Nomination of John G. Roberts, Jr. to be Chief Justice of the United States: Hearing Before the S. Comm. on the Judiciary, 109th Cong. 56 (Sept. 12, 2005).

25

expensive judicial campaign in our nation's history?[47] Is this the new norm? The state Democratic Party chair has already said that "[t]he stakes [of Ann Walsh Bradley's upcoming campaign] will be enormous," and that "[a]s a party, [Democrats will] be just about ready to do anything to avoid returning to a 'rogue court.'"[48] Ann Walsh Bradley once upon a time found this problematic.[49] She claimed to "have [had] a vision for our court system where political parties [do not] hav[e] undue input" on judicial races, as she "strongly believe[d] political parties should stay out of judicial races."[50] Time will tell whether Ann Walsh Bradley will change her position on that as well.

¶103 The majority leaves behind fundamental judicial tenets giving no deference to longstanding legal parameters. These

---

[47] *Wisconsin Supreme Court Race Cost Record $51 Million*, Wisconsin Democracy Campaign (July 18, 2023), https://www.wisdc.org/news/press-releases/139-press-release-2023/7390-wisconsin-supreme-court-race-cost-record-51m.

[48] Steven Walters, *Schimel Could Be Potent Supreme Court Candidate*, Urban Milwaukee (Dec. 4, 2023), https://urbanmilwaukee.com/2023/12/04/the-state-of-politics-schimel-could-be-potent-supreme-court-candidate

[49] Quote of Ann Walsh Bradley, Wisconsin Public Television, Candidate Debate, Mar. 27, 2015, https://ballotpedia.org/Wisconsin_Supreme_Court_elections,_2015 ("This has never happened before in the state of Wisconsin to this degree that a political party would be inserted into a nonpartisan race. Political parties have agendas and we can't have courts with agendas because that undermines the public's trust in the people in our decisions.")

[50] Scott Bauer, *Supreme Court candidates spar over partisan influences*, Green Bay Press Gazette (Mar. 24, 2015), https://www.greenbaypressgazette.com/story/news/politics/2015/03/24/supreme-court-candidates-partisan-influences/70405490/

four members of the court exhibit a continuing and escalating pattern of power-starved behavior which amounts to an exercise of sheer raw power accumulation, at any cost. This original action is their latest power grab. Power-aggregation of this nature is often "clad, so to speak, in sheep's clothing," in hopes that others will not recognize the danger they are in until it is too late. Morrison v. Olson, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting). The court of four hopes that their innocuously clad actions can escape immediate detection as usually "the potential of the asserted principle to effect important change in the equilibrium of power [between the branches] is not immediately evident," so it "must be discerned by a careful and perceptive analysis. But this wolf comes as a wolf." Id. (Scalia, J., dissenting). The four justices' evident lack of regard for fundamental sound judicial principles requires me to vociferously dissent.

I

¶104 The legislative power, per the Wisconsin Constitution, is vested in the legislative branch, not the judicial branch. Wis. Const. art. IV, § 1 ("The legislative power shall be vested in a senate and assembly.") This grant of legislative power includes the power to carry out redistricting. Per the Wisconsin Constitution, it is the legislature, following the United States census, who shall "apportion and district anew the members of the senate and the assembly, according to the number of inhabitants." Wis. Const. art. IV, §3. It is the legislature, not the judiciary, who is responsible for creating

27

maps which comply with the limited expressed apportionment guidelines under both the federal and state constitutions. Under normally functioning political process, when the legislature "redistricts anew" every 10 years and passes compliant maps, those maps take effect upon being signed into law by the governor or when the governor's veto of those maps is overridden. Wis. Const. art. V, § 10(2)a.

¶105 As a political process delegated to the political branches, redistricting was not, and is not, the responsibility of the courts. The court's responsibility as an impartial, apolitical branch is to declare what the law is. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803) (emphasis added) ("It is emphatically the province and duty of the judicial department to say what the law is."); see also Wis. Justice Initiative v. Wis. Elections Comm'n, 2023 WI 38, ¶18, 407 Wis. 2d 87, 990 N.W.2d 122 ("The main power we have been given in the constitution is the judicial power, which by necessity means the power to interpret the law in appropriate cases."). Thus, the apolitical judicial branch normally has no role to play in this political process.

¶106 But sometimes that traditional political process fails. Where that political process fails, and there is a constitutional crisis such that there are no compliant maps in place with which to conduct state elections, then the judiciary does have an important—albeit limited—role to play in providing a judicial remedy to solve the issue.

28

¶107 Such was the unappealing situation we found ourselves in during the Johnson redistricting litigation cycle. The majority's discussion of our expansive Johnson redistricting history was underdeveloped. Their framing, all two scant paragraphs of it, combined with their assertion that this court's treatment of the issue of contiguity was somehow "cursory," majority op. at ¶22, conveniently lacks important context and pertinent details on how this court——which included three current members of the majority——definitively answered these and all redistricting questions multiple times, conclusively, throughout our Johnson litigation these last two years.

¶108 Following the 2020 census, Wisconsin voters filed a petition for an original action in this court claiming the then-existing congressional and state legislative maps were malapportioned under the state and federal constitutions, requiring that new maps be drawn. See State ex rel. Reynolds v. Zimmerman, 22 Wis. 2d 544, 556, 126 N.W.2d 551 (1964) (finding "the principle of per capita equality of representation" in Article IV, Section 3 of the Wisconsin Constitution). We granted the petition. Johnson v. Wis. Elections Comm'n, No. 2021AP1450-OA, unpublished order (Sept. 22, 2021). The majority seems to overlook the inconvenient fact that during the resulting litigation, this court liberally permitted parties to intervene, and then "grant[ed] intervention to all parties that sought it." Johnson v. Wis. Elections Comm'n, 2022 WI 14, ¶2, 400 Wis. 2d 626, 971 N.W.2d 402 ("Johnson II"), summarily rev'd

29

sub nom., Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. 398, 142 S. Ct. 1245 (2022) (per curiam). These intervenors are listed below.[51] This original action commenced an "odyssey" that brought this court face-to-face with every issue and claim the parties could garner in support of their proposed maps——including the contiguity issue raised here. See Johnson v. Wis. Elections Comm'n, 2022 WI 19, 401 Wis. 2d 198, 972 N.W.2d 559 (Karofsky, J., dissenting) ("Johnson III").

### A. Johnson I

¶109 It is worth remembering how this most recent redistricting challenge came to the court. In Johnson I, we laid the groundwork for how we would proceed with the unenviable task of settling the inter-branch dispute over redistricting maps. Johnson I, 399 Wis. 2d 623. That year, "[t]he political process failed . . . , necessitating our involvement." Id., ¶19. Called upon to remedy this failure so a map would be in place for the upcoming election, this court resolved to remedy the existing malapportionment by selecting a map submitted to us by the parties. Johnson II, 400 Wis. 2d 626, ¶6. This approach sought to preserve our role as an independent judiciary free of the political thicket. "[N]othing in the constitution vests this court with the power of the legislature to enact new

---

[51] Black Leaders Organizing for Communities, Voces de la Frontera, League of Women Voters of Wisconsin, Cindy Fallona, Lauren Stephenson, Rebecca Alwin, Congressman Glenn Grothman, Congressman Mike Gallagher, Congressman Bryan Steil, Congressman Tom Tiffany, Congressman Scott Fitzgerald, Lisa Hunter, Jacob Zabel, Jennifer Oh, John Persa, Geraldine Schertz, Kathleen Qualheim, Gary Krenz, Sarah J. Hamilton, Stephen Joseph Wright, Jean-Luc Thiffeault, and Somesh Jha.

maps. Our role in redistricting remains a purely judicial one, which limits us to declaring what the law is and affording the parties a remedy for its violation." Johnson I, 399 Wis. 2d 623, ¶3. We therefore proceeded, seeing our only permissible task as "ensuring the maps satisfy all . . . constitutional and statutory requirements"; not to adjudicate "[c]laims of political unfairness in the maps[, which] present political questions, not legal ones." Id., ¶4. After all, "[t]he job of the judiciary is to decide cases based on the law." Id., ¶82 (Hagedorn, J., concurring).

¶110 This court began by stating the obvious: the map selected must comply with state law, but also federal constitutional and statutory requirements. Id., ¶¶24-27. These include the Equal Protection Clause's one-person-one-vote requirement, the prohibition on multimember congressional districts under 2 U.S.C. § 2c, and the Voting Rights Act's ("VRA's") prohibition of "the denial or abridgment of the right to vote on account of race, color, or membership in a language minority group." Id.; see Reynolds v. Sims, 377 U.S. 533, 577 (1964) ("[T]he Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as practicable."); 52 U.S.C. § 10301 (establishing the framework for so-called vote dilution claims). Like the federal constitution, we recognized that Article IV, Section 3 of the Wisconsin Constitution also imposes a one-person-one-vote rule, requiring reapportionment "according to the number of

31

inhabitants" in new districts. Johnson I, 399 Wis. 2d 623, ¶¶28-38 (confirming that this interpretation comports with the constitution's original meaning).

¶111 The parties further asked this court to consider partisan fairness in selecting a new map. This ask ran headlong into our role as an apolitical branch whose sole purpose is to resolve legal disputes. See Wis. Justice Initiative, 407 Wis. 2d 38, ¶18 ("The main power we have been given in the constitution is the judicial power, which by necessity means the power to interpret the law in appropriate cases."). We do not resolve partisan power politics. We resolve parties' rights and responsibilities under the law by "focus[ing] on the language of the adopted text and historical evidence" of its meaning. State v. Halverson, 2021 WI 7, ¶22, 395 Wis. 2d 385, 953 N.W.2d 847. Some questions, while they may be intriguing, nonetheless lie outside the legal boundaries of what courts can answer.

¶112 The majority calls partisan gerrymandering an "important and unresolved legal question," majority op., ¶7, that they declined to take up in the petition for original action over concerns of the extensive factfinding required. See Clarke v. Wis. Elections Comm'n, 2023 WI 70, 409 Wis. 2d 372, 995 N.W.2d 779. But this court answered the question of partisan gerrymandering in Johnson I, when this court concluded the Wisconsin Constitution has nothing to say about partisan gerrymandering, and therefore it is not a justiciable legal claim this court can resolve. Johnson I, 399 Wis. 2d 623, ¶81 (lead op.). Partisan gerrymandering is "[t]he practice of

32

dividing a geographical area into electoral districts, often of highly irregular shape, to give one political party an unfair advantage by diluting the opposition's voting strength." Gerrymandering, Black's Law Dictionary (11th ed. 2019). This begs the question: "Diluted relative to what benchmark?" Gonzalez v. Aurora, 535 F.3d 594, 598 (7th Cir. 2008) (recognizing that VRA vote-dilution claims beg the same question). That benchmark is proportional partisan representation——"the political theory that a party should win a percentage of seats, on a statewide basis, that is roughly equal to the percentage of votes it receives." Johnson I, 399 Wis. 2d 623, ¶42. We recognized that nothing in the law authorizes this court to grant parties relief based on whether a particular map achieves proportional partisan representation. "The people have never consented to the Wisconsin judiciary deciding what constitutes a 'fair' partisan divide; seizing such power would encroach on the constitutional prerogatives of the political branches." Id., ¶45. Seats in a representative body must be earned via the political process. That is what makes the political branches accountable to the people. "It hardly follows from the principle that each person must have an equal say in the election of representatives that a person is entitled to have his political party achieve representation in some way commensurate to its share of statewide support." Id., ¶42 (quoting Rucho v. Common Cause, 588 U.S. ___, 139 S. Ct. 2484, 2501 (2019)).

33

¶113 Not only did this court conclude partisan fairness is a political question assigned to the legislature, but our searching review of the Wisconsin Constitution revealed nothing setting forth any cognizable right to partisan fairness in redistricting. We concluded, "[n]othing supports the notion that Article I, Section 1 of the Wisconsin Constitution was originally understood——or has ever been interpreted——to regulate partisanship in redistricting."[52] Johnson I, 399 Wis. 2d 623, ¶58. "Likewise, Article I, Sections 3[53] and 4[54] of the Wisconsin Constitution do not inform redistricting challenges" because "[n]othing about the shape of a district infringes anyone's ability to speak, publish, assemble, or petition." Id., ¶¶59-60. We further said finding a legal standard for partisan fairness in Article I, Section 22, which provides,

---

[52] "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed." Wis. Const. art. I, § 1.

[53] "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions or indictments for libel, the truth may be given in evidence, and if it shall appear to the jury that the matter charged as libelous be true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact." Wis. Const. art. I, § 3.

[54] "The right of the people peaceably to assemble, to consult for the common good, and to petition the government, or any department thereof, shall never be abridged." Wis. Const. art. I, § 4.

"[t]he blessings of a free government can only be maintained by a firm adherence to justice, moderation, temperance, frugality and virtue, and by frequent recurrence to fundamental principles," and to "fabricate a legal standard of partisan fairness . . . would represent anything but 'moderation' or 'temperance[.]'" Id., ¶62. Whatever operative effect Section 22 may have, it cannot constitute an open invitation to the judiciary to rewrite duly enacted law by imposing our subjective policy preferences in the name of "justice." Id. Instead,

> Article IV, Sections 3, 4, and 5 of the Wisconsin Constitution express a series of discrete requirements governing redistricting. These are the only Wisconsin constitutional limits we have ever recognized on the legislature's discretion to redistrict. The last time we implemented a judicial remedy for an unconstitutional redistricting plan, we acknowledged Article IV as the exclusive repository of state constitutional limits on redistricting:
>
>> [T]he Wisconsin constitution itself provides a standard of reapportionment "meet for judicial judgment." The legislature shall reapportion "according to the number of inhabitants" subject to some geographical and political unit limitations in execution of this standard. We need not descend into the "thicket" to fashion standards whole-cloth.

Id., ¶63 (quoting Zimmerman, 22 Wis. 2d at 562 (alterations in original).

¶114 Finally, rejecting the Johnson I dissent's assertion that the task of adopting remedial maps required this court to

35

rule as a partisan actor,[55] we adopted "[a] least-change approach[, which] is the most consistent, neutral, and appropriate use of our limited judicial power to remedy the constitutional violations in this case." Id., ¶85 (Hagedorn, J., concurring); see also id., ¶¶69-72. Least change, as a framework this court put forward throughout the Johnson litigation, properly reflects the limited role the judicial branch plays in redistricting, as it is the legislature, not the judiciary, which is granted constitutional authority to redistrict. Least change remains the law. Until today. Now, the majority, citing to nothing, declares instead that the standard this court implemented barely two years ago "is unworkable in practice," majority op., ¶63, simply so that they can overrule it, and move this institution down the darkened path of outcome-based judicial activism.

## B. Johnson II

¶115 Having made clear the ground rules in Johnson I, this court proceeded to select remedial maps in Johnson II, 400 Wis. 2d 626. To repeat, we decided the proper way for this court to select remedial maps is to "implement judicial remedies only to the extent necessary to remedy the violation of a justiciable and cognizable right found in the United States Constitution, the VRA, or Article IV, Sections 3, 4, or 5 of the

---

[55] The Johnson I dissent incorrectly interpreted the majority's "least change" approach as "inherently political" in its determination to limit the judiciary's role in a political process granted to the legislature and the governor. Johnson I, 399 Wis. 2d 623, ¶¶88-89 (Dallet, J., dissenting).

36

Wisconsin Constitution." Johnson I, 399 Wis. 2d 623, ¶81 (lead op.). As the judiciary, we cannot "consider the partisan makeup of districts because it does not implicate any justiciable or cognizable right," and we implement "the least-change approach to remedying any constitutional or statutory infirmities in the existing maps because the constitution precludes the judiciary from interfering with the lawful policy choices of the legislature." Id. Instead of requesting a hearing or a referee to engage in factfinding, the parties agreed to proceed on stipulated facts and expert reports. Parties, including the Governor, Senate Democrats, and Citizen Mathematicians and Scientists, stipulated at the outset of the Johnson litigation that Article IV's contiguity requirement is satisfied by municipal islands, and these islands are constitutionally permissible. Joint Stip. of Facts & Law, supra ¶88 ("Contiguity for state assembly districts is satisfied when a district boundary follows the municipal boundaries. Municipal 'islands' are legally contiguous with the municipality to which the 'island' belongs.").

¶116 Applying this framework to the maps, a majority of the court first concluded that the Governor's proposed congressional map "best follow[ed] our directive to make the least changes from existing congressional district boundaries while complying with all relevant state and federal laws." Johnson II, 400 Wis. 2d 626, ¶25. A majority of the court accordingly adopted Democratic Governor Evers' proposed congressional map as the remedial map. Id. Curiously, no challenge is made to that

37

Democratically drawn map which was chosen with the "least change" methodology. Could it be that it already achieves the desired partisan outcome?

¶117 In selecting the proper remedial maps for the state legislature, however, a majority of this court initially went astray. The Johnson II majority adopted Governor Evers' proposed legislative maps——"which carve[d] seven Assembly districts with populations that [were] curiously at almost exactly 51% African-American populations"——based on an erroneous application of Section 2 of the VRA and the Equal Protection Clause. Id., ¶72 (Ziegler, C.J., dissenting). A majority of this court misunderstood and misapplied VRA § 2 in creating a race-based remedy in the absence of a VRA violation or wrong: creating such an untethered race-based remedy out of thin air, as a majority of the court had done, is in fact, unconstitutional.

¶118 "A State may not use race as the predominant factor in drawing district lines unless it has a compelling reason." Cooper v. Harris, 581 U.S. 285, 291 (2017). If there is no compelling reason, using race as the predominant factor in drawing district lines creates an unjustified, unconstitutional racial gerrymander in violation of the Equal Protection Clause. Shaw v. Reno, 509 U.S. 630 (1993). The United States Supreme Court has specified three elements, known as the "Gingles preconditions," which must be established in order to demonstrate a VRA § 2 violation necessitating the creation of an additional minority opportunity district:

38

(1) the racial group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the group must be "politically cohesive"; and (3) the white majority must "vot[e] sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate."

League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 425 (2006) (quoting Thornburg v. Gingles, 478 U.S. 30, 50-51 (1986)). "If all three Gingles requirements are established, the statutory text directs us to consider the 'totality of circumstances' to determine whether members of a racial group have less opportunity than do other members of the electorate." Id. at 425-26. Section 2 further provides, though "[t]he extent to which members of a protected class have been elected . . . may be considered," "nothing in [VRA § 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 52 U.S.C. § 10301(b). Unless "each of the three Gingles prerequisites is established, 'there neither has been a wrong nor can be a remedy.'" Cooper, 581 U.S. at 306 (quoting Growe v. Emison, 507 U.S. 25, 41 (1993)). The Supreme Court therefore "insist[s] on a strong basis in evidence of the harm being remedied" under the VRA in order to survive strict scrutiny. Miller v. Johnson, 515 U.S. 900, 922 (1995); accord Shaw, 509 U.S. at 653 ("[R]acial bloc voting and minority-group political cohesion [the requirements of a VRA redistricting violation] never can be assumed, but specifically must be proved in each case in order to establish that a redistricting plan dilutes minority voting strength in violation of § 2."). "[T]he purpose

39

of strict scrutiny is to 'smoke out' illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool." City of Richmond v. J.A. Croson Co,, 488 U.S. 469, 493 (1989).

¶119 The Johnson II majority improperly concluded that Democratic Governor Evers' racial gerrymander was proper, even though it did not meet this minimum threshold necessary to survive strict scrutiny. Johnson II, 400 Wis. 2d 626, ¶¶47, 50 ("[W]e cannot say for certain on this record that seven majority-Black assembly districts are required by the VRA. But based on our assessment of the totality of the circumstances and given the discretion afforded states implementing the Act, we conclude the Governor's configuration is permissible."). The majority's violation of the law was sufficient cause for the United States Supreme Court, three weeks after the Johnson II majority selected the Governor's maps, to take the rarely invoked action of summarily reversing the majority's

40

interpretation of the VRA[56] and the Equal Protection Clause, while leaving the rest of the analysis intact. Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. 398, 142 S. Ct. 1245 (2022) (per curiam). The Supreme Court determined that the majority of this court had "failed to answer" "whether a race-neutral alternative that did not add a seventh majority-black district would deny black voters' equal political opportunity" in trying to determine whether there was a VRA violation which justified

---

[56] First, the United States Supreme Court determined that the Johnson II majority mistook the VRA § 2 as requiring the creation of as many majority opportunity districts as possible, thus "embracing just the sort of uncritical majority-minority district maximization that [the Supreme Court] ha[s] expressly rejected." Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. 398, 142 S. Ct. 1245, 1249 (2022) (per curiam) (citing Johnson v. De Grandy, 512 U.S. 997, 1017 (1994) ("Failure to maximize cannot be the measure of § 2.")). The Johnson II majority improperly took Cooper's "leeway" language as indicating that "it had to conclude only that the VRA might support race-based districting——not that the statute required it." Id.; Cooper v. Harris, 581 U.S. 285, 306 (2017). The Supreme Court explained that its "precedent instructs otherwise"; "that 'leeway' does not allow a State to adopt a racial gerrymander that the State does not, at the time of imposition 'judg[e] necessary under a proper interpretation of the VRA.'" Wis. Legislature, 142 S. Ct. at 1250 (quoting Cooper, 581 U.S. at 306).

Second, the Court observed that the Johnson II majority's "analysis of Gingles' preconditions fell short of [the Court's] standards" by "improperly rel[ying] on generalizations to reach the conclusion that the preconditions were satisfied" "[r]ather than carefully evaluating evidence at the district level." Id. In fact, the "sole piece of cited record evidence came from an intervenor who argued that the Governor's map violated the VRA." Id. at 1250 n.2.

Finally, the Supreme Court faulted the Johnson II majority for "improperly reduc[ing] Gingles' totality-of-circumstances analysis to a single factor" and "focus[ing] exclusively on proportionality," an approach the Court previously rejected as contrary to the VRA's language. Id. at 1250.

41

the Governor's racially gerrymandered maps. Wis. Legislature, 142 S. Ct. at 1250-51.

¶120 The Supreme Court's repudiation of this court was only the third time that this court has ever been summarily reversed. The first was about 73 years ago, and the second being about 55 years ago.[57] As a result of that rare repudiation, the court was required to revisit state legislative maps for the upcoming election, but congressional maps selected by the court majority were left intact.

### C. Johnson III

¶121 We finally brought this line of cases to an end——or so we thought!——and settled this issue in Johnson III on remand from the Supreme Court's summary reversal. Johnson III, 401 Wis. 2d 198. It is worth repeating that any map this court could select as a judicial remedy had to first comply with federal constitutional and statutory requirements, including the VRA, Equal Protection Clause, one-person-one-vote requirement, and the Wisconsin Constitution, and then had to align with the court's "least change approach" adopted in Johnson I. The maps also had to comply with state law. All parties were free to, and invited to, submit maps for our consideration which met these foundational compliance requirements. Among the five maps submitted to us, we ultimately selected the Legislature's maps because, of the maps submitted, these maps were "the only legally compliant maps" and were thus "the best, and only,

---

[57] Plankinton Packing Co. v. Wis. Emp. Rels. Bd., 338 U.S. 953 (1950); Greenwald v. Wisconsin, 390 U.S. 519 (1968).

42

viable proposal." Johnson III, 401 Wis. 2d 198, ¶22. These court-selected remedial maps——the Democratic Governor's congressional map and the Republican Legislature's state senate and assembly maps——were then used to conduct the state's 2022 elections and remained in place and in effect until this most recent collateral attack on the court's judgment in Johnson III. Notably, all parties agreed, and the court concluded, that the selected maps complied with contiguity.

II

¶122 The majority's decision to hear this present case and now overrule its own less than two-year-old decision following a change in court membership is a resurrection of the contempt voiced by the Johnson III dissenters following the United States Supreme Court's summary reversal. The Johnson III dissenters demonstrated an open and notorious disregard for their fundamental duty to neutrally apply the law. "Rather than admitting [their] error" the Johnson III dissenters "launche[d] an indignant attack on this nation's highest court," echoing arguments from Justice Sotomayor's dissent to the per curiam and chastising this court for applying binding Supreme Court precedents that the dissenters felt were "gaslighting." Johnson III, 401 Wis. 2d 198, ¶¶137-39 & n.33 (Rebecca Grassl Bradley, J., concurring); id., ¶175 (Karofsky, J., dissenting). Not content with the outcome of the Johnson litigation, the majority hopes that having a fourth "kick at the cat" provides them with the predetermined outcome they desire——both state and federal all Democratic maps.

43

¶123 This original action comes camouflaged as something other than what it is: a motion for reconsideration of this court's decision in Johnson III, a procedurally problematic avenue these parties cannot avail themselves of as it is now time-barred. Wis. Stat. § (Rule) 809.64 ("A party may seek reconsideration of the judgment or opinion of the supreme court by filing a motion under s. 809.14 for reconsideration within 20 days after the date of the decision of the supreme court."). All other legal bases and procedural mechanisms for this court to reexamine these maps once again are likewise barred. Yet here we are.

¶124 This case, along with all the factual disputes and legal issues it presents, or could even possibly present, have already been thoroughly litigated at the highest courts of this state and the nation. The parties are precluded from bringing new claims now over the same maps this court has already rendered judgment on. Accordingly, this court should not be reexamining the congressional or state legislative maps we imposed as a judicial remedy less than two years ago under the guise of seeking district "contiguity" or avoiding violation of the principle of "separation of powers."

¶125 The new court majority's handling of this case strikes a resounding blow at the root of our shared foundational judicial principles and duties. We should never have taken this case. This court should not have engaged in a vaunted show of judicial window dressing in pretending that the outcome of this case was not already predetermined from the outset. There is

44

only one way the majority can justify its extraordinary steps taken in flagrant defiance of our precedent, our law, and our nation's highest court: raw judicial power.

¶126 This case should be dismissed as improvidently granted. Be that as it may, this court cannot now address issues which these parties had a prior opportunity to raise, decided not to, and now seek to raise before Johnson III is even cold, and do so in an unnecessarily constrained timeframe that runs up against our 2024 election cycle. Justice, due process, and the court system's reliance on finality of judgments, demand this case's dismissal and its arguments precluded under stare decisis, standing, judicial estoppel, issue preclusion, claim preclusion, laches, and due process. Unlike the majority opinion, I will address them in detail.

### A. Stare Decisis

¶127 These four members of the court fundamentally undermine this essential legal principle in their quest to deliver a predetermined outcome to their constituents.

¶128 The doctrine of stare decisis inhibits the majority's exercise of raw judicial power in seeking to overrule a case so recently decided. We do not formulaically adhere to, or quickly dispense with, stare decisis simply as a means for avoiding hard questions. Stare decisis is not judicial window dressing. Rather, stare decisis is a foundational concept in our legal system because "respect for prior decisions is fundamental to the rule of law." Johnson Controls, Inc., 264 Wis. 2d 60, ¶94. Stare decisis "ensures the integrity of the judicial system by

45

developing consistency in legal principles and establishing that cases are grounded in the law, not in the will of individual members of the court." State v. Roberson, 2019 WI 102, ¶97, 389 Wis. 2d 190, 935 N.W.2d 813 (Dallet, J., dissenting). "This court follows the doctrine of stare decisis scrupulously because of our abiding respect for the rule of law." Hinrichs v. DOW Chemical Co., 2020 WI 2, 389 Wis. 2d 669, 937 N.W.2d 37 (quoting Johnson Controls, Inc., 264 Wis. 2d 60, ¶94). "That is why we require a special justification in order to overturn our precedent." State v. Johnson, 2023 WI 39, ¶19, 407 Wis. 2d 195, 990 N.W.2d 174. A mere change in the composition of the court does not rise to the high level of the "special justification" standard required to overturn a prior case. Mayo v. Wis. Injured Patients & Fams. Comp. Fund, 2018 WI 78, ¶110, 383 Wis. 2d 1, 914 N.W.2d 678 (Ann Walsh Bradley, J., dissenting) ("The decision to overturn a prior case must not be undertaken merely because the composition of the court has changed.").

¶129 Adherence to stare decisis is essential because there is no finality in judgment "[w]hen constitutional interpretation is open to revision in every case, [as] 'deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results.'" Citizens Util. Bd. v. Klauser, 194 Wis. 2d 484, 513, 534 N.W.2d 608 (1995) (Abrahamson, C.J., dissenting) (quoting Appeal of Concerned Corporators of Portsmouth Sav. Bank, 525 A.2d 671, 701 (N.H. 1987) (Souter, J., dissenting)). Departing from a prior decision——decided so recently and affecting the same set of facts——erodes "public

46

faith in the judiciary as a source of impersonal and reasoned judgments." Moragne v. States Marine Lines, Inc., 398 U.S. 375, 403 (1970).

¶130 From the start of this Johnson litigation cycle, the relevant parties, including the Governor, Senate Democrats, and the Citizen Mathematicians and Scientists, agreed and this court determined that "municipal islands" are "legally contiguous even if the area around the island is part of a different district." Johnson I, 399 Wis. 2d 623, ¶36; see also Joint Stip. of Facts & Law supra ¶88 ("Contiguity for state assembly districts is satisfied when a district boundary follows the municipal boundaries. Municipal 'islands' are legally contiguous with the municipality to which the 'island' belongs."). And they have been, for years.[58] That holding was reiterated by this court again in Johnson II and yet again in Johnson III when we adopted proposed remedial maps——including remedial maps proposed by parties who now argue for a different interpretation of contiguity——which contained municipal islands. These holdings on contiguity, which three members of the current majority did not take fault with in their dissents, were in line with the court's understanding of contiguity, as reflected in the maps that existed since the 1950s or 1960s, according to counsel, previous 50 years of law on the topic, the parties own agreement

---

[58] Oral argument in Clarke v. Wis. Elections Comm'n, No. 2023AP1399-OA, held Nov. 21, 2023, available on WisconsinEye https://wiseye.org/2023/11/21/wisconsin-supreme-court-rebecca-clarke-v-wisconsin-elections-commission/ (Rebuttal arguments of Attorneys Sam Hirsch and Mark Gaber at 2:53:00 and 3:01, respectively.)

47

that the maps are contiguous, and the court's reliance on Prosser v. Elections Bd., 793 F. Supp. 859, 866 (W.D. Wis. 1992) (per curiam) ("Since the distance between town and island is slight, we do not think the failure of the legislative plan to achieve literal contiguity a serious demerit; and we note that it has been the practice of the Wisconsin legislature to treat islands as contiguous with the cities or villages to which they belong.").

¶131 The court's determination that municipal islands were constitutionally permissible in Johnson I was essential to the court's provision of a remedy, so the allegation that these repeated holdings and determinations were dicta or simply "cursory" comments is farcical. Majority. op., ¶¶22-23. Using a dicta allegation as an "end run around stare decisis" in this present case "undermines our common law tradition of fidelity to precedent." Est. of Genrich v. OHIC Ins. Co., 2009 WI 67, ¶85, 318 Wis. 2d 553, 769 N.W.2d 481 (Ann Walsh Bradley, J., concurring in part and dissenting in part); State v. Picotte, 2003 WI 42, ¶61, 261 Wis. 2d 249, 661 N.W.2d 381.

¶132 The majority dismisses 50 years of precedent, a federal court determination in Prosser, and three successive binding determinations by this court in Johnson I, II, and III in order to do away with a necessary stare decisis analysis which does not trend in their favor. As an analysis shows, this contiguity precedent did not demand a literal physically touching definition. Johnson I, 399 Wis. 2d 623, ¶36; see also Prosser, 793 F. Supp. at 866 ("Since the distance between town

48

and island is slight, we do not think the failure of the legislative plan to achieve literal contiguity a serious demerit; and we note that it has been the practice of the Wisconsin legislature to treat islands as contiguous with the cities or villages to which they belong."). The court then, as the court should now be, was "not persuaded . . . that the Wisconsin Constitution requires literal contiguity." Id. Stare decisis, as a principle, does not require the court to "retain constitutional interpretations that were objectively wrong when made." Koschkee v. Taylor, 2019 WI 76, ¶8 n.5, 387 Wis. 2d 552, 929 N.W.2d 600. But "objectively wrong" is a high bar to overcome, one which is not overcome here, as there is simply no reason for overruling Johnson I and Johnson III that would not also counsel overruling any other case.

¶133 The law demands a stare decisis analysis. That is notably absent from the majority opinion. The court's new composition does not dispense with the need for such analysis, and the opinion they put forward does not satisfy the "special justification" bar required to overturn a precedential case. See Mayo, 383 Wis. 2d 1, ¶110 (Ann Walsh Bradley, J., dissenting) ("The decision to overturn a prior case must not be undertaken merely because the composition of the court has changed.")

¶134 Given that the court's membership is all that has changed, it lends credence to the fact that overruling a case so recently decided——in violation of foundational legal principles——is little more than the majority's impermissible

49

exercise of raw judicial power for activist means. Fidelity to stare decisis and the rule of law impedes these activist means.

### B. Standing

¶135 The majority donates barely a paragraph to dispel of a rather glaring issue——whether the parties even have the requisite standing necessary to bring their claims. The majority's retreat to a position of "we need not address" the arguments that we find potentially problematic is unsurprising, yet disappointing. The issue of standing is not so easily dispensed with as the majority opinion suggests. Majority op., ¶¶38-39. Standing may actually prove to be rather problematic to them.

¶136 Standing in Wisconsin is "not a matter of jurisdiction, but of sound judicial policy." Friends of Black River Forest v. Kohler Co., 2022 WI 52, ¶17, 402 Wis. 2d 587, 977 N.W.2d 342; Wis. Bankers Ass'n Inc. v. Mut. Sav. & Loan Ass'n of Wis., 96 Wis. 2d 438, 444 n.1, 291 N.W.2d 869 (1980); State ex rel. First Nat'l Bank of Wisconsin Rapids v. M & I Peoples Bank of Coloma, 95 Wis. 2d 303, 308 n.5, 290 N.W.2d 321 (1980). "[T]he Wisconsin standing analysis is conceptually similar to the federal analysis." Waste Mgmt. of Wis., Inc. v. DNR, 144 Wis. 2d 499, 509, 424 N.W.2d 685 (1988). With this approach, the court asks, "Does the challenged action cause the petitioner injury in fact?" And "is the interest allegedly injured arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question?" Friends of Black River Forest, 402 Wis. 2d 587, ¶18

50

(citing Ass'n of Data Processing Serv. v. Camp, 397 U.S. 150, 153 (1970)). "'Standing' is a concept that restricts access to judicial remedy to those who have suffered some injury because of something that someone else has either done or not done." Krier v. Vilione, 2009 WI 45, ¶20, 317 Wis. 2d 288, 766 N.W.2d 517 (quoting Three T's Trucking v. Kost, 2007 WI App 158, ¶16, 303 Wis. 2d 681, 736 N.W.2d 239). "In order to have standing to sue, a party must have a personal stake in the outcome of the controversy." Madison v. Fitchburg, 112 Wis. 2d at 228 (emphasis added); see also Mast v. Olsen, 89 Wis. 2d 12, 16, 278 N.W.2d 205 (1979); Tri-State Home Improvement Co. Inc. v. LIRC, 111 Wis. 2d 103, 113, 330 N.W.2d 186 (1983); Moedern v. McGinnis, 70 Wis. 2d 1056, 1064, 236 N.W.2d 240 (1975). Being harmed "without more, does not automatically confer standing." Krier, 317 Wis. 2d 288, ¶20.

¶137 Standing analysis can vary "depending on the nature of the claim asserted." Chenequa Land Conservancy, Inc. v. Village of Hartland, 2004 WI App 144, ¶13, 275 Wis. 2d 533, 685 N.W.2d 573. In dealing with redistricting claims however, the United States Supreme Court has determined that residents cannot allege harms "result[ing] from the boundaries" of other residents' districts, but the harms allegedly suffered must emanate from the boundaries of the particular resident's "particular district": they must be "district specific" harms suffered. Gill v. Whitford, 585 U.S. ___, 138 S. Ct. 1916, 1930 (2018). If a harm is found, "the remedy that is proper and sufficient lies in the revision of the boundaries of the

51

individual's own district"; a remedy "does not necessarily require restructuring all of the State's legislative districts." Id. at 1930-31.

¶138 Petitioners' assertion that they have standing because the allegedly non-contiguous districts render a "less responsive and less representative" legislature, and they are thus harmed by legislators who have "difficulty advancing constituent interests" in fragmented districts, cannot advance a cognizable injury which this court can remedy. Many of the petitioners do not live in the municipal islands in question, let alone the supposedly non-contiguous districts surrounding them.[59] For these parties who do not live in these scrutinized districts, the Supreme Court outlined in Sinkfield v. Kelley that they also cannot allege a harm or present a cognizable injury on the basis of residing in districts which merely border allegedly unconstitutional districts. Sinkfield v. Kelley, 531 U.S. 28, 30-31 (2000) (per curiam). The majority seems to have misplaced these pertinent facts somewhere along the way, and has not had the good fortune to stumble back over them. Parties cannot assert a generalized grievance when they themselves do not live in, nor are directly harmed by, the presence of municipal islands which have been in place for over 50 years. In many of

---

[59] Only some of the petitioners allege to live in a district with a municipal island, and none articulate a concrete injury: two petitioners live in districts with islands of zero residents, three petitioners live in districts with islands of one to four residents, and the remaining petitioners and Citizen Mathematicians and Scientists don't claim to live in districts with municipal islands.

52

the districts of which they complain, the "islands" can be absorbed into the existing district so not to require much judicial map drawing at all.

¶139 The majority also fails to advance a compelling answer for how the petitioners' alleged initial harm, that they are unable "to achieve a Democratic majority in the state legislature," is the fault of municipal islands which overwhelmingly contain zero to 20 residents.[60] Nor is it clear why this court, in order to remedy that far-fetched alleged harm, must toss statewide maps it adopted as a judicial remedy just last year. The majority's lack of methodology leaves the public and members of the legislature in limbo. Majority op., ¶3. The majority plays the game without letting anyone else know the rules.

¶140 Connections between the alleged harm and the extreme remedy initially sought are strained to the point of breaking. Perhaps the majority recognizes this, as they duck any and all discussion or analysis of Gill v. Whitford. Gill helpfully limits alleged harms to what parties can show is "district specific," not "result[ing] from the boundaries" of other people's districts, and would, if harms were nonetheless found, limit remedy to "revision of the boundaries of the individual's own district" instead of "requir[ing] restructuring all of the State's legislative districts." Gill, 138 S. Ct. at 1930-31.

---

[60] In briefing and oral argument, the parties identified 211 "municipal islands," of which approximately 33% have zero residents, more than 80% have less than 20 residents, and a mere 5% of these contain 100 or more residents.

53

Parties alleging generalized grievances lack standing to demand the extreme statewide remedy they seek.

¶141 While this court has previously recognized that the Governor has standing to bring a redistricting challenge on behalf of the state's citizens,[61] a point the majority clings to, the Governor had his day in court and agreed the maps were contiguous. The majority fails to wrestle with the very real reality of what happens when the Governor——who they argue has the clearest claim to standing——was a party in the previous judicial proceedings and is precluded for a host of reasons from bringing these claims now. Evidently then, the rest of this hastily erected house of cards starts to crumble, and the majority would then be forced to address the numerous standing issues of the remainder of the parties. But it fails to even begin this analysis.

¶142 Stated differently, if the one party who may have the clearest claim to standing, the Governor, is nonetheless estopped and precluded from relitigating claims this court has already addressed, then the others are left without a leg to stand on. Nothing plus nothing is still nothing, unless your judges do not require that the parties have standing in order to wholesale redraw only the maps that do not lean Democratic.

C. Judicial Estoppel

---

[61] "[The] state, acting . . . through the Governor . . . , may challenge the constitutionality of a state reapportionment plan as a violation of state constitutional rights of the citizens." State ex rel. Reynolds v. Zimmerman, 22 Wis. 2d 544, 552, 126 N.W.2d 551 (1964).

54

¶143 Judicial estoppel is a preclusion principle "intended to protect the judiciary as an institution from the perversion of judicial machinery[.]" Petty, 201 Wis. 2d at 346 (quoting Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 599 (6th Cir. 1982)). Simply, judicial estoppel "protect[s] [courts] against a litigant playing 'fast and loose with the courts' by asserting inconsistent positions" at different stages of the litigation cycle. State v. Fleming, 181 Wis. 2d 546, 557, 510 N.W.2d 837 (1993) (quoting Yanez v. United States, 989 F.2d 323, 326 (9th Cir. 1993)). Thus, a party is judicially estopped from "asserting a position in a legal proceeding and then subsequently asserting an inconsistent position." Petty, 201 Wis. 2d at 347; see also State v. Mendez, 157 Wis. 2d 289, 294, 459 N.W.2d 578, 580 (Ct. App. 1990); Coconate, 165 Wis. 2d at 231. "[T]he doctrine is not reducible to a pat formula." Petty, 201 Wis. 2d at 348. But the analysis conducted "recognize[s] certain boundaries," Levinson v. United States, 969 F.2d 260, 264-65 (7th Cir. 1992), including whether (1) the party's later position is clearly inconsistent with the earlier position; (2) whether the facts at issue are the same in both cases; and (3) whether the party to be estopped convinced the first court to adopt its position. State v. Harrison, 2020 WI 35, ¶27, 391 Wis. 2d 161, 942 N.W.2d 310.

¶144 In the Johnson litigation, the parties' "earlier position" was that Article IV's contiguity requirement was satisfied without requiring literal physical contiguity. Both Governor Evers and the Citizen Mathematicians and Scientists

55

stipulated that municipal islands are legally contiguous with the municipality to which the "island" belongs, so literal contiguity was essentially not required.  Joint Stip. of Facts & Law supra ¶88; see Prosser, 793 F. Supp. at 866 (three-judge panel). And that made sense.  So the court concluded municipal islands were thus allowable within the understanding and precedent of contiguity.  According to counsel at oral argument, Wisconsin has utilized faulty, "non-contiguous" maps since the 1950s or 1960s.[62]  The Governor had no quarrel with this, as just last year he proposed remedial maps containing the municipal islands which he now decries.  He now argues in direct opposition to the argument then made.  He now avers that our constitution requires literal physical contiguity and municipal islands are not allowable.  Why the change of heart?  A change in the court.  The facts at issue between the earlier round of Johnson litigation and this current round of litigation are the same, satisfying the second element.

¶145 The Governor and the Citizen Mathematicians and Scientists persuaded the court to adopt a position on contiguity, as evidenced in their initial briefing in Johnson. These parties also stipulated to contiguity.  Joint Stip. of Facts & Law supra ¶88 ("Contiguity for state assembly districts is satisfied when a district boundary follows the municipal

---

[62] Oral argument in Clarke v. Wis. Elections Comm'n, No. 2023AP1399-OA, held Nov. 21, 2023, available on WisconsinEye https://wiseye.org/2023/11/21/wisconsin-supreme-court-rebecca-clarke-v-wisconsin-elections-commission/ (Rebuttal arguments of Attorneys Sam Hirsch and Mark Gaber at 2:53:00 and 3:01, respectively.)

boundaries. Municipal 'islands' are legally contiguous with the municipality to which the 'island' belongs.") The Governor proposed maps in Johnson that contained what he now argues is noncontiguous territory, yet he then argued it was a constitutionally compliant map.[63] This court initially adopted his maps in Johnson II on the grounds of their purported constitutional compliance. These facts collectively beggar belief then that the court was not "convinced" by the parties to adopt a position on contiguity one way or the other. The parties convinced this court to adopt their positions related to contiguity in Johnson and now attempt to convince this differently constituted court to adopt their changed position.

¶146 Judicial estoppel is an equitable doctrine which is a matter of discretion. That fact should not give the court pause when that analysis is overlaid on the facts of the case before us now. Even where courts have hesitated to exercise their judicial discretion in invoking this doctrine, they have nonetheless recognized that such hesitancy arises in cases where courts are "more uncertain . . . that the two judicial actions concern the same factual issues or positions," as judicial estoppel "should be used only when the positions taken are clearly inconsistent." Harrison v. LIRC, 187 Wis. 2d 491, 497-

---

[63] See, generally, State v. English-Lancaster, 2002 WI App 74, 252 Wis. 2d 388, 642 N.W.2d 627; see also Cnty. of Milwaukee v. Edward S., 2001 WI App 169, 247 Wis. 2d 87, 633 N.W.2d 241 (concluding when a party asks the court for something, and the court provides it, the party cannot later argue that the very thing they requested was unlawful.).

98, 523 N.W.2d 138 (Ct. App. 1994). Petitioners[64] advanced positions here which are clearly inconsistent with their positions advanced in Johnson I and II. Hesitation to invoke judicial estoppel is not necessary. These parties are judicially estopped from launching this unprincipled attack on the court's prior decisions in the Johnson litigation. And, as referenced earlier in this dissent's section on standing, supra section II B., the fact that the Governor can be judicially estopped from bringing this claim directs the court majority back to the foundational——and in this instance, foundationally problematic——issue of addressing the other parties' severely weakened assertions of standing to bring these claims in the first place.

## D. Issue Preclusion

¶147 Any trial lawyer or judge knows that parties in litigation often stipulate to certain elements of that litigation. And when they do, those stipulations are largely accepted by the court, and not necessarily analyzed to the same extent as the remaining live issues before the court. Stipulations often streamline litigation and allow resources to be devoted to the crux of the case. Quite obviously then, when all parties agree on an issue, that matter may not receive the same precise, detailed scrutiny and analysis as the matters that are fully at issue and being fully litigated without stipulation. Contiguity was agreed upon and concluded in Johnson.

---

[64] Governor Evers and Citizen Mathematicians and Scientists.

58

¶148 Were this problematic original action to somehow survive the numerous procedural issues already facing it, it would still not hold up under an issue and claim preclusion analysis. The doctrine of issue preclusion, previously known as collateral estoppel, clearly bars the parties from relitigating what was already decided in the Johnson litigation. "The doctrine of issue preclusion . . . is designed to limit the relitigation of issues that have been actually litigated in a previous action." Aldrich, 341 Wis. 2d 36, ¶88. The focus of the analysis is on whether a particular issue——that is, the application of law to a given set of facts——was decided in a previous case. See N. States Power Co. v. Bugher, 189 Wis. 2d 541, 550-51, 525 N.W.2d 723 (1995). "[T]he rights of persons not parties to the original litigation may be implicated . . . ." Kruckenberg v. Harvey, 2005 WI 43, ¶57, 279 Wis. 2d 520, 694 N.W.2d 879.

¶149 "In the first step of the analysis, we must determine whether the issue or fact was actually litigated and determined in the prior proceeding by a valid judgment in a previous action and whether the determination was essential to the judgment." Dostal, 405 Wis. 2d 572, ¶24. "An issue is 'actually litigated' when it is 'properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined.'" Id.; see also Randall v. Felt, 2002 WI App 157, ¶9, 256 Wis. 2d 563, 647 N.W.2d 373 (quoting Restatement (Second) of Judgments § 27 cmt. d (1980)). If the issue is properly raised and thus actually litigated, then a court conducts a fundamental fairness analysis

59

based on the facts of the case, to see if applying the doctrine of issue preclusion comports with principles of fundamental fairness. Est. of Rille v. Physicians Ins. Co., 2007 WI 36, ¶38, 300 Wis. 2d 1, 728 N.W.2d 693; see also Mozrek v. Intra Fin. Corp, 2005 WI 73, ¶17, 281 Wis. 2d 448, 699 N.W.2d 54.

¶150 Contiguity was actually litigated and determined in a prior proceeding. The assertion that an essential element of the Johnson litigation which parties stipulated to, was not "actually litigated," struggles to find basis in the law. The majority cites to the Restatement (Second) of Judgments to bolster their claim.[65] The parties' stipulation was, "Contiguity for state assembly districts is satisfied when a district boundary follows the municipal boundaries. Municipal 'islands' are legally contiguous with the municipality to which the 'island' belongs." Joint Stip. of Facts & Law supra ¶88.

¶151 The parties' stipulation and conclusions of the court in Johnson end the analysis. In Johnson this court asked the parties to address in their briefing the constitutional parameters that the court should be bound by in drawing or appointing constitutionally compliant maps. The parties did so. This court, as the parties did, determined that municipal islands were constitutionally permissible within the understanding of contiguity: the parties drew and proposed remedial maps containing municipal islands, arguing that their maps containing these islands satisfied contiguity, and the

---

[65] "An issue is not actually litigated if . . . it is the subject of a stipulation between the parties." Restatement (Second) of Judgments 27 cmt. e (1982).

60

court accepted three times that municipal islands satisfied contiguity in <u>Johnson I</u>, <u>II</u>, and <u>III</u>. The court's decision in the <u>Johnson</u> litigation was central to the judgment. The issue of contiguity was thus "properly raised" by the parties and "actually litigated."

¶152 Parties' stipulations in litigation are an everyday occurrence, and they are relied upon. The court should not upend this commonplace understanding.

¶153 Though a court "may permit or deny the application of the doctrine of issue preclusion on the basis of fundamental fairness," no recognized factors counsel against the doctrine's application. <u>Est. of Rille</u>, 300 Wis. 2d 1, ¶60. We consider five factors for determining whether issue preclusion should be applied:

1) Could the party against whom preclusion is sought have obtained review of the judgment as a matter of law;

2) Is the question one of law that involves two distinct claims or intervening contextual shifts in the law;

3) Do significant differences in the quality or extensiveness of proceedings between the two courts warrant relitigation of the issue;

4) Have the burdens of persuasion shifted such that the party seeking preclusion had a lower burden of persuasion in the first trial than in the second; and

5) Are matters of public policy and individual circumstances involved that would render the application of collateral estoppel to be fundamentally unfair, including inadequate opportunity or incentive to obtain a full and fair adjudication in the initial action?

61

Id., ¶61. None of these factors are applicable to this case. The Governor and the Citizen Mathematicians and Scientists obtained review when this court addressed redistricting in Johnson. We "granted intervention to all parties that sought it." Johnson II, 400 Wis. 2d 626, ¶2. As for the second factor, nothing has changed. We are looking at the same maps and the same sort of claims. There has not even been an intervening change in the law, merely an intervening change in the court's membership. Despite requests by Alabama for the Supreme Court to significantly rework its voting rights jurisprudence, the Court recently reaffirmed the very same VRA framework we applied in Johnson. See Allen v. Milligan, 599 U.S. 1, 143 S. Ct. 1487 (2023).

¶154 The parties have insisted on bringing these claims as original actions and decline to go the route of traditional factfinding. This court may use factfinding procedures such as referees in actions where it has taken original jurisdiction.[66] This court cannot delegate to this referee the judicial power vested solely in them by the Wisconsin Constitution, however. Universal Processing Servs. v. Cir. Ct. of Milwaukee Cnty., 2017 WI 26, ¶36, 374 Wis. 2d 26, 892 N.W.2d 267. Nor is there anything in the permissive language of this statute enabling this court to force parties to utilize such factfinding procedures now after the fact. If the parties now have issues or complaints with the quality of this court's proceedings in the Johnson cases, they have only themselves to blame in

---

[66] Wis. Stat. § 751.09.

foregoing the routine factfinding process. The opportunity to address contiguity was in <u>Johnson</u> or via a possible motion for reconsideration. At any measure, this court is not a factfinding tribunal. The parties have decided to bring this case as an original action and forego the traditional factfinding processes. So, it is this court's loss that we do not have a record before us to otherwise help inform on our decision.

¶155 Finally, the fifth factor counsels against relitigation. Redistricting is a process that, under our state constitution, is only supposed to occur once every decade. Wis. Const. art. IV, § 3 ("At its first session after each enumeration made by the authority of the United States, the legislature shall apportion and district anew the members of the senate and assembly, according to the number of inhabitants."). "It is now settled that without a constitutional change permitting it no more than one legislative apportionment may be made in the interval between two federal [censuses]." <u>State ex rel. Smith v. Zimmerman</u>, 266 Wis. 307, 312, 63 N.W.2d 52 (1954). "No doubt, one of the objections of the constitutional provision was to prevent juggling with apportionments." <u>State ex rel. Hicks v. Stevens</u>, 112 Wis. 170, 180, 88 N.W. 48 (1901). Reopening these previously resolved issues wreaks havoc on judicial finality and distorts our constitutional policy of ensuring that settled legislative and congressional maps remain that way. Issue preclusion effectively bars the Governor and

the Citizen Mathematicians and Scientists from undermining these settled principles.

¶156 This original action involves the same maps, the same redistricting processes, many of the same parties, and already-addressed claims. This court reviewed the proposed maps for compliance with federal and state constitutional law, as well as compliance with this court's limited judicial role (least change), ultimately selecting the Legislature's maps on those grounds. Johnson III, 401 Wis. 2d 198, ¶¶60-73. Now, after the litigation cycle has run its course, these parties, the Governor and the Citizen Mathematicians and Scientists, are dissatisfied with the outcome and want to make claims and raise issues which we have already decided and are now precluded. Issue preclusion effectively bars their attempt to do so. While the outcome may not have been what these parties wanted, they must nonetheless live with the court's decision.

¶157 As a side note, the parties attempted to backdoor considerations of "partisan fairness" or "partisan gerrymandering" back into the court's analysis by way of at least initially confining it to the remedy phase. The majority continues that ill-fated venture of taking up an issue that both this court and the United States Supreme Court have determined is non-justiciable,[67] by attempting to wrap it up in the perhaps more pleasant euphemism of "partisan impact," which the majority "will consider. . . . when evaluating remedial maps." Majority.

_____

[67] See Johnson I, 399 Wis. 2d 623; Rucho v. Common Cause, 588 U.S. ___, 139 S. Ct. 2484 (2019).

op., ¶69. Never mind figuring out how exactly the majority plans to go about evaluating "partisan impact" or determining how much "partisan impact" is permissible and how much is too much. They provide no measurable standard for calculating it. Apparently then, it is for them to know, and for us to find out! "The fact that the majority imposes its own unique and undefined standard further demonstrates that it exercises its will rather than its judgment." Hawkins v. Wis. Elections Comm'n, 2020 WI 75, ¶49, 393 Wis. 2d 629, 948 N.W.2d 877 (Ziegler, J., dissenting).

¶158 Why backdoor an issue that they did not think merited full consideration as they refused to take it up in the petition for original action? Perhaps because in going about it this way, members of the majority hope to evade appellate review. Perhaps because with this issue, members of the majority are more wary of stare decisis. The majority knows that this court has already directly addressed the issue at length. We already considered and settled the issue of partisan gerrymandering as related to these maps, determining that the Wisconsin Constitution has nothing to say about partisan gerrymandering or partisan fairness, and therefore it is not a justiciable legal claim which this court can resolve. Johnson I, 399 Wis. 2d 623. This court, in line with the United States Supreme Court, determined previously that "[t]he Wisconsin Constitution contains 'no plausible grant of authority' to the judiciary to determine whether maps are fair to the major parties . . . ." Id., ¶52 (quoting Rucho, 139 S. Ct. at 2507). Finally, this

65

court recognized that nothing in the law authorizes this court to grant parties relief based on whether a particular map achieves proportional partisan representation. Johnson I, 399 Wis. 2d 623, ¶45 ("The people have never consented to the Wisconsin judiciary deciding what constitutes a 'fair' partisan divide."). So, if this court were to get involved in this discussion, it would violate the separation of powers principle these parties are concerned with by "encroach[ing] on the constitutional prerogative of the political branches." Id.

¶159 As explained above, Johnson I thoroughly examined the question of whether the Wisconsin Constitution prohibits the legislature from engaging in partisan gerrymandering. Id., ¶¶39-63. We explained that partisan fairness is a political question constitutionally assigned to the legislature, and that no provision of our state constitution forbids the legislature from gerrymandering to produce a partisan advantage. Id. Again, this court is not a political body empowered to resolve political disputes: it is a judicial body empowered to resolve legal disputes. Wis. Justice Initiative, 407 Wis. 2d 87, ¶¶68-69 (Rebecca Grassl Bradley, J., concurring). It is inevitable that a partisan body, such as the legislature, would reach a result that is in some measure, partisan. See Whitford v. Gill, 218 F. Supp. 3d 837, 939 (W.D. Wis. 2016) (Griesbach, J., dissenting) ("[P]artisan intent is not illegal, but is simply the consequence of assigning the task of redistricting to the political branches of government.") rev'd sub nom., Whitford v. Gill, 138 S. Ct. 1916 (2018).

66

¶160 The majority's reliance on foreign case law fares no better in propping up their attempt to relitigate partisan fairness outside of the pesky limitations of "least change." Foreign cases are not binding on this court. Additionally, the United States Supreme Court concluded in Rucho that "judicial review of partisan gerrymandering does not meet th[e] basic requirements" that judicial action "must be governed by standard, by rule," and must be "'principled, rational, and based upon reasoned distinctions' found in the Constitution or laws" so partisan gerrymandering claims are non-justiciable. Rucho, 139 S. Ct. at 2507. The parties rush right past the clear directive in Rucho and fail to cite to or even address its influence over the various federal cases they cite.

¶161 This court must not allow a non-justiciable, political question like partisan fairness to be camouflaged into the majority's decision. The majority declines to put forward a measurable standard by which this court is supposed to define or determine "partisan impact," demonstrating that they "exercise[]. . . . [their] will rather than [their] judgment." Hawkins, 393 Wis. 2d 629, ¶49 (Ziegler, J., dissenting). Their standard-deficient approach evokes recollections of the "eyeballing" tests from bygone legal eras encapsulated in "we'll know it when we see it" terminology.[68] This court has already

---

[68] Jacobellis v. Ohio, 378 U.S. 184, 197 (1964) (Stewart, J., concurring) ("I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it. . . .").

67

addressed the issues of partisan gerrymandering and political fairness, as well as contiguity. Issue preclusion bars us now from allowing these relevant parties to relitigate what has already been litigated.

### E. Claim Preclusion

¶162 The Governor and the Citizen Mathematicians and Scientists raise an issue which was decided in Johnson—contiguity—and raised an issue which was not decided in Johnson—separation of powers. Regardless, the doctrine of claim preclusion bars both claims from being brought now. See Dostal, 405 Wis. 2d 572, ¶24 ("[C]laim preclusion . . . extends to all claims that either were or could have been asserted in the previous litigation.").

> Three elements must be present for an earlier action to bar a subsequent action: "(1) an identity between the parties or their privies in the prior and present suits; (2) an identity between the causes of action in the two suits; and, (3) a final judgment on the merits in a court of competent jurisdiction."

Fed. Nat'l Mortgage Ass'n v. Thompson, 2018 WI 57, ¶31, 381 Wis. 2d 609, 912 N.W.2d 364 (quoting N. State Power Co., 189 Wis. 2d at 551). "A final judgment is conclusive in all subsequent actions between the same parties [or their privies] as to all matters which were litigated or which might have been litigated in the former proceedings." Lindas v. Cady, 183 Wis. 2d 547, 558, 515 N.W.2d 458 (1994) (quoting Depratt v. West Bend Mutual Ins. Co., 113 Wis. 2d 306 310, 334 N.W.2d 883 (1983)).

¶163 The first element of claim preclusion is easily met. Both the Governor and the Citizen Mathematicians and Scientists were parties to the initial Johnson litigation.

¶164 In order to satisfy the remaining second element necessary for claim preclusion to apply, Wisconsin has adopted a "transactional approach" from the Second Restatement of Judgments to inform when there is an "identity between the causes of action in the two suits." N. States Power Co., 189 Wis. 2d at 551, 553-55; see also Restatement (Second) of Judgments § 24 (1982). Simply, "if both suits arise from the same transaction, incident, or factual situation, [claim preclusion] generally will bar the second suit." N. States Power Co., 189 Wis. 2d at 554. "The concept of a transaction connotes a common nucleus of operative facts." Kruckenberg, 279 Wis. 2d 520, ¶26. "It is irrelevant that 'the legal theories, remedies sought, and evidence used may be different between the first and second actions.'" Menard v. Liteway Lighting Prods., 2005 WI 98, ¶32, 282 Wis. 2d 582, 698 N.W.2d 738; see also N. States Power Co., 189 Wis. 2d at 555 ("[T]he number of substantive theories that may be available to the plaintiff is immaterial——if they all arise from the same factual underpinnings."). To determine whether claims arise from one transaction, the court "consider[s] whether the facts are related in time, space, origin, or motivation." Menard, 282 Wis. 2d 582, ¶30 (citing Restatement (Second) of Judgments § 24 cmt. B (1982)).

69

¶165 The majority contends that these causes of action are "fundamentally different." Majority op., ¶48. In this current case, there is far more than a "common nucleus of operative facts," Kruckenberg, 279 Wis. 2d 520, ¶26, connecting the prior and current actions, sufficient to satisfy the requirements of the second element of claim preclusion. We have the Governor and the Citizen Mathematicians and Scientists, which are identical to the parties from our Johnson litigation. These parties brought claims and advanced legal theories "arising from the same transaction and factual situations" as those this court already addressed in Johnson I and Johnson III. These parties' claims are based on the same maps, which are rooted in the same "factual situations" previously addressed by this court. The causes of action are related in time, as this most recent petition was filed a little over a year after this court concluded this line of litigation involving these legislative maps in Johnson III, and less than two years since this court initiated this line of litigation in Johnson I. The motivations, declaring the current maps unconstitutional on various grounds, remains the same. While the remedies sought and some of the legal theories advanced in the subsequent action differ from those of the prior action, that discrepancy is immaterial as "they all arise from the same factual underpinnings": this court's adoption of the Legislature's redistricting maps. N. States Power Co., 189 Wis. 2d at 555. The common thread running through this line of Johnson litigation connects them all to this "common nucleus of

70

operative facts." The second element of claim preclusion is satisfied.

¶166 The doctrine of "claim preclusion . . . extends to all claims that either were or could have been asserted in the previous litigation." See Dostal, 405 Wis. 2d 572, ¶24. Contiguity was already raised, addressed, and decided on previously by a court of competent jurisdiction: this court. See Johnson I, 399 Wis. 2d 623; Johnson III, 401 Wis. 2d 198. Claim preclusion forbids the Governor and the Citizen Mathematicians and Scientists from relitigating the question of contiguity. Additionally, though they were free to do so, these parties failed to present their additional separation of powers claim or advance their additional legal theories in our prior Johnson litigation cycle. Following this court's decision in Johnson III, claims which could have been, but for whatever reason were not raised (separation of powers) are now barred, as this court's final judgment "is conclusive in all subsequent actions between the same parties as to all matters which were litigated or which might have been litigated in the former proceedings." Lindas, 183 Wis. 2d at 558 (quoting Depratt, 113 Wis. 2d at 310). While claim preclusion bars this separation of powers argument from being brought now, this argument seemed destined to be relegated to an honorable mention in a footnote anyway; perhaps the result of an over-eager party grasping at baseless straws emanating from a disgruntled dissenter to this court's decision in Johnson III.

71

¶167 If the majority's logic holds true, and contiguity was not properly raised and actually litigated, then there is nothing stopping any party from waiting this litigation round out and in similar fashion, waiting until next year and litigating other issues or points which the court did not address here. Could parties raise the remaining issues which the majority declined to take up in the Clarke petition for original action,[69] since they have not been fully litigated either? What about those similarly raised in Wright which this court declined to take up? The resulting application of the majority's logic should be enough to condemn it.

## F. Laches

¶168 Where were these parties throughout the Johnson redistricting litigation? Just over two years ago in Johnson, under a different court composition, we liberally and freely "granted intervention to all parties that sought it." Johnson II, 400 Wis. 2d 626, ¶2. Nothing prevented any of the previous or new parties to this case from presenting their claims, along with everyone else, when it was appropriate to do so in Johnson. Some of these parties, like the Clarke petitioners, for whatever reason, chose not to accept the open invitation to participate

---

[69] The three remaining issues which the court declined to take up all center around whether the state legislative redistricting plans proposed by the legislature and judicially imposed by this court in Johnson III are "extreme partisan gerrymanders" implicating various Wisconsin constitutional provisions and protections.

72

at the time this court addressed these issues in Johnson.[70] While we should tackle issues that remain to be decided and not abdicate our responsibility, we should not relitigate issues that were just decided. The fact that these parties chose not to participate, or at best made no effort to do so, should not necessitate the court to now reward that unexplainable dilatory behavior and encourage litigants to play the same "wait and see" game.

¶169 "Laches is founded on the notion that equity aids the vigilant, and not those who sleep on their rights to the detriment of the opposing party . . . ." State ex rel. Wren v. Richardson, 2019 WI 110, ¶14, 389 Wis. 2d 516, 936 N.W.2d 587; see also Town of Paris, 148 Wis. 2d at 188 ("[E]quity aids the vigilant, not those who sleep on their rights."); 27A Am. Jur. 2d Equity § 108 (2023). At its core, laches is "an equitable defense designed to bar relief when a claimant's failure to promptly bring a claim causes prejudice to the party having to defend against that claim." Wis. Small Business United, Inc. v. Brennan, 2020 WI 69, ¶11, 393 Wis. 2d 308, 946 N.W.2d 101. Courts may apply laches where (1) a party unreasonably delays in bringing a claim; (2) a second party lacks knowledge that the first party would raise that claim; and (3) the second party is prejudiced by that delay. Id., ¶12. Laches, as an equitable

---

[70] The Clarke petitioners were not parties in the Johnson litigation. However, many of the same law firms and lawyers who represented parties previously in the Johnson litigation are now continuing their redistricting litigation fight through new representation of the Clarke petitioners, including Law Forward, Inc.; Stafford Rosenbaum LLP; and the Campaign Legal Center.

73

bar, is "designed to bar relief when a claimant's failure to promptly bring a claim causes prejudice to the party having to defend against that claim." Id. (quoting Sawyer v. Midelfort, 227 Wis. 2d 124, 159, 595 N.W.2d 423 (1999)).

¶170 This court had a different composition two years ago, but that fact alone cannot be why these parties chose not to actively participate in that litigation at that time. To the dispassionate observer, such contortions of the law appear questionable and should come with consequences. Surprisingly, the parties are forthright enough to tell us themselves that this is in fact their reason for bringing this claim now——after waiting two years in alleged ongoing state of harm——to ensure that this case coincided with the changed composition of the court.[71] It defies reason for parties to sit out litigation, obtain the benefit of seeing how arguments are presented, and then with that benefit of hindsight, bring their now modified claims over the same issues, with the same legal representation, at their leisure, years later. It further defies reason that given those same facts, and the fact that the respondents would not have had knowledge of the parties bringing new claims over the same maps a year later, that the parties can now demand that

---

[71] Steve Schuster, Lawsuit to challenge Wisconsin's legislative maps to be filed, Wis. Law Journal (Apr. 6, 2023), https://wislawjournal.com/2023/04/06/lawsuit-to-challenge-wisconsins-legislative-maps-to-be-filed/ ("A Madison-based law firm is planning to challenge the state's gerrymandered legislative maps . . . . The lawsuit will be filed after Justice-elect Janet Protasiewicz is sworn in on Aug. 1, Nicole Safar, executive director of Madison-based Law Forward, said . . . .").

74

this court provide them an extraordinary remedy (overturning decades of precedent and the votes of millions of Wisconsinites), and do so in a constrained timeframe of mere months before another round of elections gets underway. Such unnecessary fast tracking due to the parties' own inexplicable delay may rightfully raise questions of intrusion on the opposing party's rights to fully litigate the claims presented.

¶171 There was unreasonable delay and prejudice here because "unreasonable delay in laches is based not on what litigants know, but what they might have known with the exercise of reasonable diligence." Wren, 389 Wis. 2d 516, ¶20. Additionally, "[w]hat amounts to prejudice . . . depends upon the facts and circumstances of each case, but it is generally held to be anything that places the party in a less favorable position." Id., ¶32. Respondents could not have known that parties which brought claims in Johnson would bring claims again after the result did not go their way: nor could the respondents have known that parties which could have participated in Johnson but chose not to, would bring modified claims after the fact. Rather, respondents as well as millions of Wisconsinites relied on the court's judicially imposed maps to conduct the 2022 elections.

¶172 If ever a case was foreclosed by laches, this is that case. A laches analysis essentially asks, "whether a party delayed without good reason," and then beyond that, whether that party's delay "prejudiced the party seeking to defend against that claim." Brennan, 393 Wis. 2d 308, ¶11; see also Wren, 389

75

Wis. 2d 516, ¶14. When correctly applied, laches forbids the court from addressing issues the court has already decided. This present case is unlike our prior election-related cases where laches was at issue because in those cases, the court shirked its responsibility to consider and address live issues the court had <u>not</u> already decided, but were issues that would recur and be left uncertain for future elections.[72] See <u>Trump v. Biden</u>, 2020 WI 91, ¶107, 394 Wis. 2d 629, 951 N.W.2d 568 (Ziegler, J., dissenting) ("Once again, in an all too familiar pattern, four members of this court abdicate their responsibility to [declare what the law is]."); <u>Hawkins</u>, 393 Wis. 2d 629, ¶32 (Ziegler, J., dissenting); <u>Trump v. Evers</u>, No. 2020AP1971-OA, unpublished order (Wis. Dec. 3. 2020); <u>Wis. Voters Alliance v. Wis. Elections Comm'n</u>, No. 2020AP1930-OA, unpublished order (Wis. Dec. 4, 2020) (Roggensack, C.J., dissenting). Choosing rather to kick the can down the road to some indeterminate time in the unknown future for anyone but

---

[72] The majority misrepresents what happened in <u>Trump v. Biden</u>, focusing on the remedy rather than the issues. Majority op., ¶43 n.20. <u>Trump v. Biden</u> was not singularly about a requested remedy, of this court "overturn[ing] the results of [an] election." <u>Id.</u> Rather, <u>Trump v. Biden</u> posed four election-related issues which, absent this court declaring what the law is, would be left uncertain for future elections; namely, "[a]bsentee ballots lacking a separate application; absentee envelopes that are missing or have a defective witness address; indefinitely confined voters/faulty advice from election officials; and ballots cast at Madison's Democracy in the Park/ballot drop boxes." <u>Trump v. Biden</u>, 394 Wis. 2d 629, ¶114 (Ziegler, J., dissenting). To say that the <u>Trump v. Biden</u> case was limited to a decision regarding one remedy lacks an understanding about the many issues that were ripe for legal analysis and should have been decided regardless of the requested remedy.

76

that current court majority to have to deal with, is not a proper application of laches. Here though, we have already decided the case and its issues throughout the Johnson litigation. This is not a live, undecided issue. There is no constitutional crisis whereby absent a court decision there are no existing maps.

¶173 The parties present no compelling reason why they should have been allowed to "sit on their hands" and prejudice the opposing party in not bringing their claims at the time that the door to such claims was open. The majority echoes the questionable assertions of counsel at oral argument, that they could not participate in Johnson because they "ran out of time" to do so. Majority op., ¶42. Surely, both counsel and the majority are familiar with the existence of varied deadlines which constrain parties' actions and reactions throughout a litigation cycle. Additionally, the majority appears to make the mistake of starting to toll the laches clock at the conclusion of Johnson III, instead of where it properly should start: at Johnson I, when this court invited parties to participate and granted intervention to those who sought it. Johnson I, 399 Wis. 2d 623, ¶6. These contortions around laches to reach a pre-determined outcome make a mockery of our legal system and prejudice the opposing party who relies on the finality of this court's decision. This court should not reward such behavior. Laches applies, and laches bars these untimely claims.

## G. Due Process

77

¶174 Not only has the majority ignored procedural and legal principles which would bar consideration of this case, but it hides from the law concerning due process,[73] contributing a mere two sentences to the important issue. They relegate litigants' fundamental due process rights to hopeful inconspicuousness in a footnote.[74] What's the rush? Why hide from the issue?

¶175 The foundational legal principle that "no [wo]man can be a judge in [her] own case" is essential to maintaining a fair, independent, and impartial judiciary. Williams v. Pennsylvania, 579 U.S. 1, 8—9 (2016). An independent judiciary protects "[t]he Constitution and the rights of individuals from the effects of those ill humors, which the arts of designing men, or the influence of particular conjectures, sometimes disseminate among the people themselves." The Federalist No. 78, at 469 (Alexander Hamilton) (Clinton Rossiter ed., 1961). It instills public confidence in the fairness of the judicial process and system, and in the judiciary's role "as apolitical and neutral arbiters of the law." Johnson I, 399 Wis. 2d 623, ¶72. In contrast, it is the legislature's duty to write the law, and "until the legislature changes the law it is [the court's] duty to construe the law as we find it." Fredricks v.

---

[73] The United States Constitution provides that no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

[74] "Respondents also make a brief argument that adjudicating this case in Petitioners' favor will violate Respondents' due process rights under the Fourteenth Amendment of the United States Constitution. These arguments are underdeveloped, and as such, we do not address them." Majority op., ¶37 n.16.

Kohler Co., 4 Wis. 2d 519, 525-26, 91 N.W.2d 93 (1958); see also State v. Doxtater, 47 Wis. 278, 288, 2 N.W. 439 (1879) ("It is our duty to expound and execute the law as we find it . . . ."). These principles are not only fundamental to our governmental system, but they protect a litigant's constitutional right to due process of law. This right to due process includes the right to have one's day in court and to have one's case heard by a neutral arbiter, as "[a] fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136 (1955). "The operation of the due process clause in the realm of judicial impartiality, then, is primarily to protect the individual's right to a fair trial." People v. Freeman, 222 P.3d 177, 181 (Cal. 2010). A justice violates litigants' constitutional rights to due process if there is "objective proof of actual bias" or "a serious risk of actual bias." State v. Herrmann, 2015 WI 84, ¶113, 364 Wis. 2d 336, 867 N.W.2d 772 (Ziegler, J., concurring) (citing Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 883-84 (2009)).

¶176 In Caperton, the United States Supreme Court concluded that a justice was disqualified from hearing an appeal because his sitting as a judicial officer on the case violated litigants' due process rights. In a very fact-specific decision, the Supreme Court reversed the state supreme court because a recently elected justice failed to recuse himself when the justice had an "unconstitutional potential for bias." Caperton, 556 U.S. at 882. A future litigant had spent significant funds ensuring the judge's election, including the

79

statutory minimum $1,000 to his campaign committee, another nearly $2.5 million to a political organization supporting the candidate, and another over $500,000 on independent expenditures to support the candidate.  Id. at 873.  This future potential litigant's $3 million contribution was "more than the total amount spent by all other [] supporters and three times the amount spent by [the candidate's] own committee."  Id.  The contributor had a case that would most certainly be heard by the newly elected justice.  In other words, that contributor made sure that candidate would decide his case.  The Court concluded that his sitting on a case that would come to him shortly after his election, was a due process violation because "'under a realistic appraisal of psychological tendencies and human weakness,' the interest 'poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.'"  Id. at 883-84 (quoting Withrow v. Larkin, 421 U.S. 35, 47 (1975)).

¶177 The crux of Caperton is that a due process violation occurs when a party who would like that judicial officer to hear their case, essentially picks that judicial officer to hear their case, by funding that judge's election, and knowing that the newly minted judge will surely sit in judgment of that interested party's case in the near future.  "Approximately 11 months after [the judge] won the election, and shortly before A.T. Massey filed its petition for appeal, Caperton moved to disqualify [the judge] in the particular case that was pending the entire election . . . ."  Miller v. Carroll, 2020 WI 56,

¶70, 392 Wis. 2d 49, 944 N.W.2d 542 (Ziegler, J., concurring). The judge denied the motion nearly six months later, eight months before the appeal was filed. Caperton, 556 U.S. at 874.

> Based on the relative size of [the] contribution in comparison to the total amount of money contributed to the campaign; the total amount spent in the election; the apparent effect such contribution had on the outcome of the election; and the temporal relationship between the contribution, the election, and the pendency of the case, the Supreme Court concluded there was a serious, objective risk of the [the justice]'s actual bias in sitting on that particular case . . . .

State v. Allen, 2010 WI 10, ¶268, 322 Wis. 2d 372, 778 N.W.2d 863 (per curiam) (Ziegler, J., concurring). The facts of Caperton were so extreme[75] that the Supreme Court found that "due process require[d] recusal" as "the probability of actual bias [rose] to an unconstitutional level." Caperton, 556 U.S. at 872, 887.

¶178 Reviewing the facts of Caperton versus the facts of Clarke, it is clear that due process deserves more than a two-sentence consideration. In Caperton, the interested party knew that whoever "won the[] election would most certainly be on the court when it decided whether to sustain or overturn" the court's verdict against him but that case did not arise for 11 months. Miller v. Carroll, 392 Wis. 2d 49, ¶70 (Ziegler, J., concurring) (citing Caperton, 556 U.S. at 872). With Clarke,

---

[75] "Caperton involved extreme and extraordinary facts which the Supreme Court recognized in its majority opinion no less than a dozen times." State v. Herrmann, 2015 WI 84, ¶128, 364 Wis. 2d 336, 867 N.W.2d 772 (Ziegler, J., concurring) (citing State v. Allen, 2010 WI 10, ¶261, 322 Wis. 2d 372, 778 N.W.2d 863 (per curiam) (Ziegler, J., concurring)).

the interested parties filed this case directly with the Wisconsin Supreme Court just after its candidate was sworn in. With Caperton, the interested party knew the state's highest court would consider his pending case on appeal, so he supported the candidate he wanted to have sit in judgment of his case. With Clarke, the interested parties supported their candidate so she would be sitting on their future redistricting case. In Caperton, the interested party donated or spent $3 million to help elect his candidate of choice. In Clarke, the interested parties donated at least $10 million, in a record-breaking election, to elect their judge who spoke freely of her thoughts on redistricting.[76] In Caperton, the interested party's "outsized" donation was "more than the total amount spent by all other[] supporters and three times the amount spent by the [the candidate's] own committee." Caperton, 556 U.S. at 873. With Clarke, nearly $60 million was spent,[77] ranking Justice Protasiewicz's campaign as the most expensive judicial campaign

---

[76] WisPolitics tracks $56 million in spending on Wisconsin Supreme Court race (July 19, 2023), https://www.wispolitics.com/2023/wispolitics-tracks-56-million-in-spending-on-wisconsin-supreme-court-race/; see also Wisconsin Supreme Court Race Cost Record $51 Million, Wis. Democracy Campaign (Mar. 29, 2023), https://www.wisdc.org/news/press-releases/139-press-release-2023/7351-protasiewicz-received-2-of-every-3-from-democratic-party.

[77] Id., https://www.wispolitics.com/2023/wispolitics-tracks-56-million-in-spending-on-wisconsin-supreme-court-race/.

in United States history.[78]  In Caperton, the interested parties' chosen judicial candidate won with 53.3% of the vote.[79]  In Clarke, the interested parties' chosen judicial candidate won with 55.5% of the vote.[80]  In Caperton, the petitioner moved to disqualify the recently elected justice before bringing his appeal, but the newly elected judge denied the motion to recuse six months later.  Caperton, 556 U.S. at 874-75.  With Clarke, members of the Wisconsin Legislature filed a recusal motion against Justice Protasiewicz, but she, also a recently elected justice, denied their recusal motion.  Clarke v. Wis. Elections Comm'n, 2023 WI 66, ¶5, 409 Wis. 2d 249, 995 N.W.2d 735.

¶179 The parties interested in Justice Protasiewicz's election are intricately involved with, and beneficiaries of, the case they filed directly before her in this original action right after she was sworn in.  Their timing of selecting her as

---

[78] This campaign's spending is five times higher than the previous state record ($10 million for the 2020 Wisconsin Supreme Court race) and more than three times higher than the national record spent on a judicial race ($15 million on a 2004 Illinois race).  See Wisconsin Supreme Court Race Cost Record $51 Million, Wis. Democracy Campaign (July 18, 2023), https://www.wisdc.org/news/press-releases/139-press-release-2023/7390-wisconsin-supreme-court-race-cost-record-51m.

[79] Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 873 (2009).

[80] Liberal judge Janet Protasiewicz won a seat on Wisconsin's state Supreme Court, flipping the body's ideological majority, Politico (last updated Nov. 26, 2023), https://www.politico.com/2023-election/results/wisconsin/supreme-court/

their judge and then bringing this petition is irrefutable.[81] Now, the four members of the court have fast-tracked this litigation, bypassing and rushing the traditional court steps, processes, and the law.

¶180 To be clear, Justice Protasiewicz was not shy expressing her personal viewpoint during her campaign. For example, at a candidate forum hosted by WisPolitics, then-candidate Protasiewicz indicated that she entered the race because she "could not sit back and watch extreme right-wing partisans hijack our Supreme Court" and remarked, "let's be clear here, the maps are rigged . . . bottom line, absolutely, positively rigged. They do not reflect the people of this state."[82] Then-candidate Protasiewicz went on to criticize this court's "least change approach" to redistricting, saying that it "might sound good for some people, [but] I see no basis for it in the constitution, no basis in case law. Basically, what the

---

[81] Steve Schuster, Lawsuit to challenge Wisconsin's legislative maps to be filed, Wis. Law Journal (Apr. 6, 2023), https://wislawjournal.com/2023/04/06/lawsuit-to-challenge-wisconsins-legislative-maps-to-be-filed/ ("A Madison-based law firm is planning to challenge the state's gerrymandered legislative maps . . . . The lawsuit will be filed after Justice-elect Janet Protasiewicz is sworn in on Aug. 1, Nicole Safar, executive director of Madison-based Law Forward, said . . . ."); see also Jack Kelly, Liberal law firm to argue gerrymandering violates Wisconsin Constitution, The Cap Times (Apr. 6, 2023), https://captimes.com/news/government/liberal-law-firm-to-arguegerrymandering-violates-wisconsin-constitution/article_2dfb9757-6d2d-58ba-9461- 10b3d20d5f00.html.

[82] Paul Fanlund, Supreme Court election is a chance to beat the far right at its long game, The Cap Times (Jan. 13, 2023), https://captimes.com/opinion/paul-fanlund/opinion-supreme-court-election-is-a-chance-to-beat-the-far-right-at-its-long/article_af9b5d76-a584-54ad-9226-7c9d7a806d12.html.

least-change approach has done, it has taken . . . meaningful votes away from people in larger communities in Dane County and Milwaukee County."[83] From the outset, then-candidate Protasiewicz indicated what she, as a presumed future member of the court, would do: remove least change as an "unworkable" governing standard in order to clear the way for the newly constituted court to redraw the maps. Even more directly, then-candidate Protasiewicz celebrated via her Facebook page, Politico's highlighting of the Wisconsin Supreme Court race, exclaiming "POLITICO says that our race could challenge the court's narrow 4-3 conservative majority and have ramifications over future redistricting decisions in Wisconsin. Judge Janet Protasiewicz (@Janet for Justice) Facebook, (Jan. 9, 2023) (emphasis added) https://www.facebook.com/JanetforJustice. Her colleague, Justice Rebecca Dallet, campaigned invoking tremendous out-of-state support, and when at a Democratic-hosted California fundraiser she said, "I know that [California] values are our Wisconsin values that we've lost along the way."[84] Justice Protasiewicz, also having received much out-of-state support, has remarked, "I would anticipate that at some point, we'll be looking at those maps" and that she "would anticipate that [she] would enjoy taking a fresh look at the gerrymandering

---

[83] Id.

[84] Patrick Marley, Court candidate Rebecca Dallet rells San Francisco crowd "your values are our Wisconsin values," Milwaukee Journal Sentinel (Mar. 21, 2018), https://www.jsonline.com/story/news/politics/2018/03/21/court-candidate-rebecca-dallet-tells-san-francisco-crowd-your-values-our-wisconsin-values/445869002/.

question."[85]  The parties even said that this case would be filed once the new justice was sworn in.  And it was.[86]

¶181 A person, including a justice, has the right to free speech as protected under both our federal and state

---

[85] Jessie Opoien and Jack Kelly, Protasiewicz would "enjoy taking a fresh look" at Wisconsin voting Maps, The Cap Times (Mar. 2, 2023), https://captimes.com/news/government/ protasiewicz-would-enjoy-taking-a-fresh-look-at-wisconsin-voting-maps/article_d07fbe12-79e6-5c78-a702-3de7b444b332.html.

[86] While then-candidate Protasiewicz did then say, "I can't ever tell you what I am going to do on a particular case, but I can tell you my values and common sense tells that it's wrong," can you un-ring the bell?  Id.

constitutions.[87]  But, that free speech may affect whether that justice may sit on a case.[88]

¶182 Due Process does not reward the petitioners' "judge shopping," as "'[j]udge shopping' has always been taboo." Allen, 322 Wis. 2d 372, ¶262 (Ziegler, J., concurring).  "In Caperton, the Supreme Court reaffirmed that basic tenet when it concluded that a litigant's efforts to "choose[] the judge," through directing a justice's election campaign and thus placing that justice on that contributing party's pending case did not pass constitutional muster."  Id., ¶262 (Ziegler, J.,

---

[87] U.S. Const. amend. I ("Congress shall make no law. . . . abridging the freedom of speech."); Wis. Const. art. I, § 3 ("Every person may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press.").

[88] The Supreme Court's decision in Republican Party of Minnesota v. White, 536 U.S. 765, 788 (2002) (holding that a restriction on an announcement by a candidate for judicial office of his or her views on disputed legal and political issues during a campaign violates the First Amendment), is not incompatible with the Court's decision in Caperton.  Put together, these cases address issues that while complementary, are yet distinct.  In White, the Court was more concerned with the First Amendment claims and concerns of the judicial candidate.  In Caperton, the Court was more concerned with the due process claims and concerns of the litigant.  Neither invalidates the other; rather, when contextually read together, both cases shed some light on the careful balancing act that courts are routinely engaged in.  In the case before us, we must conduct the unenviable yet necessary act of balancing a judicial candidate's right to freedom of speech against a claimant's fundamental right to due process and having his or her claim heard before a neutral arbiter.  The constitutional right to speak freely is not without its limits. It must yield to Wisconsin claimants' constitutional rights to due process before an impartial tribunal.

87

concurring) (citation omitted). Judges with an "unconstitutional potential for bias" are required to recuse themselves to preserve litigants' due process rights. Caperton, 556 U.S. at 881. Even before Caperton, "if a justice should have been disqualified from considering the case and nevertheless participates, the decision is void." State v. Henley, 2011 WI 67, ¶45 n.5, 338 Wis. 2d 610, 802 N.W.2d 175 (Abrahamson, C.J., Ann Walsh Bradley and Crooks, JJ., dissenting) (citing State v. Am. TV & Appliance of Madison, Inc., 151 Wis. 2d 175, 179, 443 N.W.2d 662 (1989)); see also Caperton, 556 U.S. 868. That determination is even clearer post-Caperton.

¶183 We don't know whether Caperton will be reviewed by the Supreme Court. But if not, it seems a new bar has been set.

### III. CONCLUSION

¶184 This original action should never have been accepted. It is nothing more than a motion for reconsideration, which is time-barred; it ignores stare decisis, standing, judicial estoppel, issue preclusion, claim preclusion, and laches. Not only is this a fundamentally legally flawed proceeding for these preceding listed reasons, but it also raises serious questions regarding Caperton and whether this proceeding is a violation of litigants' due process rights. What's next? Pre-selected "consultants" who will decide the fate of Wisconsin voters even though the Wisconsin Supreme Court already decided these issues conclusively in the Johnson litigation? Will these "consultants" be endowed with the authority to reach all factual

88

and legal conclusions necessary to draw the maps, while evading review and the constitutional protections due the parties? The four rogue members of the court have upended judicial practices, procedures, and norms, as well as legal practices, procedures, and precedent, yielding only to sheer will to create a particularized outcome which will please a particular constituency. At a minimum, this is harmful to the judicial branch and the institution as a whole. I dissent.

¶185 REBECCA GRASSL BRADLEY, J. *(dissenting).* Riding a Trojan horse named Contiguity, the majority breaches the lines of demarcation separating the judiciary from the political branches in order to transfer power from one political party to another. Alexander Hamilton forewarned us that "liberty can have nothing to fear from the judiciary alone, but would have everything to fear from its union with either of the other departments." The Federalist No. 78, at 523 (J. Cooke ed., 1961). With its first opinion as an openly progressive faction, the members of the majority shed their robes, usurp the prerogatives of the legislature, and deliver the spoils to their preferred political party. These handmaidens of the Democratic Party trample the rule of law, dishonor the institution of the judiciary, and undermine democracy.

¶186 The outcome in this case was preordained with the April 2023 election of a candidate who ran on a platform of "taking a fresh look"[1] at the "rigged" maps.[2] As promised just

---

[1] Jessie Opoien & Jack Kelly, Protasiewicz Would 'Enjoy Taking a Fresh Look' at Wisconsin Voting Maps, The Cap Times (Mar. 2, 2023), https://captimes.com/news/government/protasiewicz-would-enjoy-taking-a-fresh-look-at-wisconsin-voting-maps/article_d07fbe12-79e6-5c78-a702-3de7b444b332.html.

[2] Corrinne Hess, Wisconsin Supreme Court Candidate Janet Protasiewicz Assails State's Election Maps as 'Rigged', Milwaukee J. Sentinel (Jan. 9, 2023), https://www.jsonline.com/story/news/politics/2023/01/09/wisconsin-supreme-court-candidate-protasiewicz-assails-election-maps/69790966007/.

two days after Protasiewicz's election,[3] petitioners filed this case only one day after she joined the court. The majority chooses contiguity as a convenient conduit by which to toss the legislative maps adopted by this court in 2022 as a remedy for malapportionment, but any issue grounded in state law would suffice in order to insulate the majority's activism from review by the United States Supreme Court. The majority's machinations do not shield it from the Court vindicating the respondents' due process rights, however. See Appendix A. Litigants are constitutionally entitled to have their cases heard by a fair and impartial tribunal, an issue of primary importance the majority absurdly dismisses as "underdeveloped." Majority op., ¶37 n.16. The parties fully briefed the due process claim, which Protasiewicz unilaterally rejected. Clarke v. Wis. Elections Comm'n, 2023 WI 66, 995 N.W.2d 735. While this court is powerless to override her recusal decision,[4] the United States Supreme Court is not.

¶187 The majority's treatment of the remaining issue sophomorically parrots the petitioners' briefing and undermines the rule of law. The Wisconsin Constitution requires assembly districts "to consist of contiguous territory"

---

[3] Jack Kelly, Liberal Law Firm to Argue Gerrymandering Violates Wisconsin Constitution, The Cap Times (Apr. 6, 2023), https://captimes.com/news/government/liberal-law-firm-to-arguegerrymandering-violates-wisconsin-constitution/article_2dfb9757-6d2d-58ba-9461- 10b3d20d5f00.html.

[4] State v. Henley, 2011 WI 67, 338 Wis. 2d 610, 802 N.W.2d 175 (per curium).

2

and senate districts "of convenient contiguous territory." Wis. Const. art. IV, §§ 4-5. For fifty years, maps drawn by both Republican and Democratic legislative majorities contained districts with detached territory. State and federal courts uniformly declared such districts to be "legally contiguous even if the area around the island is part of a different district." Johnson v. Wis. Elections Comm'n, 2021 WI 87, ¶36, 399 Wis. 2d 623, 967 N.W.2d 469 (Johnson I); Prosser v. Elections Bd., 793 F. Supp. 859, 866 (W.D. Wis. 1992). Just last year, three members of the majority in this very case adopted maps containing districts with detached territory. Johnson v. Wis. Elections Comm'n, 2022 WI 14, ¶¶34-36, 400 Wis. 2d 626, 971 N.W.2d 402 (Johnson II), rev'd sub nom. Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. 398 (2022) (per curiam). This well-established legal conclusion having become politically inconvenient, the same three justices now deem the existence of such districts "striking." Majority op., ¶1. If this creative constitutional "problem" were so glaringly obvious, then the attorneys who neglected to raise the issue over the last five decades committed malpractice, and the federal and state judges who adopted maps with districts containing detached territory should resign for incompetency.

¶188 No one is fooled, however. The members of the majority refashion the law to achieve their political agenda. The precedent they set (if anything remains of the principle) devastates the rule of law. The Wisconsin Constitution commands redistricting to occur once every ten years. Wis. Const. art.

3

IV, § 3. Both state and federal courts have always respected "the command in the Wisconsin Constitution not to re-district more than once each 10 years." Baldus v. Members of Wis. Gov't Accountability Bd., 849 F. Supp. 2d 840, 859 (E.D. Wis. 2012) (citing State ex rel. Smith v. Zimmerman, 266 Wis. 307, 63 N.W.2d 52 (1954)).

¶189 The majority's machinations in this case open the door to redistricting every time court membership changes. A supreme court election in 2025 could mean Clarke is overturned, Johnson is restored, and new maps adopted. In 2026 or 2027, Johnson could be overturned (again), Clarke resurrected, and new maps adopted. This cycle could repeat itself in 2028. And in 2029. And in 2030.

¶190 Although the majority endorses repeated kicks at the redistricting cat, this is not normal in redistricting, or any other sort of case. The majority rewrites history to suggest otherwise. As but one example, the majority claims "Johnson itself enjoined the use of a court-ordered plan adopted by the federal courts [sic] in Baldus v. Members of Wis. Gov't Accountability Bd., 862 F. Supp. 2d 860 (E.D. Wis. 2012)." Majority op., ¶54. The majority disingenuously ignores the fact that this court's actions in Johnson occurred ten years after Baldus and only after the 2020 census rendered the prior decade's maps malapportioned. See Johnson I, 399 Wis. 2d 623, ¶4. After the federal court in Baldus identified a violation of federal law—shortly after the legislature enacted the maps—the federal court (there was only one) decided it "will not tread

4

into the black water of re-drawing the redistricting boundaries itself. Instead, as discussed above, the Court will allow the Legislature to sort out the redistricting maps' infirmities on its own." Baldus, 849 F. Supp. 2d at 861 (internal citation omitted). The federal court in Baldus ultimately ordered "that the redistricting plans adopted pursuant to Act 43 for all Assembly Districts and Senate Districts, with the exception of Assembly Districts 8 and 9 to the extent noted above, shall remain unchanged." Baldus 862 F. Supp. 2d at 863. A "slight adjustment" to two assembly districts hardly transforms legislatively-enacted plans into court-developed ones as the majority misleadingly insinuates. Johnson I, 399 Wis. 2d 623, ¶4 (citing Baldus, 862 F. Supp. 2d at 863).

¶191 Upon completion of the 2020 census, the governor vetoed the redistricting plans passed by the legislature, so the court in Johnson enjoined the 2011 legislative maps that had become unconstitutionally malapportioned due to population shifts. Political impasse left the judiciary as the only branch able to act. There is absolutely no precedent for a supreme court to enjoin its own remedy one year later. Perhaps if the majority focused on studying the law rather than rushing to set its political machinations on a ridiculous fast track, it would avoid such embarrassing errors.

¶192 When the people shift political power to a different party, they vote for changes in the law. The constitution limits the judicial power, however, to declaring what the law is. The majority elevates its political desires over the

5

structural separation of powers on which the preservation of our republic depends. The majority imperils freedom and opens the door to judicial tyranny. I dissent.[5]

## I. JOHNSON I RESOLVED THE CONTIGUITY QUESTION

¶193 Riddled with non sequiturs, heavy on hypocrisy, and laden with law review citations but light on actual law, the majority opinion presents a misleading caricature of the court's decision in Johnson I, necessitating an overview of what that opinion actually says. Just twenty months ago, this court used its limited remedial powers to reapportion Wisconsin's legislative districts in order to bring them into compliance with the constitutional guarantee of equality in representation. See Johnson v. Wis. Elections Comm'n, 2022 WI 19, ¶73, 401 Wis. 2d 198, 972 N.W.2d 559 (Johnson III). The inability of the legislature and the governor to agree on new legislative maps after the 2020 census necessitated the court's involvement in redistricting. Johnson I, 399 Wis. 2d 623, ¶¶17-18, 68 ("Judicial action becomes appropriate to prevent a constitutional crisis."). The 2011 legislative maps——enacted by

---

[5] The majority punts on the petitioners' nonsensical separation of powers argument, which was inspired by the rhetorical bluster of a dissenting justice unhappy with the court's decision. See Johnson v. Wis. Elections Comm'n, 2022 WI 19, ¶187, 401 Wis. 2d 198, 972 N.W.2d 559 (Johnson III) (Karofsky, J., dissenting). While dissents may embellish for rhetorical effect, their "silly extravagances" should not migrate into an official court opinion. See Obergefell v. Hodges, 576 U.S. 644, 719 (2015) (Scalia, J., dissenting). If the separation of powers argument had any legal merit, it is inexplicable why the majority doesn't embrace it. Three-fourths of the justices comprising today's majority already did, in Johnson III.

6

the legislature, signed into law by the governor, and upheld by a federal court (with a slight adjustment)——had become non-compliant "with the constitutional requirement of an equal number of citizens in each legislative district, due to shifts in population across the state." Id., ¶4. This court allowed every interested party to participate in Johnson, granting every motion for intervention. See Johnson II, 400 Wis. 2d 626, ¶2.

¶194 Every party in Johnson stipulated before we decided Johnson I that the contiguity requirements under Article IV, Sections 4 and 5 of the Wisconsin Constitution permit municipal islands detached from their assigned districts. See Joint Stip. of Facts and Law, Johnson v. Wis. Elections Comm'n, No. 2021AP1450, at 15 (Nov. 4, 2021). We agreed. Johnson I, 399 Wis. 2d 623, ¶36. So did the dissenters. See id., ¶¶88-115 (Dallet, J., dissenting). Every party——including the Governor——submitted maps containing municipal islands. A majority in Johnson II,[6] selected the Governor's proposed legislative maps, municipal islands and all; three justices in this current majority blessed those maps as constitutional.[7] 400 Wis. 2d 626, ¶36.

---

[6] Johnson v. Wis. Elections Comm'n, 2022 WI 14, ¶8, 400 Wis. 2d 626, 971 N.W.2d 402 (Johnson II), rev'd sub nom. Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. 398 (2022) (per curiam). The United States Supreme Court summarily reversed Johnson II because the majority in that case improperly applied the constitutional guarantee of equal protection in its selection of the Governor's maps, which sorted voters based on race without constitutionally permissible justification. Wis. Legislature, 595 U.S. at 406.

[7] For example, Assembly Districts 3, 5, 26, 46, and 96 in the Governor's proposed maps contain detached municipal islands.

7

¶195 The majority in this case misrepresents the Johnson I court's holding on contiguity, misleadingly asserting the court "failed to analyze the contiguity requirements evident in the text of the constitution" and "did not attempt to square its view of contiguity with" our past cases, such as State ex rel. Lamb v. Cunningham. Majority op., ¶24. Quoting Lamb in Johnson I, the court acknowledged constitutional contiguity "generally means a district 'cannot be made up of two or more pieces of detached territory.'" 399 Wis. 2d 623, ¶36 (quoting State ex rel. Lamb v. Cunningham, 83 Wis. 90, 148, 53 N.W. 35 (1892)). We continued, "[i]f annexation by municipalities creates a municipal 'island,' however, the district containing detached portions of the municipality is legally contiguous even if the area around the island is part of a different district." Id. (citing Prosser, 793 F. Supp. at 866).

¶196 After the court decided Johnson I, the Governor, or any other petitioner who participated in the case, could have filed a motion for reconsideration[8] on contiguity, asking the court to correct the allegedly flagrant constitutional error somehow repeatedly overlooked by countless lawyers, federal judges,[9] and justices of this court for five decades.[10] To no

---

[8] Wis. S. Ct. IOP, IV, J. (Aug. 4, 2023).

[9] In 1992, a panel of three federal judges declared that the Wisconsin Constitution did not require "literal contiguity" because "it has been the practice of the Wisconsin legislature to treat islands as contiguous with the cities or villages to which they belong." Prosser v. Elections Bd., 793 F. Supp. 859, 866 (W.D. Wis. 1992).

8

one's surprise, they instead waited for the Clarke petitioners to file this suit immediately after the makeup of the court changed, courtesy of an election bought and paid for by the Democratic Party of Wisconsin.[11]

¶197 "Legal opinions are important . . . for the reasons they give, not the result they announce[.] . . . An opinion that gets the reasons wrong gets everything wrong . . . ." Antonin Scalia, The Dissenting Opinion, 1994 J. Sup. Ct. Hist. 33, 33 (1994). An apt description of the majority opinion. Although the majority purports to interpret our constitution, it fails to follow our judicial methodology——or any methodology at all. See Wis. Just. Initiative, Inc. v. Wis. Elections Comm'n, 2023 WI 38, 407 Wis. 2d 87, 990 N.W.2d 122 (originalism). Unbounded by methodological discipline, the majority opinion is devoid of an intellectual foundation and without integrity.

¶198 The majority misuses dictionaries to declare the constitutional contiguity requirements "mean what they say." Majority op., ¶3. Although the words "contiguous territory" come from our original constitution of 1848, the majority relies most heavily on modern dictionaries, considering contemporaneous dictionaries and practices from the founding of the state mere "support." Id., ¶17. It is elementary that words don't have

---

[10] It appears that at least since the 1970s, Wisconsin's legislative maps, whether drawn by the legislature or adopted by a court, have contained municipal islands.

[11] See WisPolitics Tracks $56 Million in Spending on Wisconsin Supreme Court Race, WisPolitics (July 19, 2023), https://www.wispolitics.com/2023/wispolitics-tracks-56-million-in-spending-on-wisconsin-supreme-court-race/.

meaning on their own; their meaning comes from the context in which they are used. See Towne v. Eisner, 245 U.S. 418, 425 (1918) (citing Lamar v. United States, 240 U.S. 60 (1916) ("A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."). The majority's reliance on modern dictionaries is misplaced.

¶199 The majority resorts to verifiable fibs, maintaining that "using practically any dictionary" "contiguous means 'touching' or 'in actual contact.'" Majority op., ¶16. That is patently untrue, and the majority knows it. The respondents cited a litany of contemporaneous dictionaries defining contiguous to mean "near" or "close" to, but not necessarily touching:

> Nathan Bailey, An Universal Etymological English Dictionary (1775) (Contiguous: "that touches, or is next; very near, close, adjoining"); Samuel Johnson & John Walker, A Dictionary of the English Language 153 (1828) (Contiguity: "Actual contact; nearness of situation"; Contiguousness: "Close connection"); John Ogilvie & Charles Annandale, The Imperial Dictionary of the English Language 571 (1885) (Contiguity: "Actual contact of bodies; a touching; nearness of situation or place; a linking together, as a series of objects; a continuity."; Contiguous: "Touching; meeting or joining at the surface or border; close together; neighbouring; bordering or adjoining"); Contiguity, Black's Law Dictionary (1st ed. 1891) ("In close proximity; in actual close contact."); James A.H. Murray, A New English Dictionary on Historical Principles 903 (1893) (Contiguity: "loosely. Close proximity, without actual contact"; Contiguous: "loosely. Neighbouring, situated in close proximity (though not in contact)"); Robert Hunter & Charles Morris, Universal Dictionary of the English Language

10

1238 (1897) (Contiguity: "Ordinary language: (1) Contact with, or (more loosely) immediate proximity to, nearness in place"; Contiguous: "Ordinary language: 1. Meeting so as to touch; adjoining, touching, close together, connected. . . . 2. Used more loosely in the sense of neighbouring, close, near.").

It is intellectually dishonest to pretend these definitions do not exist and that the respondents never provided them. The majority also neglects to mention that this court has recognized the term "contiguous" is often used to mean near, but not necessarily touching. N. Pac. Ry. Co. v. Douglas Cnty., 145 Wis. 288, 291, 130 N.W. 246, 248 (1911) ("'Adjacent' is sometimes used for touching on or bounded by; but strictly speaking it signifies, near to but not touching; contiguous is probably sometimes also used in the former sense and sometimes and more properly in the latter, while 'adjoining' is really the proper term for in contact with, though each of such words is occasionally used in a perverted way. It will be found that they have been construed variously by courts according to circumstances."); Hennessy v. Douglas Cnty., 99 Wis. 129, 136-37, 74 N.W. 983 (1898) ("'Adjacent' signifies, in this connection, 'lying near, close to, or contiguous, but not actually touching.'").

¶200 The majority's misuse of dictionaries betrays a profound misunderstanding of how these resources are used in legal analysis. A dictionary is not a talisman that a judge can invoke to provide the definitive meaning of a term used in a statute or constitution. It is merely a tool among several a judge may use to understand a text's meaning. Care must be

11

taken for a number of reasons. Dictionaries "define the core meanings of a term" but often omit "the periphery." Antonin Scalia & Brian A. Garner, Reading Law: The Interpretation of Legal Texts 418 (2012). Dictionaries also often omit typical, ordinary uses of terms, or list the order of possible definitions differently and for different reasons. Ellen P. Aprill, The Law of the Word: Dictionary Shopping in the Supreme Court, 30 Ariz. State L.J. 275, 298 (1998). Because words often have more than one meaning, context matters a great deal. Dictionaries cannot tell you what, in context, a word means. A dictionary is merely a "museum of words." Frank H. Easterbrook, Text, History, and Structure in Statutory Interpretation, 17 Harv. J.L. & Pub. Pol'y 61, 67 (1994). Accordingly, "a comparative weighing of dictionaries is often necessary" when they are employed. Scalia & Garner, supra, at 417. Dictionaries cannot communicate what words mean in a specific context.

¶201 The majority does not seem to recognize the limits of dictionaries, or the importance of acknowledging and weighing different definitions. The majority resorts to fabrication with its obviously false claim that all dictionaries define the term "contiguous" the way the majority prefers. The remarkable power to declare something unconstitutional——and forever remove it from democratic decision making——should be exercised carefully and with humility. The majority's drive-by dictionary citations exhibit a slipshod analysis.

¶202 The majority's lack of intellectual foundation is on full display with its asymmetrical treatment of cases and dictionaries. For reasons left unexplained, the majority treats dictionaries contemporaneous to the constitution's ratification as less authoritative than modern dictionaries. Majority op., ¶¶16-17. But the majority treats older cases as more authoritative than recent cases. See id., ¶¶21-23. The majority does not even attempt to square the circle. This inconsistency reveals the majority is not searching for the constitution's meaning, but carefully cherry-picking sources to feign support for its preferred outcome.

¶203 True to form, the majority mischaracterizes the respondents' contiguity argument. The majority contends that respondents claim "a district with separate, detached territory" is contiguous provided it is a municipal island and "the main body of the municipality is located elsewhere in the district." Id., ¶18. But the respondents' actual argument on the contiguity requirement doesn't resemble the majority's retelling.

¶204 The respondents argue the term "contiguous territory" in Article IV, Sections 4 and 5 of the Wisconsin Constitution allows for the use of existing municipal boundaries to form a single district. For example, if town and city boundaries are used to form an assembly district, as long as the town and city share a border, or are near each other, the "contiguous territory" requirement is met, even if the city or town has municipal islands.

13

¶205 Central to respondents' interpretation, the term "territory" in the phrase "contiguous territory" refers to the various government entities (like towns and wards) that are used to create an assembly or senate district. See State ex rel. Reynolds v. Zimmerman, 23 Wis. 2d 606, 128 N.W.2d 16 (1964) (per curium) (requiring "individual senate districts [to] consist[ ] of contiguous assembly districts"). Under respondents' theory, an assembly district contains "detached territory" if, for example, it includes a town that does not touch, or is not near, any other government entity used to form the assembly district. Accordingly, respondents believe their interpretation is consistent with Lamb's statement that an assembly district "cannot be made up of two or more pieces of detached territory." Lamb, 83 Wis. at 148. Contrary to the majority's recasting of respondents' argument, respondents do not believe that "detached territory can still be contiguous——so long as the detached territory is a 'municipal island[ ].'" Majority op., ¶18. Respondents reject the idea that municipal islands are "detached territory" in the context of the contiguity requirement.

¶206 Based on its own mischaracterization of respondents' argument, the majority claims the respondents' contiguity interpretation "would essentially require us to read an exception into the contiguity requirements——that district territory must be physically touching, except when the territory is a detached section of a municipality located in the same district." Id. And because "the text contains no such exception," the court rejects the respondents' argument. Id.,

14

¶19. This is sophistry. The respondents never even suggested the "district['s] territory" must be touching. Nor did the respondents ask the majority to create an exception to the constitution's commands. Instead, the respondents provided an interpretation of "contiguous territory" the majority finds too difficult to refute. In response, the majority tilts at windmills——pretending the respondents made an argument that is easier for the majority to dismiss. After completing its exercise in deception, the majority simply assumes——without any analysis whatsoever——that the word "territory" refers to the land comprising a district.

¶207 Glossing over these glaring analytical errors, the majority obliges its political benefactor, seizing the exclusive constitutional roles of the legislature and the governor in the redistricting process, and anointing itself an all-powerful committee of four to supplant the political choices of the coordinate branches with its subjective notions of what is "fair." Such "accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many, and whether hereditary, self appointed, or elective, may justly be pronounced the very definition of tyranny." The Federalist No. 47, supra, at 324 (Madison).

## II. THE CONSTITUTION CONSTRAINS THIS COURT FROM OVERSTEPPING ITS AUTHORITY AND INVADING THE POLITICAL BRANCHES' DOMAIN

¶208 If the current maps were unconstitutional, the only proper exercise of this court's power would be a remedy that respects the legislature's and the governor's constitutionally prescribed roles in the redistricting process. If the members

15

of the majority were acting as a court rather than a super legislature of four, they would modify the maps only to the extent necessary to comply with the law. Specifically, if the majority wished to remedy only detached municipal islands, as it professes, it would adopt the respondents' proposal and redraw only those districts containing detached territory. The majority refuses to do so, with nothing more than a single sentence explanation in which the majority says a more modest remedy would "cause a ripple effect across other areas of the state" so new maps are "necessary." Majority op., ¶56. The majority offers zero support for this conclusory assertion because none exists. The majority instead dispenses with the existing maps in order to confer an advantage on its preferred political party with new ones.

¶209 The majority abandons the court's least-change approach adopted in Johnson I in order to fashion legislative maps that "intrude upon the constitutional prerogatives of the political branches and unsettle the constitutional allocation of power." 399 Wis. 2d 623, ¶64. The least-change approach in Johnson I guaranteed the court would ground any reapportionment decisions in the law alone, leaving the political decisions of redistricting to the political branches where they belong. Id., ¶71. The majority's decision to discard the judicially restrained methodology of Johnson I unveils its motivation to redraw the legislative maps for the benefit of Democratic state legislative candidates. By design, the majority's transparently political approach will reallocate political power in Wisconsin

16

via a draconian remedy, under the guise of a constitutional "error" easily rectified by modest modifications to existing maps.

¶210 The majority misrepresents the least-change approach as "an unclear assortment of possible redistricting metrics," majority op., ¶61, a hypocritical stance for justices who replace it with a "partisan impact" factor bereft of any definition.  The majority misleads the public to disguise what it is actually doing:  abandoning the law and giving itself free reign to shift political power from Republicans to Democrats. In overruling the following holding, the majority rejects the notion that it should confine its actions to the powers the people gave the judiciary:  "Because the judiciary lacks the lawmaking power constitutionally conferred on the legislature, we will limit our remedy to achieving compliance with the law rather than imposing policy choices."  Johnson I, 399 Wis. 2d 623, ¶72; accord id., ¶85 (Hagedorn, J., concurring) ("A least-change approach is the most consistent, neutral, and appropriate use of our limited judicial power to remedy the constitutional violations in this case").

¶211 The majority professes to overrule Johnson I's least-change approach because it is supposedly "unworkable in practice."  Majority op., ¶63.  The voters of Wisconsin should remember that four justices have confessed an inability to conform their official actions to the law.  It should be neither "impracticable" nor "unfeasible," id., for any jurist to set aside policy preferences and instead apply the law.  As a

17

barrier to judges basing their decisions on political leanings, the least-change approach is only "impracticable" and "unfeasible" for justices who wish to act as a super legislature, as the members of the majority do in this case. A majority may dismantle that barrier but the judicial oath of office remains.

¶212 As the respondents proposed, any contiguity violation could be remedied by simply dissolving municipal islands into their surrounding assembly districts. The majority dismisses the idea without explaining why the maps must instead be redrawn in their entirety. To say the quiet part out loud, confining the court's remedy to districts with municipal islands would deprive the majority of its desired political outcome. Its overreach flouts not only Johnson I but also black-letter law limiting the judiciary's remedial powers.

¶213 "The remedial powers of an equity court must be adequate to the task, but they are not unlimited." Whitcomb v. Chavis, 403 U.S. 124, 161 (1971). Under this longstanding principle of judicial restraint, the remedy in this case——as in all cases——should be tailored to the actual violation. If a district contains unconstitutionally noncontiguous territory, then dissolving the detached territory into its surrounding district represents the most logical and adequate remedy. This more modest remedy would minimize disruption to Wisconsin voters. The majority's drastic remedy of overhauling the entirety of the legislative maps will maximize it.

18

¶214 A district-by-district remedy rather than a full redrawing of the legislative maps would follow the federal approach to redistricting cases the majority once professed to revere. Johnson I, 399 Wis. 2d 623, ¶88 (Dallet, J. dissenting) ("[T]he federal courts . . . are best suited to handle redistricting cases."). In Gill v. Whitford, the United States Supreme Court considered whether voters had federal standing to challenge the entirety of the 2011 Wisconsin state legislative maps as an unfair partisan gerrymander. 585 U.S. ___, 138 S. Ct. 1916, 1929-30 (2018). Without deciding the merits of the voters' partisan gerrymandering claims, the Court said if a harm were found it "does not necessarily require restructuring all of the State's legislative districts." Id. at 1931. This holding relied on the following principle: A "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." Lewis v. Casey, 518 U.S. 343, 357 (1996). A court's modifications of an otherwise constitutional map should be confined to those necessary to remedy the constitutional violations. Upham v. Seamon, 456 U.S. 37, 42-43 (1982).

¶215 The parties identified approximately 200 municipal islands surrounded by another assembly district in violation of the majority's crabbed reading of the contiguity requirement in Article IV, Sections 4 and 5 of the Wisconsin Constitution. The vast majority of these districts contain few people; many are uninhabited. The majority opinion does not address these facts and instead emphasizes a few districts it believes are the most

19

egregious to justify the unwarranted redrawing of the legislative maps in their entirety. Majority op., ¶¶31-33. Less than five percent of the roughly 200 municipal islands have more than 100 people. The court could easily satisfy the majority's new definition of contiguity by dissolving each municipal island into its surrounding district. Some tinkering would have to be done to bring the maps into compliance with the one-person, one-vote principle, but this remedy would stop short of wading into the political morass of redrawing maps from scratch. The majority shuns a modest remedy because it would foreclose consideration of the partisan "impact" factor the majority buries at the end of its opinion but which will dominate the entire process going forward.

III. PARTISAN FAIRNESS IS NOT A JUDICIALLY MANAGEABLE STANDARD

¶216 Buried at the end of its opinion, the majority identifies "partisan impact" as the fifth and last "redistricting principle" it will consider in reallocating political power in this state. Id., ¶69. Its placement disguises the primacy this factor will have in the majority's schemes. The majority neglects to offer a single measure, metric, standard, or criterion by which it will gauge "partisan impact." Most convenient for the majority's endgame, there aren't any, lending the majority unfettered license to design remedial maps fulfilling the majority's purely political objectives. See Harper v. Hall, 881 S.E.2d 156, ¶124 (2023) (Newby, J., dissenting), opinion withdrawn and superseded on reh'g, 886 S.E.2d 393 (2023) ("By intentionally stating vague

20

standards, it ensures that four members of this Court alone understand what redistricting plan is constitutionally compliant.").

¶217 In considering "partisan impact," the majority acts without authority. Unlike other state constitutions,[12] "[n]othing in the Wisconsin Constitution authorizes this court to recast itself as a redistricting commission in order 'to make [its] own political judgment about how much representation particular political parties deserve——based on the votes of their supporters——and to rearrange the challenged districts to achieve that end.'" Johnson I, 399 Wis. 2d 623, ¶45 (quoting Rucho v. Common Cause, 588 U.S. ___, 139 S. Ct. 2484, 2499 (2019)). "The people have never consented to the Wisconsin judiciary deciding what constitutes a 'fair' partisan divide; seizing such power would encroach on the constitutional prerogatives of the political branches." Id., ¶45 (citing Vieth v. Jubelirer, 541 U.S. 267, 291 (2004) (plurality opinion)).

¶218 The majority's decision to consider the "partisan impact" of proposed maps lacks any legal foundation, enabling the majority to engage in a purely political exercise. As the court explained in Johnson I, the "lack of standards by which to

---

[12] See Fla. Const. art. III, § 21(a) ("No apportionment plan or district shall be drawn with the intent to favor or disfavor a political party or an incumbent[.]"); Ohio Const. art. XI, § 6 (prohibiting redistricting commission from creating a legislative district plan that favors or disfavors a political party); Mo. Const. art. III, § 3 ("Districts shall be designed in a manner that achieves both partisan fairness and, secondarily, competitiveness."); Colo. Const. art. V, § 48.1(3)(a) (directing the redistricting commission to "maximize the number of politically competitive districts").

21

judge partisan fairness is obvious from even a cursory review of partisan gerrymandering jurisprudence." 399 Wis. 2d 623, ¶41. Accordingly, courts "'have no license to reallocate political power between the two major political parties,' because 'no legal standards [exist] to limit and direct [our] decisions.'" Id., ¶52 (quoting Rucho, 139 S. Ct. at 2507).

¶219 The majority says it will "take care to avoid selecting remedial maps designed to advantage one political party over another," but provides no guiding principles to govern its actions. Majority op., ¶71. The majority doesn't offer any limiting principles because there aren't any. By its nature, redistricting involves political decisions entrusted to the legislative branch. Despite its unconvincing attempts to shroud its "partisan impact" lodestar with empty invocations of judicial neutrality and impartiality, adjudicating "partisan impact" unavoidably "recast[s] this court as a policymaking body rather than a law-declaring one." Johnson I, 399 Wis. 2d 623, ¶52.

¶220 The majority says it won't select a map "designed to advantage one political party over another" or one that "privilege[s] one political party over another." Majority op., ¶¶70-71. Words like "advantage" and "privilege" imply a baseline of fairness, but the court never defines it. It can't; no law says what an "unfair" political advantage in a legislative map looks like. And what about third parties? The majority will marginalize and exclude minority interests if it fails to bestow proportional representation on every minor

22

party; after all, the constitution does not privilege the dominant parties. The novice map drawers in the majority would then discover what "unworkable in practice," id., ¶63, really means.

¶221 The United States Supreme Court comprehensively described the impossibility of judicially defining or identifying what constitutes politically "fair" maps, an irrefutable point we echoed in Johnson I. 399 Wis. 2d 623, ¶¶40-41. In Rucho v. Common Cause, the Court documented the presence of partisanship in the drawing of legislative districts——by the political branches——dating back to the founding of our nation. 139 S. Ct. at 2494-95. There is nothing surprising about it; the legislative and executive branches are, well, political. The judiciary is not supposed to be.[13] In declaring such claims nonjusticiable, the Court highlighted two of its prior cases,[14] in which it attempted to define what constitutes an unfair partisan apportionment. Id. at 2497-98. In doing so, it reiterated Justice Anthony Kennedy's earlier admonition that judicial standards must be "'clear, manageable, and politically neutral.'" Id. at 2498 (quoting Vieth, 541 U.S. at 308-09 (Kennedy, J., concurring in

---

[13] See Williams-Yulee v. Fla. Bar, 575 U.S. 433, 437 (2015) ("Judges are not politicians, even when they come to the bench by way of the ballot.").

[14] In both of those cases, the United States Supreme Court did not reach a majority and the number of separate writings reveal the utter confusion over what judicial standard to apply when judges are tasked with determining what level of partisanship is "fair." See Davis v Bandemer, 478 U.S. 109 (1986); Vieth v. Jubelirer, 541 U.S. 267 (2004).

23

the judgment)). Because the Court was unable to identify any legal standards by which to adjudicate partisan fairness, it determined such claims involve nonjusticiable political questions "beyond the competence of the federal courts." Id. at 2500. The majority in this case believes it possesses a judicial ability the United States Supreme Court somehow lacks. What extraordinary hubris.

¶222 In successfully convincing the majority to consider partisan fairness, petitioners point to the difference between the statewide percentage of votes received by Democrats compared to the number of Democrats in the state legislature. Their argument presumes that an individual voter who votes for a Democrat at the top of the ticket will automatically support a Democratic state legislative candidate. Voters do not, however, blindly cast their ballots for one party. Whitford v. Gill, 218 F. Supp. 3d 837, 936 (W.D. Wis. 2016) (Griesbach, J., dissenting), vacated, 138 S. Ct. 1916 (2018) ("Party affiliation is not set in stone or in a voter's genes[.]"). A variety of factors influence electoral choices. See Rucho, 139 S. Ct. at 2503. Partisan preferences can change rapidly and social science cannot reliably predict voters' future choices among candidates. Id. Political identification is not an immutable

24

characteristic; election results in Wisconsin reveal recurring shifts in party preferences and loyalties.[15]

¶223 What the majority calls "partisan impact" will mean proportional representation. See id. at 2499 ("Partisan gerrymandering claims invariably sound in a desire for proportional representation."). Proportionality is far from politically neutral and is incompatible with the constitution, which requires single-member legislative districts. Wis. Const. art. IV, §§ 4-5. Requiring single-member districts renders proportionality impossible because single-member district elections unavoidably produce disproportionate results. See Whitford, 218 F. Supp. 3d at 950 (Griesbach, J., dissenting) ("Another reason proportionality is not a right is that disproportionality is built in, and in fact even assumed, in winner-take-all systems of voting."). Proportionality is also in tension with our state constitution "because Article IV of the Wisconsin Constitution specifies requirements that favor the preservation of communities of interest, irrespective of individual partisan alignment." Johnson I, 399 Wis. 2d 623, ¶47. The majority attacks our representative form of government by introducing the extra-constitutional criterion of "partisan impact."

---

[15] Craig Gilbert, What 30 Years of Voting History Tells Us about Wisconsin's Shifting Suburban Vote, Milwaukee J. Sentinel, May 10, 2023, https://www.jsonline.com/story/news/politics/analysis/2023/05/10/how-the-2024-presidential-race-in-wisconsin-hinges-on-suburban-trends/70179579007/.

¶224 Perfect political symmetry between the statewide vote and the composition of the legislature is unattainable because of the geographic distribution of the state's voters. While Wisconsin has had close statewide races over the prior decade, the concentration of voters differs dramatically among urban, suburban, and rural areas of the state. For example, in the 2020 presidential election, Dane County and Milwaukee County, the two largest counties by total votes, cast approximately 35 percent of the total statewide votes for Joe Biden.[16] Waukesha and Brown County[17] accounted for only 14 percent of the total statewide votes for Donald Trump. Increasingly, the large percentage of Democratic votes from Dane County has been a determining factor in otherwise close statewide elections.[18] Republican statewide candidates receive support from more rural and less densely populated counties throughout the state. This

---

[16] President Biden received 1,630,866 total votes in Wisconsin in 2020 and Dane County recorded 260,121 votes for Biden and Milwaukee County recorded 317,527 votes for Biden. 2020 Wisconsin Election Results, N.Y. Times, (Accessed Nov. 30, 2023), https://www.nytimes.com/interactive/2020/11/03/us/elections/results-wisconsin.html.

[17] These two counties were chosen for comparison because their voters cast the two highest number of ballots for Donald Trump. Of the 1,610,184 total votes Donald Trump received in Wisconsin in 2020, Waukesha County recorded 159,649 votes and Brown County recorded 75,871 votes. Id.

[18] Ruth Conniff, How Dane County is Making Wisconsin Less Red, Isthmus, Dec. 3, 2022, https://isthmus.com/opinion/opinion/how-dane-county-is-making-wisconsin-less-red/.

political reality[19] illustrates why the statewide vote is a flawed indicator of what the makeup of the state legislature "should" be. Even if representative proportionality were an attainable goal, the constitution gives the judiciary, the only non-partisan branch of state government, no role to play in such political calculations.

¶225 Supreme Court Justice Sandra Day O'Connor, a former state legislator, recognized the unsound premises underlying proportional representation, which the majority fails to grasp in its quest to enforce partisan "fairness":

> This preference for proportionality is in serious tension with essential features of state legislative elections. Districting itself represents a middle ground between winner-take-all statewide elections and proportional representation for political parties. If there is a constitutional preference for proportionality, the legitimacy of districting itself is called into question: the voting strength of less evenly distributed groups will invariably be diminished by districting as compared to at-large proportional systems for electing representatives. Moreover, one implication of the districting system is that voters cast votes for candidates in their districts, not for a statewide slate of legislative candidates put forward by the parties. Consequently, efforts to determine party voting strength presuppose a norm that does not exist——statewide elections for representatives along party lines.

Davis v. Bandemer, 478 U.S. 109, 159 (1986) (O'Connor, J., concurring in the judgment) (emphasis added). Justice Antonin Scalia explained that the federal Constitution, like ours, does

---

[19] "Democrats have often been concentrated in cities while Republicans have often been concentrated in suburbs and sometimes rural areas." Vieth, 541 U.S. at 359 (2004) (Breyer, J., dissenting).

27

not guarantee "equal representation in government to equivalently sized groups. It nowhere says that farmers or urban dwellers, Christian fundamentalists or Jews, Republicans or Democrats, must be accorded political strength proportionate to their numbers." Vieth, 541 U.S. at 288.

¶226 By shoehorning consideration of "partisan impact" into the remedial phase of this litigation, the majority strikes a blow against our republican form of government. Forcing legislative representation reflecting the statewide strength of a political party on citizens in less populated areas of the state overrides their choice of candidates without their consent. "Proportional party representation is simply incompatible with the constitutionally prescribed form of representative government chosen by the people of Wisconsin." Johnson I, 399 Wis. 2d 623, ¶50.

¶227 The majority says it must consider "partisan impact" in redrawing the state's legislative maps in order to remain politically "neutral and independent." Majority op., ¶71. If that "sounds contradictory," Johnson I, 399 Wis. 2d 623, ¶112 (Dallet, J., dissenting), that's because it is. The court concedes its decision does not derive from the Wisconsin Constitution or any other law. And the gerrymander-claim-versus-judicial-remedy distinction, which "appears at first to be an escape hatch" for the majority is "upon reflection, a trap door." Nathaniel Persily, In Defense of Foxes Guarding Henhouses: The Case for Judicial Acquiescence to Incumbent-Protecting Gerrymanders, 116 Harv. L. Rev. 649, 673 (2002). The

28

majority's fixation on "partisan impact" might, intentionally or unintentionally, run afoul of the Voting Rights Act. 52 U.S.C. § 10301. Historically, a preoccupation with "fair maps" has come at the expense of communities of color. Johnson III, 401 Wis. 2d 198, ¶¶96-104 (Rebecca Grassl Bradley, J., concurring). By injecting "partisan impact" into the calculation, the majority transforms itself into a legislative body making political and policy decisions. A pledge to be "neutral and independent" cannot be fulfilled when the majority appropriates the political tasks of redistricting that belong to the political branches.

¶228 Since the majority recognizes its focus on partisan fairness is untethered to law, it must explain, in a politically neutral way, why judicial neutrality does not require the consideration of countless other factors. The majority's choice to consider "partisan impact" is imbued with policy determinations necessitating overtly political choices. Opening the door to judicial policymaking in this manner invites interest groups of every kind to demand "fairness" in representation on any basis whatsoever: sex, religion, age, socioeconomic status, gender identity, etc. As a matter of policy, why wouldn't the majority ensure that farmers, union members, property owners, renters, small business owners, and hunters have representation in proportion to their numbers? See Vieth, 541 U.S. at 288; Johnson I, 399 Wis. 2d 623, ¶57 (citing Larry Alexander & Saikrishna B. Prakash, Tempest in an Empty Teapot: Why the Constitution Does Not Regulate Gerrymandering,

29

50 Wm. & Mary L. Rev. 1, 21-22 (2008)) (noting that if proportionality for partisan affiliation is required, every group, including gun owners and vegetarians, has a valid claim to proportional representation in the legislature because "[n]othing distinguishes partisan affiliation from hundreds——perhaps thousands——of other variables"). Is it acceptable to increase partisan fairness at the expense of the ability of Evangelical Christians to elect their preferred candidates? Why does the majority prioritize partisan fairness over the interests of the elderly? The answer is obvious; the majority's decision is deeply partisan. So much for judicial neutrality.

¶229 "A government of laws means a government of rules." Morrison v. Olson, 487 U.S. 654, 733 (1988) (Scalia, J., dissenting). The majority replaces rules with whim, preferring its own malleable notions of fairness over constitutional commands, in order to engineer districts more favorable for Democratic state legislative candidates. The majority succumbs to the temptation of results at the expense of its own legitimacy. Robert H. Bork, The Tempting of America: The Political Seduction of the Law 2 (1990).

IV. LACHES AND JUDICIAL ESTOPPEL SHOULD BAR THIS CASE

¶230 Redistricting is the quintessential "political thicket." See Colegrove v. Green, 328 U.S. 549, 556 (1946) (plurality opinion). We should not decide such cases unless, as in 2021, we must. In this case, we need not enter the thicket. Unlike the majority, I would not address the merits. A collateral attack on a supreme court judgment, disguised as an

30

original action petition, would ordinarily be dismissed upon arrival. Allowing petitioners' stale claims to proceed makes a mockery of our judicial system, politicizes the court, and incentivizes litigants to sit on manufactured redistricting claims in the hopes that a later, more favorable makeup of the court will accept their arguments. The doctrines of laches and judicial estoppel exist to prevent such manipulation of the judicial system.

### A. Laches

¶231 Two days after Protasiewicz's election, one of the six law firms representing the petitioners announced its plan "to challenge the state's voting maps based on the assertion that partisan gerrymandering violates the Wisconsin Constitution," although at that point the lawyers were "still putting the pieces together about what we think the most successful arguments will be."[20] It is hard to imagine a more fitting case for the application of laches than a tardy litigant calling to collect on judicial campaign trail promises. To preserve its institutional legitimacy, the court should have applied the doctrine and dismissed this action.

¶232 The doctrine of laches bars relief "when a claimant's failure to promptly bring a claim causes prejudice to the party having to defend against that claim." Wis. Small Bus. United, Inc. v. Brennan, 2020 WI 69, ¶11, 393 Wis. 2d 308, 946 N.W.2d 101 (citation omitted). This affirmative, equitable

---

[20] Kelly, supra note 3.

31

defense ensures that "'equity aids the vigilant, and not those who sleep on their rights to the detriment of the opposing party.'" State ex rel. Wren v. Richardson, 2019 WI 110, ¶14, 389 Wis. 2d 516, 936 N.W.2d 587 (quoting 27A Am. Jur. 2d Equity § 108). "Application of laches is within the court's discretion upon a showing by the party raising the claim of [1] unreasonable delay, [2] lack of knowledge the claim would be raised, and [3] prejudice." Trump v. Biden, 2020 WI 91, ¶10, 394 Wis. 2d 629, 951 N.W.2d 568 (citation omitted). The doctrine of laches is of particular importance in election-related disputes. Id., ¶11.

¶233 All three elements of laches exist in this case. The constitution limits redistricting to occur once every ten years, after the federal census, and the constitution gives the legislature the power of reapportionment. Only political stalemate triggers court involvement. See Wis. Const. art. IV, § 3; Johnson I, 399 Wis. 2d 623, ¶18; Baldus, 849 F. Supp. 2d at 859 (citing Zimmerman, 266 Wis. 307) (noting the Wisconsin Constitution's "command" "not to re-district more than once each 10 years."). We should not indulge litigants who sat out Johnson——or worse yet, were parties in Johnson——and who strategically conjure legal claims that could have been made more than two years ago. "The doctrine of laches is derived from the maxim that those who sleep on their rights, lose them." Chattanoga Mfg., Inc. v. Nike, Inc., 301 F.3d 789, 792 (7th Cir. 2002).

32

¶234 As a preliminary matter, the doctrine of laches applies to redistricting claims, as well as requests for injunctive relief, notwithstanding an alleged ongoing harm. Petitioners contend laches does not apply in this case because an alleged harm——constitutionally noncontiguous districts——is ongoing and they are requesting prospective relief. The majority appears to agree. See majority op., ¶43 n.20. But as one court explained, an ongoing-violation theory "is contrary to well settled reapportionment and laches case law." Fouts v. Harris, 88 F. Supp. 2d 1351, 1354 (S.D. Fla. 1999), aff'd sub nom. Chandler v. Harris, 529 U.S. 1084 (2000) (citation omitted) (barring claim that districts were racially gerrymandered contrary to the United States Constitution with the doctrine of laches); see also White v. Daniel, 909 F.2d 99 (4th Cir. 1990) (applying laches to bar redistricting claim under Section 2 of the Voting Rights Act of 1965); Sanders v. Dooly County, 245 F.3d 1289 (11th Cir. 2001) (applying laches to deny request for injunctive relief related to a districting plan containing racially gerrymandered districts violating the Equal Protection Clause); Knox v. Milwaukee Cnty. Bd. of Elections Comm'rs, 581 F. Supp. 399 (E.D. Wis. 1984) (applying laches to deny request to enjoin implementation of a Milwaukee reapportionment plan, which plaintiffs claimed violated Section 2 of the Voting Rights Act of 1965); Mac Govern v. Connolly, 637 F. Supp. 111 (D. Mass. 1986) (applying laches to bar injunctive relief for plaintiffs claiming the state legislative maps where not equally apportioned under the Equal Protection Clause); Chestnut v.

33

_Merrill_, 377 F. Supp. 3d 1308 (N.D. Ala. 2019) (applying laches to deny injunctive relief under Section 2 of the Voting Rights Act of 1965 against challenged districts). Wisconsin precedent accords with federal cases. This court has approved the use of laches to deny prospective injunctive relief, even against government actors seeking to vindicate public rights. _Forest Cnty. v. Goode_, 219 Wis. 2d 654, 681-84, 579 N.W.2d 715 (1998) (stating that laches should be considered by the circuit court when deciding whether to issue an injunction against one violating a zoning ordinance). The doctrine of laches applies to claims for prospective relief, even in the redistricting context.

### 1. Unreasonable Delay

¶235 The first element of laches concerns whether the petitioners "unreasonably delayed" in bringing their claim. _Trump_, 394 Wis. 2d 629, ¶13. "What constitutes an unreasonable delay varies and 'depends on the facts of a particular case.'" _Id._ (quoting _Brennan_, 393 Wis. 2d 308, ¶14). Because redistricting cases require the court to enter the political thicket, and in light of the disruption another round of redistricting may cause, this requirement has extra force in redistricting cases and analogous contexts. See _id._, ¶30 ("Parties bringing election-related claims have a special duty to bring their claims in a timely manner."). This element is met.

¶236 The Wisconsin legislature last enacted legislative maps in 2011 and those maps contained municipal islands. 2011

34

Wis. Act 44; 2011 Wis. Act 43. None of the petitioners argued the maps were unconstitutional for containing noncontiguous territory within one or more districts. The maps created in 2011 became unconstitutionally malapportioned due to population shifts identified following the census of 2020. Johnson I, 399 Wis. 2d 623, ¶16. Four voters filed an original action with this court, seeking a mandatory injunction to remedy malapportionment. Id., ¶5. We invited any prospective intervenor to move to participate in Johnson and granted every motion to intervene. Johnson II, 400 Wis. 2d 626, ¶2. Many of the parties in this case——the Governor and all but two of the Atkinson intervenor-petitioners[21]——participated in Johnson. They did not argue the 2011 maps contained unconstitutionally noncontiguous districts nor did they propose the definition of contiguity advanced and adopted in this case. In fact, the petitioners who participated in Johnson stipulated that municipal islands are constitutionally contiguous. The petitioners who participated in both cases could have raised the contiguity issue in Johnson. They didn't. They could have moved the court for reconsideration after we issued our decision. They didn't. To wait nearly two years after our decision in Johnson I addressed the meaning of contiguous territory constitutes unreasonable delay, even setting aside the admitted gamesmanship of the litigants.

¶237 The majority starts the unreasonable-delay clock after Johnson III was decided and insists the Clarke petitioners did

---

[21] The two newcomers are Nathan Atkinson and Leah Dudley.

35

not immediately raise the contiguity issue after Johnson III because petitioners "could not obtain relief prior to the 2022 elections." Majority op., ¶42. But the majority presupposes something prevented the Clarke petitioners from participating in the Johnson litigation. Nothing did. The petitioners who sat out Johnson have never explained why they did not participate in Johnson, even when given the opportunity to explain themselves at oral argument. Nor did they show they were reasonably unaware of the contiguity issue at that time. "[U]nreasonable delay in laches is based not on what litigants know, but what they might have known with the exercise of reasonable diligence. This underlying constructive knowledge requirement arises from the general rule that 'ignorance of one's legal rights is not a reasonable excuse in a laches case.'" Wren, 389 Wis. 2d 516, ¶20 (quoting 27A Am. Jur. 2d Equity § 138) (emphasis added). Everyone knows this action was brought promptly after Protasiewicz joined the court because the petitioners knew she and the three dissenters in Johnson would welcome any opportunity to redraw the maps they viewed as "rigged." Laches bars such tactics. See Knox, 581 F. Supp. at 403-04 (finding unreasonable delay when the plaintiffs were given opportunities to participate in the districting process, voice their concerns, and even submit alternative plans, but chose not to).

¶238 If waiting to file this original action until August 2, 2023, one day after Protasiewicz's investiture, were not blatant enough, the law firm representing the petitioners said the quiet part out loud two days after Protasiewicz won her

election, promising to file a gerrymandering claim and admitting the firm would not have brought any claim if Protasiewicz had lost the election.[22] Contrary to the majority's telling, the petitioners did not just wait until "August of 2023" to bring their claims, majority op., ¶42; they waited until the day after the composition of the court changed——a fact so embarrassing the majority never acknowledges it. Such gamesmanship and delay would not be rewarded by a court with integrity. Trump v. Biden conveyed the court's expectation for parties to act diligently when bringing election-related claims. Relaxing the rule when the petitioners seek partisan advantage on behalf of Democrats signals that different standards apply to Republicans. Putting a partisan thumb on the scales of justice calls into question the court's legitimacy.

## 2. Lack of Knowledge

¶239 The second element of laches asks whether the respondents lacked knowledge that the petitioners would bring the contiguity claim. Brennan, 393 Wis. 2d 308, ¶18. Respondents assert they were unaware the petitioners would bring the contiguity claim. Nothing in the record suggests otherwise. The petitioners who did participate in Johnson all stipulated that municipal islands were constitutionally contiguous. The

---

[22] Kelly, supra note 3 ("When asked if she and her colleagues would be discussing a potential legal challenge if Protasiewicz hadn't won on Tuesday, Safar said, 'There wouldn't be an opportunity to have a fair argument, I don't think, under Justice Kelly.'"). This undermines——to put it mildly——the believability of counsel's statement at oral argument that petitioners would have filed this original action even if Protasiewicz had lost the election.

37

second element is met. See id. (holding the second element of laches is met if respondent "had no advance knowledge or warning of [the] particular claim").[23]

### 3. Prejudice

¶240 The third and final element of laches requires a showing of prejudice, which means "'anything that places the party in a less favorable position.'" Trump, 394 Wis. 2d 629, ¶24 (quoting Wren, 389 Wis. 2d 516, ¶32). In a context analogous to redistricting, this court has considered prejudice to third parties. See id., ¶¶25-27 (considering prejudice to voters in election-related context); id., ¶125 (Ziegler, J., dissenting) (noting the majority focused "on the prejudice to third parties"). Other courts have likewise considered prejudice to third parties in redistricting cases. White, 909 F.2d at 103-04 (considering the prejudicial effect judicially mandated redistricting would have on voters not party to the suit); Chestnut, 377 F. Supp. 3d at 1317 (similar); Fouts, 88 F. Supp. 2d at 1354 (similar); see Sanders, 245 F.3d at 1291. The third element of laches is met.

¶241 The respondents assert they spent considerable time and resources in the Johnson litigation to ensure Wisconsin voters would have constitutionally permissible maps for future elections. This court also spent considerable time and

---

[23] Although the respondents meet the second element of laches, it does not always apply because the requirement "focuses on the ability of the asserting party to mitigate any resulting prejudice when notice is provided. But this may not be possible in all types of claims." Trump v. Biden, 2020 WI 91, ¶23 n.10, 394 Wis. 2d 629, 951 N.W.2d 568.

38

resources on Johnson. Petitioners seek to wipe out all of the work done in Johnson——and the majority obliges. This is an accepted form of prejudice to respondents. See Wren, 389 Wis. 2d 516, ¶33 (noting economic prejudice is a cognizable form of prejudice for purposes of laches); 27A Am. Jur. 2d Equity § 144 (footnotes omitted) ("Prejudice may also be invoked by the expenditure of time and the effort that the plaintiff's delayed claim would defeat.").

¶242 Because the majority errs by starting the clock at the end of Johnson III, the majority fails to find any prejudice against the respondents. The respondents do not claim the costs of litigating this suit cause them prejudice. Instead, the respondents claim that wiping away all of the money, time, and effort devoted to Johnson is prejudicial. Contrary to what the majority asserts, prejudice in the form of wasted money, time, and effort on an action already concluded distinguishes respondents' claim of prejudice from the case on which the majority relies, which states that costs incurred in litigating a current suit are not prejudicial. Majority op., ¶43 (citing Goodman v. McDonnell Douglass Corp., 606 F.2d 800, 808 (8th Cir. 1979)). The prejudice to respondents is especially acute because all of the petitioners were either parties in Johnson or could have been. The contiguity challenge could have been resolved in that case. It is extremely prejudicial to the respondents for the petitioners to sit out litigation they were invited to join, "'gamble on the outcome'" of the litigation, "'and then challenge it when dissatisfied with the results.'"

39

See Trump, 394 Wis. 2d 629, ¶11 (quoting 29 C.J.S. Elections § 459 (2020)). But the majority doesn't care about that kind of unfairness.

¶243 Respondents are not the only ones to suffer prejudice as a result of the majority entertaining the petitioners' claim. The petitioners waited until after the maps adopted in Johnson had been used and after voters and legislators became accustomed to their new districts. Both voters and legislators are prejudiced by this suit because many legislators have developed relationships with their constituents. Redrawing the maps so soon after Johnson, and after elections have occurred under those maps, risks severe voter confusion——a well-recognized form of prejudice in the redistricting context. E.g., White, 909 F.2d at 104 ("We believe that two reapportionments within a short period of two years would greatly prejudice the County and its citizens by creating instability and dislocation in the electoral system and by imposing great financial and logistical burdens."); Chestnut, 377 F. Supp. 3d at 1317 ("[W]hile congressional races are better funded and more highly publicized, the court remains unconvinced that a more publicized election will necessarily educate voters on where the newly drawn district lines lay."); see also 27A Am. Jur. 2d Equity § 144 (Prejudice "may further arise from delayed actions challenging elections or election procedures, due to confusion to voters . . . .").

¶244 The majority unconvincingly attempts to dismiss the prejudice to voters engendered by redrawing the state

40

legislative maps. First, the majority minimizes this well-recognized form of prejudice as merely "vague assertions about disruption to the status quo." Majority op., ¶43. Second, the majority insists that "any disruption . . . is necessary to serve the public's interest in having districts that comply with each of the requirements of the Wisconsin Constitution." Id., ¶43. The majority's dismissiveness perfunctorily discounts the prejudice to confused voters. The majority surely did not apply this logic in Trump v. Biden. In that case, the petitioners sought the invalidation of several thousands of ballots because they were cast unlawfully or were otherwise invalid. 394 Wis. 2d 629, ¶1. The court held laches barred the petitioners from bringing their claims. Id., ¶3. The court held that voters would be prejudiced if their ballots were struck. Id., ¶¶24-28. The court did not disregard prejudice to voters simply because the public also has an interest in elections being conducted in accordance with state law. It would be one thing if the majority acknowledged this prejudice and then, using its discretion, decided not to apply laches because it thinks other interests outweigh the prejudice to confused voters. But to pretend no prejudice exists, because concluding otherwise would thwart the majority's political agenda, is shameful.

¶245 This court has applied the laches doctrine in election-related disputes specifically when the relief sought "would be an extraordinary step for this court to take." Trump, 394 Wis. 2d 629, ¶31. The petitioners in this case seek the extraordinary remedy of tossing the legislative maps in their

41

entirety and upending the political balance of the state legislature just months before the 2024 elections, yet the majority entertains a claim that could have been brought in Johnson I. Petitioners waited until the court's membership changed with the hope of achieving a more favorable outcome. An impartial application of this court's recent laches doctrine would bar the petitioners' claims.

### 4. Discretion

¶246 Even though all of the elements of laches are met, it remains within our discretion to apply the doctrine. Wren, 389 Wis. 2d 516, ¶15 (citing State ex rel. Washington v. State, 2012 WI App 74, ¶26, 343 Wis. 2d 434, 819 N.W.2d 305). Applying the doctrine of laches is the only "appropriate and equitable" decision in this case. Id. The constitution does not permit redistricting to be a yearly affair. It is a fundamentally political process in which this court acted in Johnson only to avoid a constitutional crisis. Johnson I, 399 Wis. 2d 623, ¶68 ("Judicial action becomes appropriate to prevent a constitutional crisis."). Absent political impasse, for the sake of our institutional legitimacy and out of respect for roles the constitution assigns to the political branches, we keep ourselves out of the process. Failure to bring redistricting claims promptly poses a great danger "to the entire administration of justice." Trump, 394 Wis. 2d 629, ¶30. Entertaining political claims delayed until the seating of a justice who had prejudged the existing maps as "rigged" poses a great danger to the integrity of this court. The majority could

42

have its integrity by properly applying the doctrine of laches but instead forges ahead to the detriment of this court's institutional legitimacy.

### B. Judicial Estoppel

¶247 The doctrine of judicial estoppel bars the Governor and the Atkinson petitioner-intervenors who participated in the Johnson litigation[24] from arguing municipal islands are unconstitutionally noncontiguous. "The equitable doctrine of judicial estoppel . . . is intended to protect against a litigant playing fast and loose with the courts . . . . The doctrine precludes a party from asserting a position in a legal proceeding and then subsequently asserting an inconsistent position." State v. Petty, 201 Wis. 2d 337, 347, 548 N.W.2d 817 (1996) (internal quotation marks and citations omitted). Judicial estoppel applies if: (1) the party's later position is inconsistent with its earlier position; (2) the facts at issue are the same in both cases; and (3) the party convinced the first court to adopt its position. Id. at 348 (quoted source omitted).

¶248 Both the Governor and the Atkinson petitioner-intervenors deny taking a position in this case at odds with their position in Johnson and further claim the court never adopted their initial position. The facts betray their duplicity.

---

[24] Stephen Wright, Gary Krenz, Sarah Hamilton, Jean-Luc Thiffeault, and Somesh Jha all participated in Johnson.

43

¶249 The Governor and Atkinson petitioner-intervenors contend they never argued that municipal islands are constitutionally contiguous in Johnson. This is false. The Atkinson petitioner-intervenors, then identifying as "Citizen Mathematicians and Scientists," argued for the permissibility of municipal islands in Johnson I.[25] Both the Governor and Atkinson petitioner-intervenors stipulated that municipal islands are constitutionally contiguous.[26] The stipulation verifies the parties' position that municipal islands are constitutional.[27] Having lost in Johnson, the Governor and the Atkinson petitioner-intervenors now argue municipal islands are unconstitutional, the opposite of the position they advanced in Johnson. The court adopted their position in Johnson I, holding

---

[25] "This Court has defined 'contiguous' to mean that a district 'cannot be made up of two or more pieces of detached territory.' State ex rel. Lamb v. Cunningham, 83 Wis. 90, 148, 53 N.W. 35, 57 (1892); but cf. Prosser, 793 F. Supp. at 866 (holding that the Wisconsin Constitution does not require 'literal contiguity' where a town had annexed noncontiguous 'islands' and 'the distance between town and island is slight')." Br. Intervenors-Pet'rs Citizen Mathematicians and Scientists, Johnson v. Wis. Elections Comm'n, No. 2021AP1450, at 22 (Oct. 25, 2021).

[26] "Contiguity for state assembly districts is satisfied when a district boundary follows the municipal boundaries. Municipal 'islands' are legally contiguous with the municipality to which the 'island' belongs. Wis. Stat. §5.15(1)(b); Wis. Stat. §4.001(2) (1972); see Prosser v. Election Bd., 793 F. Supp. 859, 866 (W.D. Wis. 1992) (three-judge court)." Joint Stip. of Facts and Law, Johnson v. Wis. Elections Comm'n, No. 2021AP1450, at 15 (Nov. 4, 2021).

[27] A stipulation, by definition, is an "agreement between opposing parties concerning some relevant point[.]" Stipulation, Black's Law Dictionary 1712 (11th ed. 2019).

44

municipal islands are constitutional. 399 Wis. 2d 623, ¶36. No justice dissented on this point. Shifting majorities in Johnson II and Johnson III adopted maps with municipal islands. See Johnson II, 400 Wis. 2d 626, ¶¶8-10; Johnson III, 401 Wis. 2d 198, ¶70. No justice dissented on this point in either of those decisions. Notably, the court adopted the Governor's proposed state legislative maps in Johnson II, municipal islands and all. In his brief urging the court to adopt his legislative maps in Johnson II, the Governor argued his maps were constitutionally contiguous despite having municipal islands.[28]

¶250 The Governor contends the court was not convinced to adopt his position because there was no adversarial briefing on the issue of municipal islands in the Johnson litigation. The Governor, however, fails to cite any legal authority requiring adversarial briefing on an issue before judicial estoppel may apply. Precedent supports its application even absent adversarial briefing. E.g., Cnty. of Milwaukee v. Edward S., 2001 WI App 169, ¶11, 247 Wis. 2d 87, 633 N.W.2d 241 (estopping a litigant from arguing an adjournment was improper when the parties stipulated to the adjournment). Regardless, courts may not blindly accept a stipulation of law; they have a duty to independently determine what the law is. "[W]e are not bound by the parties' interpretation of the law or obligated to accept a party's concession of law. This court, not the parties, decides questions of law." State v. Carter, 2010 WI 77, ¶50, 327 Wis.

---

[28] Gov. Tony Evers's Br. Support Proposed Maps, Johnson v. Wis. Elections Comm'n, No. 2021AP1450, at 17 (Dec. 15, 2021).

45

2d 1, 785 N.W.2d 516. Irrespective of the parties' stipulation of law, this court was duty-bound to satisfy itself that remedial maps met the constitutional command of contiguity and it did so, irrespective of the parties' shared position on the issue.

¶251 The Governor fundamentally misconstrues the requirement that the party to be estopped must have convinced the earlier court to adopt its position. Applying judicial estoppel does not require us to peer into the minds of judges to ascertain whether a court was actually convinced of the party's position. The requirement merely means that the party estopped needs to have "succeed[ed] in maintaining that position," Matter of Cassidy, 892 F.2d 637, 641 (7th Cir. 1990) (quoting Davis v. Wakelee, 156 U.S. 680, 689 (1895)); or, stated differently, the party is estopped if "the court maintains that [same] position." State v. English-Lancaster, 2002 WI App 74, ¶19, 252 Wis. 2d 388, 642 N.W.2d 627 (citing State v. Gove, 148 Wis. 2d 936, 944, 437 N.W.2d 218 (1989)). Stated conversely, "[a] party is not bound to a position it unsuccessfully maintained." Matter of Cassidy, 892 F.2d at 641; Olson v. Darlington Mut. Ins. Co., 2006 WI App 204, ¶6, 296 Wis. 2d 716, 723 N.W.2d 713 ("Because 'a litigant is not forever bound to a losing argument,' there must be an action of the court adopting a party's position to give rise to judicial estoppel."). If the estopped party advanced a position the court later adopted, the requirement is met. See English-Lancaster, 252 Wis. 2d 388, ¶22 (holding that a defendant was judicially estopped from arguing that a

46

cautionary instruction was inadequate because it was the defendant who asked for the cautionary instruction and accepted the wording of the court's proposed instruction, calling it a case of "classic judicial estoppel"). The Governor and Atkinson petitioner-intervenors stipulated that municipal islands are constitutional, and the court held as much in Johnson I. 399 Wis. 2d 623, ¶36. The Governor proposed state legislative maps containing municipal islands, and this court adopted them in Johnson II. 400 Wis. 2d 626, ¶¶8-10. The court clearly adopted their position on contiguity in the Johnson litigation.

¶252 The Governor and the Atkinson petitioner-intervenors do not advance their contiguity arguments in good faith. Like the majority, they could not care less what "contiguous territory" means in Article IV, Sections 4 and 5 of the Wisconsin Constitution. Everyone understands their argument is not based on a newfound concern for the court's fidelity to the constitution. It is merely an argument onto which the parties have latched in order to smuggle a partisan "fairness" claim through the court. The call for a partisan power shift permeates their briefs. The Atkinson petitioner-intervenors falsely deny asserting the contiguity of municipal islands in Johnson and falsely claim they argued that municipal islands are not constitutionally contiguous. Not only did the Atkinson petitioner-intervenors argue such islands are constitutional in their brief in Johnson I, they also stipulated to the constitutionality of municipal islands. Judicial estoppel bars such duplicity. Petty, 201 Wis. 2d at 354 ("The doctrine looks

47

toward cold manipulation, not an unthinking or confused blunder."). The Governor and the Atkinson petitioner-intervenors should be barred by the doctrine of judicial estoppel from arguing that municipal islands are unconstitutional.

¶253 The majority does not contest that the elements of judicial estoppel are met. See majority op., ¶50. Instead, the majority simply "decline[s] to exercise [its] discretion to apply judicial estoppel here." Id. In doing so, the majority invokes "compelling public policy reasons." Id.

¶254 Harkening back to the monarchical principle that the king can do no wrong,[29] the majority privileges the Governor's duplicity because he is a government actor. See id. No precedent insulates the Governor from application of the doctrine. While some courts have been reluctant to apply judicial estoppel to government actors,[30] this court has never limited the doctrine to non-government actors. To bolster their flawed argument, the Governor and the majority rely solely on cases concerning equitable estoppel, and fail to cite a single case involving judicial estoppel: Turkow v. DNR, 216 Wis. 2d 273, 576 N.W.2d 288 (Ct. App. 1998); DOR v. Moebius Printing Co., 89 Wis. 2d 610, 279 N.W.2d 213 (1979); Vill. of Hobart v.

---

[29] See Holytz v. City of Milwaukee, 17 Wis. 2d 26, 33, 115 N.W.2d 618 (1962) (quoting Britten v. Eau Claire, 260 Wis. 382, 386, 51 N.W.2d 30 (1952)) (holding that the government does not have common law immunity from tort suits for harms wrongfully caused by it, noting that the doctrine was rooted "'in the ancient and fallacious notion that the king can do no wrong'").

[30] See New Hampshire v. Maine, 532 U.S. 742, 755-56 (2001).

48

Brown Cnty., 2005 WI 78, 281 Wis. 2d 628, 698 N.W.2d 83; State v. Chippewa Cable Co., 21 Wis. 2d 598, 124 N.W.2d 616 (1963); Park Bldg. Corp. v. Indus. Comm'n, 9 Wis. 2d 78, 100 N.W.2d 571 (1960). This court has hesitated to apply equitable estoppel only when applying it would interfere with the state's exercise of its police powers. Vill. of Hobart, 281 Wis. 2d 628, ¶29 n.9. But hesitancy does not translate to immunity. The Governor changed his position on the issue of contiguity to benefit his political party, not the public interest.[31] There has been no change in state public policy or material facts since the Johnson litigation. Notably, some of the respondents in this case are also government actors, and "each owes the other a full measure of respect." New Hampshire v. Maine, 532 U.S. 742, 756 (2001). The Governor's change in position embodies political gamesmanship, and the majority's embrace of it belies their hollow professions of neutrality. The Governor "'make[s] a mockery out of justice,'" and the court should bar him from doing so. Blumberg v. USAA Cas. Ins. Co., 790 So. 2d 1061, 1066 (Fla. 2001).

¶255 The majority's feeble defense for declining to apply judicial estoppel in this case is a procession of non sequiturs. The majority posits that "[g]iven our past case law on contiguity, as well as the primacy of our constitution, preventing parties from litigating this issue would not serve the goals" of judicial estoppel. Majority op., ¶50. It should

---

[31] Tony Evers was the Governor during the Johnson litigation and currently holds that office. There has not been a change in officeholder to justify the Governor's flip-flop on the issue.

49

be self-evident that neither our past cases on contiguity nor the primacy of the constitution have anything to do with preventing the Governor and the Atkinson petitioner-intervenors from re-litigating the issue of contiguity in order to protect the court from assaults on its integrity. Petty, 201 Wis. 2d at 354. The majority dismisses the judicial estoppel doctrine because "[g]iven the parties' stipulation in Johnson, it is difficult to view any inconsistency in position as 'cold manipulation' which judicial estoppel seeks to deter." Majority op., ¶50. There is, however, no relationship between a party's stipulation to a legal position and the party's later manipulation of willing justices. In a footnote the majority states it will "explain" why the stipulation "undermines Respondents' argument that judicial estoppel should bar the Petitioners' contiguity claim" "later." Id., ¶45 n.22. The majority, however, neglects to provide its promised explanation. Regardless, the majority's myopic focus on the parties' stipulation misses the point. The Governor not only stipulated that municipal islands are constitutionally contiguous. The Governor also proposed state legislative maps——containing municipal islands——in Johnson II and argued that those maps were constitutionally contiguous. The majority's non sequiturs and narrow focus on the stipulation create a smoke screen to obscure the bad faith of the Governor and the Atkinson petitioner-intervenors. Because the majority yearns to redraw the state legislative maps, it rebrands the petitioners' manipulations as mere "mistakes." Id., ¶50.

50

¶256 The Governor offers one final reason to not apply the doctrine of judicial estoppel: public policy.[32] See May v. May, 2012 WI 35, ¶14, 339 Wis. 2d 626, 813 N.W.2d 179 ("If a trial court's decision to apply estoppel would violate public policy, a reviewing court must reverse that decision as an erroneous exercise of discretion."). Public policy interests squarely favor estopping the Governor's gamesmanship. Because this second round of redistricting litigation seeks to shift the balance of political power, this court should be a bulwark against such attacks on the integrity of our court system. The majority's indulgence of the Governor's manipulation of the law for political advantage only confirms suspicions that redistricting cases are nothing more than exercises of raw political power by judicial partisans. Judicial estoppel developed as a doctrine to protect the judiciary's integrity——an interest at its apex when this court enters the "'political thicket' that judges 'ought not to enter.'" See Jensen v. Wis. Elections Bd., 2002 WI 13, 249 Wis. 2d 706, 639 N.W.2d 537 (quoting Colegrove, 328 U.S. at 556).

¶257 In any ordinary case, the Governor and the Atkinson petitioner-intervenors would be barred by the doctrine of judicial estoppel from arguing that municipal islands are unconstitutional. Both previously argued that municipal islands are constitutional. The court accepted their argument, holding

---

[32] The majority similarly says there are "compelling public policy reasons why this court should not exercise its discretion to apply estoppel in this case." Majority op., ¶50. The majority fails to actually articulate any reasons.

51

municipal islands are constitutional. The Governor and the Atkinson petitioner-intervenors made an about-face as soon as it was advantageous to do so. This is a textbook example of when judicial estoppel applies. Just like its selective application of laches, the majority abuses its discretion, applying equitable doctrines against Republicans, Trump, 394 Wis. 2d 629, but not Democrats. The doctrine of judicial estoppel is meant to protect the integrity of courts by prohibiting parties from manipulating the judicial process. Petty, 201 Wis. 2d at 354 (stating that the "doctrine of judicial estoppel is designed to combat" "manipulative perversion[s] of the judicial process"). The majority's rejection of the doctrine in this political case betrays its lack of integrity and its complicity in the manipulation.[33]

## V. STARE DECISIS

¶258 "To avoid an arbitrary discretion in the courts, it is indispensable that they should be bound down by strict rules and precedents, which serve to define and point out their duty in every particular case that comes before them." The Federalist No. 78, supra, at 529 (Hamilton). Expounding the value of following prior precedent, the court recognizes this judicial maxim "ensures that existing law will not be abandoned lightly.

---

[33] See Clarke v. Wis. Elections Comm'n, 2023 WI 70, 995 N.W.2d 779, 801-02 (Hagedorn, J., dissenting) (noting that the court was "happy to oblige" the petitioners' requests, despite their obvious partisan ambitions, going so far as to "dutifully adopt[ ] an accelerated briefing and oral argument schedule" and "change[ ] our internal writing deadline on original actions to ensure this case would be fast-tracked").

52

When existing law is open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results." Schultz v. Natwick, 2002 WI 125, ¶37, 257 Wis. 2d 19, 653 N.W.2d 266 (footnotes and internal quotation marks omitted). The Johnson litigation concluded last year. The constitution's meaning has not changed in the interim——just the court's membership.

¶259 Two members of the majority once extolled the importance of stare decisis "'because it promotes evenhanded, predictable, and consistent development of legal principles . . . and contributes to the actual and perceived integrity of the judicial process.'" Mayo v. Wis. Injured Patients & Fams. Comp. Fund, 2018 WI 78, ¶110, 383 Wis. 2d 1, 61, 914 N.W.2d 678, 707 (Ann Walsh Bradley, J., dissenting) (quoting Johnson Controls, Inc. v. Emps. Ins. of Wausau, 2003 WI 108, ¶95, 264 Wis. 2d 60, 665 N.W.2d 257 (2003)). "Stare decisis, the principle that courts must stand by things decided, is fundamental to the rule of law." State v. Prado, 2021 WI 64, ¶67, 397 Wis. 2d 719, 960 N.W.2d 869 (Per Ann Walsh Bradley, J.). "We have repeatedly recognized the importance of stare decisis." State v. Johnson, 2023 WI 39, ¶19, 407 Wis. 2d 195, 90 N.W.2d 174 (Per Dallet, J.). Justice Ann Walsh Bradley has specifically lamented, "[a] change in membership of the court does not justify a departure from precedent." St. Croix Cnty. Dep't of Health & Hum. Servs. v. Michael D., 2016 WI 35, ¶93, 368 Wis. 2d 170, 880 N.W.2d 107 (Abrahamson & Ann Walsh Bradley, JJ., dissenting). Despite their lip service to the

53

doctrine in previous cases, the justices now "throw[ ] the doctrine of stare decisis out the window" and retread paths this court only just traveled. Koschkee v. Taylor, 2019 WI 76, ¶62, 387 Wis. 2d 552, 929 N.W.2d 600 (Ann Walsh Bradley, J., dissenting).

¶260 While this court is not inexorably bound by stare decisis, respecting this well-established legal maxim "reduces incentives for challenging settled precedents, saving parties and courts the expense of endless relitigation." Kimbel v. Marvel Ent., LLC, 576 U.S. 446, 455 (2015). The doctrine's preservation of stability and finality are especially important in the context of redistricting.

¶261 Reopening the redistricting door and rehearing the same arguments we addressed and resolved in the Johnson cases——just two terms ago——feeds the perception that the majority will discard settled cases when politically advantageous for implementing the four justices' policy preferences. Voters and their representatives should now expect their districts to change after each state supreme court election cycle. The majority sows confusion and disorder that will inexorably lead to instability in the balance of power and conflict between the political branches.

VI.  CONCLUSION

¶262 "[T]here is no liberty, if the judiciary power be not separated from the legislative and the executive," the French philosopher Montesquieu warned. "Were it joined with the legislative, the life and liberty of the subject would

54

be exposed to arbitrary control; for the judge would be then the legislator." Baron De Montesquieu, The Spirit of Laws 152 (Thomas Nugent trans., Hafner Publishing Company 1949) (1748). The majority appoints itself as a redistricting commission to impose legislative maps it deems politically "fair." The court arrogates unto itself the power to make purely political decisions——untethered to any law, and with no lawful authority. Democrats may cheer the majority's mission to bestow political power on their party, but the majority's abandonment of neutrality delegitimizes the institution. See Baker v. Carr, 369 U.S. 186, 267 (1962) (Frankfurter, J., dissenting) ("The Court's authority . . . ultimately rests on sustained public confidence in its moral sanction. Such feeling must be nourished by the Court's complete detachment . . . from political entanglements and by abstention from injecting itself into the clash of political forces in political settlements."). The majority crowns itself supreme over the governor and the legislature, but the people never gave the judiciary such authority. An election never overrides the constitution.

¶263 "Do Justice!" counsel for the Democratic Senators proclaimed as she concluded her oral argument before the court. "[A] [c]ourt-managed version of the French Revolution,"[34] however, is not the kind of justice this court is supposed to dispense. Hohri v. United States, 793 F.2d 304, 313 (D.C. Cir. 1986) (Bork, J., dissenting from denial of reh. en banc), rev'd,

---

[34] See Robert H. Bork, The Tempting of America: The Political Seduction of the Law 207 (1990).

55

482 U.S. 64 (1987)) ("[W]e administer justice according to law. Justice in a larger sense, justice according to morality, is for [the legislature] and the [governor] to administer . . . ."). The majority's diktat transforms the judiciary from the "least dangerous"[35] branch into one of the greatest threats to liberty the people of Wisconsin have ever faced.

---

[35] The Federalist No. 78, at 522 (Alexander Hamilton) (J. Cooke ed., 1961)

Appendix A

<u>Clarke v. Wisconsin Elections Commission</u>, No. 2023AP1399-OA, 2023 WI 70, 995 N.W.2d 779 (Rebecca Grassl Bradley, J., dissenting).

Page 14
October 6, 2023
No. 2023AP1399-OA    <u>Clarke v. Wisconsin Elections Commission</u>

REBECCA GRASSL BRADLEY, J. (dissenting).

"Herald, read the accusation!" said the King.

On this the White Rabbit blew three blasts on the trumpet, and then unrolled the parchment scroll, and read as follows:—

"The Queen of Hearts, she made some tarts,
    All on a summer day:
The Knave of Hearts, he stole those tarts,
    And took them quite away!"

"Consider your verdict," the King said to the jury.

"Not yet, not yet!" the Rabbit hastily interrupted. "There's a great deal to come before that!"

***

"No, no!" said the Queen. "Sentence first—verdict afterwards."

Lewis Carroll, <u>Alice's Adventures in Wonderland</u> 165-67, 187 (1865).

A great deal came before the majority's decision to grant the petitioners this additional kick at the cat. Ironically, an election for the office of supreme court justice makes possible this purely political proceeding—unconvincingly masquerading as a "judicial" one. Janet Protasiewicz and Jill Karofsky delivered their sentence first—"Rigged!"—and will form a majority with Ann Walsh Bradley and Rebecca Dallet to shift legislative power from Republicans and bestow an electoral advantage on Democrats, fulfilling one of Protasiewicz's many promises to the principal funder of her campaign, the Democratic Party of Wisconsin. At least the King in <u>Alice's Adventures in Wonderland</u> wouldn't have wasted time on a show trial contaminated with copious conflicts of interest. Protasiewicz campaigned on "restoring democracy"[14] and the other members of the majority regularly rail against imaginary threats to democracy. <u>See, e.g.</u>, <u>Teigen v. WEC</u>, 2022 WI 64, ¶208, 403 Wis. 2d 607, 725, 976 N.W.2d 519, 577 (Ann Walsh Bradley, J., dissenting), <u>reconsideration denied</u>, 2022 WI 104. It is hard to imagine a more brazen assault on democracy than removing duly elected senators from office by judicial fiat.

---

[14] Janet Protasiewicz (@janetforjustice), Twitter (Mar. 7, 2023, 2:21 PM) https://twitter.com/janetforjustice/status/1633201166929592320?cxt=HHwWgIC8md3zpaotAAAA.

Page 15
October 6, 2023
No. 2023AP1399-OA    Clarke v. Wisconsin Elections Commission

## I. Down the Rabbit Hole

Petitioners are late to the redistricting tea party, which started in 2021 and concluded in 2022. After each decennial census conducted under the United States Constitution, the Wisconsin Constitution requires the legislature "to apportion and district anew the members of the senate and assembly, according to the number of inhabitants." Wis. Const. art. IV, § 3; see Johnson v. WEC, 2021 WI 87, ¶1, 399 Wis. 2d 623, 967 N.W.2d 469 (Johnson I). In 2021, the Wisconsin Legislature drew and passed new maps, but the governor vetoed them. Johnson I, 399 Wis. 2d 623, ¶2. The then-existing maps, enacted into law in 2011, were unconstitutional because shifts in Wisconsin's population "disturbed the constitutionally guaranteed equality of the people's representation in the state legislature." Id. In the face of political impasse, this court was asked to provide a remedy for that inequality. Id. We did so, initially selecting the legislative maps proposed by Governor Evers. See Johnson v. WEC, 2022 WI 14, ¶10, 400 Wis. 2d 626, 971 N.W.2d 402 (Johnson II). The United States Supreme Court summarily reversed because a majority of this court improperly applied the constitutional guarantee of equal protection in its selection of the Governor's maps, which sorted voters based on race without constitutionally permissible justification. Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. 398, 406 (2022) (per curiam).[15] On remand, this court selected maps drawn by the Wisconsin Legislature. See Johnson v. WEC, 2022 WI 19, ¶3, 401 Wis. 2d 198, 972 N.W.2d 559 (Johnson III). The remedial maps adopted by this court "would be in effect only 'until such time as the legislature and governor have enacted a valid legislative apportionment plan.'" Johnson I, 399 Wis. 2d 623, ¶19 (quoting State ex rel. Reynolds v. Zimmerman, 23 Wis. 2d 606, 606, 128 N.W.2d 16 (1964) (per curiam)).

## II. The Pool of Tears

Redistricting litigation concluded—or at least it should have—in April 2022, with this court's selection of new maps as a remedy for malapportionment. Thereafter, state legislative elections occurred under those maps. At a January 9, 2023 candidate forum, Protasiewicz abandoned universal judicial ethics to unequivocally declare her position on the matter now before this court: "So let's be clear here. The maps are rigged—bottom line. Absolutely, positively rigged. They do not reflect the people in the state. They are rigged, period." She continued, "I believe the gerrymandering decision was wrong. As I indicated to you before, I can't ever tell you what I would do on a particular case, but I can tell you my values and common sense tell you that

---

[15] In a startling confession of ignorance, Rebecca Dallet revealed on a podcast her inability to understand the United States Supreme Court's equal protection jurisprudence: "[T]he Supreme Court said, 'Sorry this [sic] maps, the governor's maps violate the Equal Protection Clause' and they reversed and remanded to us. . . . I've read [the Supreme Court decision] numerous times and I don't understand it analytically[.]" Justice Rebecca Dallet, The Supreme Importance of Wisconsin's Election, Strict Scrutiny (Apr. 3, 2023) (28:56-29:58), https://open.spotify.com/episode/0Ijqvbr52tuszDRB3lGGgQ?si=NPOfVN72TZiv6iYYKSqL6A.

2

Page 16
October 6, 2023
No. 2023AP1399-OA    Clarke v. Wisconsin Elections Commission

it's wrong."[16]   Calling her preferred case outcomes her "values" does not alleviate the ethical dilemmas underlying Protasiewicz's involvement with this case.

The Democratic Party of Wisconsin invested nearly $10,000,000 in Protasiewicz's successful campaign.[17]   One day after her term began, Petitioners—all Democrats—filed this petition.  Overturning precedent to strip duly elected Republicans of their seats and deliver them to Democrats reeks of a quid pro quo.  Rebecca Dallet foreshadowed this very case:  "Big-money special interests have taken over.  Justices refuse to recuse themselves even when their donors—who've given massive amounts of money—want the court to rule a certain way."[18]   Indeed.

Along with her pro-abortion platform, Protasiewicz showcased her commitment to "fair" maps (whatever that might mean in her subjective opinion), announcing she would "enjoy taking a fresh look at the gerrymandering question."[19]   Protasiewicz acknowledged the issue would come before the court should she win the election:  "I would anticipate that at some point, we'll be looking at those maps."[20]   Protasiewicz went so far as to signal how she would rule after her "fresh look" at the maps:  "If you look at the dissent in that maps case, that dissent is what I will tell you I agree with."[21]

---

[16] Zac Schultz, Candidates Tangle over Political Issues, Judicial Perspectives at First 2023 Wisconsin Supreme Court Forum, PBS Wis. (Jan. 10, 2023), https://pbswisconsin.org/news-item/candidates-tangle-over-political-issues-judicial-perspectives-at-first-2023-wisconsin-supreme-court-forum/.

[17] WisPolitics Tracks $56 Million in Spending on Wisconsin Supreme Court Race, WisPolitics (July 19, 2023), https://www.wispolitics.com/2023/wispolitics-tracks-56-million-inspending-on-wisconsin-supreme-court-race/.

[18] Judge Rebecca Dallet, Judge Rebecca Dallet: We Need to Fix Our Broken Wisconsin Supreme Court, The Cap Times (Feb. 13, 2018), https://captimes.com/opinion/column/judge-rebecca-dallet-we-need-to-fix-our-broken-wisconsin-supreme-court/article_3851d423-bec8-5b34-bebc-4866cca7da3f.html.

[19] Jessie Opoien & Jack Kelly, Protasiewicz Would 'Enjoy Taking a Fresh Look' at Wisconsin Voting Maps, The Cap Times (Mar. 2, 2023), https://captimes.com/news/government/protasiewicz-would-enjoy-taking-a-fresh-look-at-wisconsin-voting-maps/article_d07fbe12-79e6-5c78-a702-3de7b444b332.html.

[20] Id.

[21] Henry Redman, Supreme Court Candidates Accuse Each Other of Lying, Extremism in Sole Debate, Wis. Exam'r (Mar. 21, 2023), https://wisconsinexaminer.com/2023/03/21/supreme-court-candidates-accuse-each-other-of-lying-extremism-in-sole-debate/

Page 17
October 6, 2023
No. 2023AP1399-OA    Clarke v. Wisconsin Elections Commission

Failing to grasp the indispensability of impartiality in the exercise of judicial functions, Protasiewicz divulged, "I think that everybody knows that anybody running for any type of office has their [sic] own personal opinions and their [sic] own personal values. And the question is, do you want to hide those opinions and those values from the public? Are they entitled to know what your personal feelings are? I mean, we've all got them. So the question is, do we hide them? Or do we let the public know?"[22] Protasiewicz chose her campaign strategy, but Wisconsin's Code of Judicial Conduct prohibits judges from engaging in extra-judicial activities which "[c]ast reasonable doubt on the judge's capacity to act impartially as a judge." SCR 60.05(1)(a). Protasiewicz's "I can't tell you how I would rule on a case" smokescreen does not insulate her declarations from a due process challenge; no reasonable person familiar with her campaign statements would expect her to rule other than according to the "values" she explicitly professed. No reasonable person would believe Protasiewicz can remain fair and impartial in this original action.

Rebecca Dallet once recognized the corrosive effect of judicial candidates opining on issues the court may be called upon to decide: "But as a judge, I don't take positions on specific issues that might come before the court. It's wrong to do so. When judges take positions on issues, they call into question the fairness of the courts. Explicit partisan bias harms our system of justice."[23]

These common-sense principles are not unique to Wisconsin. Then-Chief Justice Ronald M. George of the California Supreme Court explained, "when a candidate for judicial office speaks during an election campaign about his or her views on issues that may come before the court, voters reasonably will anticipate that he or she will render decisions in accordance with those personal views[.]" Ronald M. George, Foreword: Achieving Impartiality in State Courts, 97 Cal. L. Rev. 1853, 1861 (2009). "The inclusion of a judge's personal views among the criteria for judicial election encourages a process of adjudication that is neither independent nor impartial." Id. at 1862. And it may violate litigants' constitutional rights.

While Protasiewicz may have a First Amendment right to say whatever she thinks will get her elected, parties with cases before this court have a Fourteenth Amendment right to impartial arbiters of the law. Would any party defending the maps adopted as this court's remedy in Johnson III have any confidence in receiving an unbiased decision after repeatedly hearing Protasiewicz's "personal opinions" and "personal values" about the maps, or after reading the following social media post:[24]

---

[22] Opoien & Kelly, supra note 6.

[23] Dallet, supra note 5.

[24] Protasiewicz, supra note 1.

Page 18
October 6, 2023
No. 2023AP1399-OA    Clarke v. Wisconsin Elections Commission



While judicial candidates cannot control what third parties (much less Hollywood elites) say about them, candidates have absolute control over what they repost on social media. Wisconsin's Code of Judicial Conduct governs such statements: "A judge, judge-elect, or candidate for judicial office shall not make or permit or authorize others to make on . . . her behalf, with respect to cases, controversies, or issues that are likely to come before the court, pledges, promises, or commitments that are inconsistent with the impartial performance of the adjudicative duties of the office." SCR 60.06(3)(b). The First Amendment may permit Protasiewicz to "air" her "grievances," but retweeting Julia Louis-Dreyfus' inducement to vote for Protasiewicz in order to "win" "[f]air maps" and "[a]bortion rights" and "[c]ontrol of Congress" reflects Protasiewicz's commitment to voting in favor of those outcomes irrespective of the law. Protasiewicz's failure to

5

Page 19
October 6, 2023
No. 2023AP1399-OA    Clarke v. Wisconsin Elections Commission

recuse from this case despite her blatant bias should be reviewed by the United States Supreme Court before Wisconsin taxpayers are forced to foot the bill for a redistricting do-over. The reverberations of Protasiewicz's choice to exercise her First Amendment right at the expense of judicial impartiality extend beyond Wisconsin. Judicial candidates nationwide may replicate Protasiewicz's successful but ethically compromised playbook until the Court curbs the tactic. "The judicial process works only when it is done in a disinterested manner, which is inconsistent with campaigns in which judges commit to rule, or appear to commit to rule, in a certain way in certain cases." Carey v. Wolnitzek, 614 F.3d 189, 193 (6th Cir. 2010).

In Caperton v. Massey, the United States Supreme Court decided due process required a state supreme court justice's recusal from a case because "'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable'" based in no small part on $3 million dollars in donations from the chairman and principal officer of a party to the action, to a political organization formed to support the justice who would hear the case after his election. 556 U.S. 868, 877, 884 (2009) (quoting Withrow v. Larkin, 421 U.S. 35, 47 (1975)). Consistent with universal judicial ethics, the justice in Caperton had not made any statements during his campaign suggesting he had prejudged the case. See id. at 882. Nevertheless, the Court determined the justice's participation violated the Due Process Clause because the campaign spending, coupled with its temporal proximity to the case, presented "a serious, objective risk of actual bias." Id. at 886. This court adopted the Caperton test, holding that a circuit court judge's repeated social media interactions with a litigant in a contested paternity case pending before the judge constituted a due process violation. Miller v. Carroll, 2020 WI 56, 392 Wis. 2d 49, 944 N.W.2d 542. "To assess whether the probability of actual bias rises to the level of a due process violation, we apply, verbatim, the standard from Caperton." Id., ¶24.

Highlighting this court's rejection of a constitutionally-infirm proposal to require recusal from cases involving parties who contributed $15,000 to a justice's campaign,[25] Protasiewicz's media apologists either misunderstand or misrepresent Caperton. It isn't just about the money, although anyone equating $10,000,000 and $15,000 exhibits something more than bad arithmetic. Caperton is based on an enduring principle, pronounced decades ago by the United States Supreme Court: "Not only is a biased decisionmaker constitutionally unacceptable, but 'our system of law has always endeavored to prevent even the probability of unfairness.'" Withrow, 421 U.S. at 47.

The probability of actual bias on Protasiewicz's part likely approaches 100%. Wisconsin's Code of Judicial Conduct defines "Impartiality" as "the absence of bias or prejudice in favor of, or against, particular parties, or classes of parties, as well as maintaining an open mind in considering issues that may come before the judge." SCR 60.01(7m). "A judge, candidate for judicial office, or judge-elect should not manifest bias or prejudice inappropriate to the judicial office." SCR 60.06(3)(a). "Expressions of bias or prejudice by a judge, even outside the judge's judicial activities, may cast reasonable doubt on the judge's capacity to act impartially as a judge."

---

[25] S. Ct. Order 17-01 (issued June 30, 2017).

Page 20
October 6, 2023
No. 2023AP1399-OA   Clarke v. Wisconsin Elections Commission

Comment to SCR 60.05(1).  A mind made up on the campaign trail is unlikely to be magically opened after the election.

While Caperton likely governs recusal based on Protasiewicz's receipt of more than three times the amount deemed to offend due process in that case, Wisconsin's recusal rules govern her statements on the campaign trail:

> [A] judge shall recuse . . . herself in a proceeding when the facts and circumstances the judge knows or reasonably should know establish one of the following or when reasonable, well-informed persons knowledgeable about judicial ethics standards and the justice system and aware of the facts and circumstances the judge knows or reasonably should know would reasonably question the judge's ability to be impartial:
>
> . . .
>
> > (f) The judge, while a judge or a candidate for judicial office, has made a public statement that commits, or appears to commit, the judge with respect to any of the following:
> >
> > 1. An issue in the proceeding.
> > 2. The controversy in the proceeding.

SCR 60.04(4)(f) (emphasis added).

Protasiewicz is not the only occupant of the office of justice to declare her position on an issue everyone knew would be presented to the court upon her election.  In March 2023, in support of Protasiewicz's campaign, Karofsky said:  "When it comes to the maps, the maps are rigged.  I wrote in a dissent that the maps, I didn't use the word rigged, but if you read the dissent that I wrote in the final case in WEC v. Johnson err—Johnson v. WEC, you will see those maps are rigged. You can't be in this state and not realize that.  Janet Protasiewicz is saying the quiet part out loud."[26] One can't be in this state and not realize that at least some members of the majority already made up their minds on the issues presented in this petition.  "'[T]he most sacred of the duties of a government is to do equal and impartial justice to all its citizens.'"  United States v. Surratt, 855 F.3d 218, 220 (4th Cir. 2017) (Wynn, J., dissenting from dismissal) (quoting Thomas Jefferson). The constitutional guarantee of due process embodies this first principle.

---

[26] Frederica Freyberg, Jill Karofsky on the 2023 Wisconsin Supreme Court Election, PBS Wis. (Mar. 31, 2023), https://pbswisconsin.org/news-item/jill-karofsky-on-the-2023-wisconsin-supreme-court-election/.

### III. A Mad Tea-Party

"Decisions first, principles later."  Robert H. Bork, Neutral Principles and Some First Amendment Problems, 47 Ind. L.J. 1, 5 (1971).

The petitioners pose five claims, any one of which would suffice to reach the majority's preordained outcome in this case, but the majority selects two, the better to expedite its resolution of this case in petitioners' favor and perhaps dodge United States Supreme Court review:

1. Do the existing state legislative maps violate the contiguity requirements contained in Article IV, Sections 4 and 5 of the Wisconsin Constitution?

This question was asked, and answered in the negative, in Johnson III, 401 Wis. 2d 198, ¶70 ("The assembly districts are contiguous and sufficiently compact.").

2. Did the adoption of the existing state legislative maps violate the Wisconsin Constitution's separation of powers?

This question could have been asked, but was not.  The petitioners could have moved to intervene in the Johnson litigation two years ago, but did not, and instead waited for the membership of the court to change before bringing this claim.  If the majority were consistent in its treatment of parties who sleep on their rights in this manner, they would apply the doctrine of laches onto which they latched to avoid answering unsettled issues in prior cases.  See, e.g., Trump v. Biden, 2020 WI 91, 394 Wis. 2d 629, 951 N.W.2d 568; Hawkins v. WEC, 2020 WI 75, 393 Wis. 2d 629, 948 N.W.2d 877 (applying laches to bar action filed two days after certification of candidates for election).  Of course, those cases involved challenges to the administration of elections which produced outcomes the majority favored.

The court should deny this petition because it relitigates claims this court only recently decided in Johnson III, 401 Wis. 2d 198, and asserts claims that could have been brought by intervention at the outset in Johnson I, 399 Wis. 2d 623, in 2021.  Only a change in court membership makes a do-over possible, as the litigants recognized by announcing their plan to file an original action just two days after Protasiewicz's election[27] and by filing this petition one day after her term began.  At least one member of the current majority—Ann Walsh Bradley—has repeatedly decried altering precedent based on a change in court membership:[28]

---

[27] Jack Kelly, Liberal Law Firm to Argue Gerrymandering Violates Wisconsin Constitution, The Cap Times (Apr. 6, 2023), https://captimes.com/news/government/liberal-law-firm-to-arguegerrymandering-violates-wisconsin-constitution/article_2dfb9757-6d2d-58ba-9461-10b3d20d5f00.html.

[28] This is not the first time Ann Walsh Bradley upended established precedent after a change in the membership of the court.  In 2006, she joined a majority in overturning

Page 22
October 6, 2023
No. 2023AP1399-OA   Clarke v. Wisconsin Elections Commission

- "Before concluding, I observe that the majority's analysis and its overruling of <u>Ferdon</u> depart from the time-honored principle of stare decisis. We decided <u>Ferdon</u> only thirteen years ago. '[R]espect for prior decisions is fundamental to the rule of law.' <u>Johnson Controls, Inc. v. Emp'rs Ins. of Wausau</u>, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257 (2003). 'Stare decisis is the preferred course of judicial action because it promotes evenhanded, predictable, and consistent development of legal principles . . . and contributes to the actual and perceived integrity of the judicial process.' <u>Id.</u>, ¶95. 'The decision to overturn a prior case must not be undertaken merely because the composition of the court has changed.' <u>Id.</u>; see also <u>Bartholomew v. Wisconsin Patients Comp. Fund and Compcare Health Servs. Ins. Corp.</u>, 2006 WI 91, ¶32, 293 Wis. 2d 38, 717 N.W.2d 216 ('No change in the law is justified by a change in the membership of the court[.]')." <u>Mayo v. Wis. Injured Patients & Fams. Comp. Fund</u>, 2018 WI 78, ¶¶ 109-110, 383 Wis. 2d 1, 61, 914 N.W.2d 678, 707 (Ann Walsh Bradley, J., dissenting).

- "Stare decisis (Latin for 'let the decision stand') is a basic tenet of the rule of law.  Although stare decisis is not a mechanical formula requiring blind adherence to precedent, departing from precedent requires special justification, and '[n]o change in the law is justified by a change in the membership of the court or a case with more egregious facts.'" <u>St. Croix Cnty. Dep't of Health & Hum. Servs. v. Michael D.</u>, 2016 WI 35, ¶85, 368 Wis. 2d 170, 880 N.W.2d 107 (Abrahamson & Ann Walsh Bradley, JJ., dissenting) (footnotes omitted; alteration in opinion).  "Nothing aside from the membership of the court has changed since <u>Steven H.</u>  A change in membership of the court does not justify a departure from precedent." <u>Id.</u>, ¶93.

Nothing aside from the membership of the court has changed since <u>Johnson III</u>.  The majority abandons inconvenient principles that would otherwise obstruct its activism.

---

<u>Panzer v. Doyle</u>, 2004 WI 52, 271 Wis. 2d 295, 680 N.W.2d 666, which the court had decided just two years earlier.  See <u>Dairyland Greyhound Park, Inc. v. Doyle</u>, 2006 WI 107, ¶286, 295 Wis. 2d 1, 719 N.W.2d 408  (Roggensack, J., concurring in part/dissenting in part) ("The decisions of this court are final if not set aside on a motion for reconsideration in the case in which the ruling was issued, Wis. Stat. § 809.64 (2003–04), or overturned by a federal court on a federal question, see <u>State v. Webster</u>, 114 Wis. 2d 418, 426 n.4, 338 N.W.2d 474 (1983). Notwithstanding this rule of law, at the request of the Governor, the majority opinion takes up an issue we decided in 2004 and puts it into the appeal of a 2001 circuit court decision.") .

Page 23
October 6, 2023
No. 2023AP1399-OA    Clarke v. Wisconsin Elections Commission

IV. The Queen's Croquet-Ground

In resurrecting the following issues from last year's litigation and imposing them on parties who haven't raised them, the majority tips its hand; it will overrule Johnson I and Johnson III, supplant the rule of law with the collective will of four members of the court, and replace last year's judicial remedy with an entirely political one:

1. If the court rules that Wisconsin's existing state legislative maps violate the Wisconsin Constitution for either or both of these reasons and the legislature and the governor then fail to adopt state legislative maps that comply with the Wisconsin Constitution, what standards should guide the court in imposing a remedy for the constitutional violation(s)?

2. What fact-finding, if any, will be required if the court determines there is a constitutional violation based on the contiguity clauses and/or the separation-of-powers doctrine and the court is required to craft a remedy for the violation? If fact-finding will be required, what process should be used to resolve questions of fact?[29]

That which was constitutional in 2022 cannot become unconstitutional in 2023, even if the majority so decrees. Nevertheless, the standards by which the court in 2022 ordered a remedy for the inequality of the people's representation in the state legislature will be discarded by the majority, in a grave affront to the rule of law.

In exercising unbridled power absent lawful authority, the members of the majority will violate the Wisconsin Constitution, arrogating unto themselves purely legislative power the people never gave them. Granting this original action petition "is a naked judicial claim to legislative—indeed, *super*-legislative—power; a claim fundamentally at odds with our system of government." Obergefell v. Hodges, 576 U.S. 644, 717 (2015) (Scalia, J., dissenting). "By vesting certain powers exclusively within each of the three co-equal branches of government, the drafters of the Wisconsin Constitution recognized the importance of dispersing governmental power in order to protect individual liberty and avoid tyranny." League of Women Voters of Wis. v. Evers, 2019 WI 75, ¶31, 387 Wis. 2d 511, 929 N.W.2d 209. Tyranny may wear a black robe. See Johnson I, 399 Wis. 2d 623, ¶ 80 (citing In re Review of the Code of Judicial Ethics, SCR Chapter 60, 169 Wis. 2d xv, xxv (1992) (Day, J., concurring, joined by a majority) ("Tyranny need not be dressed in a military uniform, it can also wear a black robe!"). "[L]iberty can have nothing to fear from the judiciary alone, but would have every thing to fear from its union with either of the other departments." The Federalist No. 78, at 523 (Jacob E. Cook ed., 1961) (Alexander Hamilton). In Wisconsin, that fear has come to pass.

"A system of government that makes the People subordinate to a committee of nine unelected lawyers does not deserve to be called a democracy." Obergefell, 576 U.S. at 717 (Scalia,

---

[29] The majority's nonsensical final question in the order betrays its inability to distinguish a legal claim from a factual one.

Page 24
October 6, 2023
No. 2023AP1399-OA    Clarke v. Wisconsin Elections Commission

J., dissenting).  Although Wisconsin's justices are elected, democracy also does not countenance a system of government that subordinates the people of Wisconsin to a committee of four lawyers, regardless of how they are chosen.  After all, justices are elected to exercise judicial power, not to fulfill the wishes of their political benefactors.  See Williams-Yulee v. Fla. Bar, 575 U.S. 433, 446-47 (2015) ("In deciding cases, a judge is not to follow the preferences of his supporters, or provide any special consideration to his campaign donors.").  Under our Wisconsin Constitution, judicial power is the only authority the people gave this court.  Wis. Const. art. VII, § 2.  Judicial elections cannot override the constitution.

Ultimately, petitioners ask the court to unseat Wisconsin's duly elected senators by judicial decree—"off with their heads!"  The majority's acquiescence to this unprecedented demand would deal a death blow to democracy in this state.  Wisconsin citizens would become the majority's subjects, at the mercy of the masters who were once the People's servants.

* * *

The democratic integrity of law . . . depends entirely upon the degree to which its processes are legitimate.  A judge who announces a decision must be able to demonstrate that he began from recognized legal principles and reasoned in an intellectually coherent and politically neutral way to his result.  Those who would politicize the law offer the public, and the judiciary, the temptation of results without regard to democratic legitimacy.

Robert H. Bork, The Tempting of America: The Political Seduction of the Law 2 (1990).  The outcome of this original action has been predetermined.  In granting this petition, four members of this court pretend the Johnson litigation never happened.  ("'Oh, I've had such a curious dream!' said Alice.")[30]  Their perverse politicization of this state's highest court begins with the results—"Fair maps!"—and will end with decisions devoid of democratic integrity, and without democratic legitimacy.  Would that it were The End, but the majority's degradation of the court is only just beginning.  Through the Looking Glass[31] we go.

I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER joins this dissent.

---

[30] Lewis Carroll, Alice's Adventures in Wonderland 189 (1865).

[31] Lewis Carroll, Through the Looking Glass, and What Alice Found There (1871).

¶264 BRIAN HAGEDORN, J. *(dissenting).* This is a sad turn for the Wisconsin Supreme Court. Today, the court dives headlong into politics, choosing to wield the power it has while it has it. Wisconsinites searching for an institution unpolluted by partisan warfare will not find it here.

¶265 No matter how today's decision is sold, it can be boiled down to this: the court finds the tenuous legal hook it was looking for to achieve its ultimate goal——the redistribution of political power in Wisconsin. Call it "promoting democracy" or "ending gerrymandering" if you'd like; but this is good, old-fashioned power politics. The court puts its thumb on the scale for one political party over another because four members of the court believe the policy choices made in the last redistricting law were harmful and must be undone. This decision is not the product of neutral, principled judging.

¶266 The matter of legislative redistricting was thoroughly litigated and resolved after the 2020 census. We adopted a judicial remedy (new maps) and ordered that future elections be conducted using these maps until the legislature and governor enact new ones. Johnson v. Wis. Elections Comm'n, 2022 WI 19, ¶3, 401 Wis. 2d 198, 972 N.W.2d 559 (Johnson III). That remedy remains in place, and under Wisconsin law, is final. Now various parties, new and old, want a mulligan. But litigation doesn't work that way. Were this case about almost any other legal matter, the answer would be cut-and-dried. We would unanimously dismiss the case and reject this impermissible collateral attack on a prior, final decision.

1

¶267 So why are the ordinary methods of deciding cases now thrown by the wayside? Because a majority of the court imagines it has some moral authority, dignified by a black robe, to create "fair maps" through judicial decree. To be sure, one can in good faith disagree with Johnson's holding that adhering as closely as possible to the last maps enacted into law——an approach called "least change"——is the most appropriate use of our remedial powers. And the claim here that the constitution's original meaning requires the territory in all legislative districts to be physically contiguous is probably correct, notwithstanding decades of nearly unquestioned practice otherwise. But that does not give litigants a license to ignore procedure and initiate a new case to try arguments they had every opportunity to raise in the last action, but did not. Procedural rules exist for a reason, and we should follow them. As we have previously explained, "Litigation rules and processes matter to the rule of law just as much as rendering ultimate decisions based on the law. Ignoring the former to reach the latter portends of favoritism to certain litigants and outcomes." Doe 1 v. Madison Metro. Sch. Dist., 2022 WI 65, ¶39, 403 Wis. 2d 369, 976 N.W.2d 584. Indeed it does.

¶268 The majority heralds a new approach to judicial decision-making. It abandons prior-stated principles regarding finality in litigation, standing, stare decisis, and other normal restraints on judicial will——all in favor of expediency. But principles adopted when convenient, and ignored when inconvenient, are not principles at all. It is precisely when

2

one's principles are tested and costly——yet are kept nonetheless——that they prove themselves truly held. The unvarnished truth is that four of my colleagues deeply dislike maps that give Republicans what they view as an inappropriate partisan advantage. Alas, when certain desired results are in reach, fidelity to prior ideals now seems . . . a bit less important than before. No matter how pressing the problem may seem, that is no excuse for abandoning the rules of judicial process that make this institution a court of law.

¶269 The majority's outcome-focused decision-making in this case will delight many. A whole cottage industry of lawyers, academics, and public policy groups searching for some way to police partisan gerrymandering will celebrate. My colleagues will be saluted by the media, honored by the professoriate, and cheered by political activists. But after the merriment subsides, the sober reality will set in. Without legislative resolution, Wisconsin Supreme Court races will be a perpetual contest between political forces in search of political power, who now know that four members of this court have assumed the authority to bestow it. A court that has long been accused of partisanship will now be enmeshed in it, with no end in sight. Rather than keep our role in redistricting narrow and circumspect, the majority seizes vast new powers for itself. We can only hope that this once great court will see better days in the future. I respectfully dissent.

## I. REDISTRICTING BACKGROUND——HOW WE GOT HERE

¶270 I begin by answering the question that many are probably asking: why is the Wisconsin Supreme Court involved in drawing maps in the first place? The short story is as follows.

¶271 The Wisconsin Constitution requires the legislature to draw new state legislative maps after the federal census every ten years. Wis. Const. art. IV, § 3. This means the legislature must enact new maps into law, which requires the governor's signature or an override of the governor's veto. Wis. Const. art. V, § 10. In 2011, after the 2010 census, the legislature did enact new maps into law. See 2011 Wis. Act 43 (state legislative maps); 2011 Wis. Act 44 (congressional maps). Following the 2020 census, however, the governor and legislature could not agree on district lines and, thus, no maps were enacted. Johnson v. Wis. Elections Comm'n, 2021 WI 87, ¶2, 399 Wis. 2d 623, 967 N.W.2d 469 (Johnson I). The 2011 maps remained the law.

¶272 In 2021, this court entered the fray at the request of a group of voters. Johnson, No. 2021AP1450-OA, Order (Wis. Sept. 22, 2021). Given the constitutional right of citizens to proportionate representation following updated census numbers,[1] we were asked to fill the void and adopt temporary maps (what I will call "remedial maps") reflecting population changes. We invited almost anyone to participate in the litigation as a party, including interest groups, voters, elected officials, the

_____

[1] See Reynolds v. Sims, 377 U.S. 533, 577 (1964); State ex rel. Att'y Gen. v. Cunningham, 81 Wis. 440, 484, 51 N.W. 724 (1892).

4

Governor, and the Legislature. Id. Each party briefed us on all relevant legal requirements, including contiguity. In the end, we adopted remedial maps for use until either new maps are enacted into law or a new census triggers the constitutional duty to reapportion again. Johnson III, 401 Wis. 2d 198, ¶3. To this day, the governor and legislature have not complied with their constitutional obligation to enact new maps into law, so the remedial maps remain in place.

¶273 It is important to understand that when a court draws legislative maps, it is not making new law. When this court adopted new maps two years ago, it only imposed a temporary legal remedy. It is the legislature's responsibility to "district anew" through the legislative process. Wis. Const. art. IV, § 3. The constitution does not contemplate courts drawing maps in the ordinary course. Redistricting is, after all, "an inherently political and legislative——not judicial—— task." Jensen v. Wis. Elections Bd., 2002 WI 13, ¶10, 249 Wis. 2d 706, 639 N.W.2d 537. We step in if and only if the political process fails.

¶274 In Johnson I, we concluded that remedial maps should be based on the last maps enacted into law, and that they should only modify what is necessary to remedy any constitutional violations. 399 Wis. 2d 623, ¶¶76-78. This respects the constitutional role of the political branches and keeps the judiciary out of policymaking to the maximum amount possible. Id. Thus, our aim was to alter existing law only as necessary to vindicate the constitutional rights at stake, and no more.

5

Additionally, we concluded that partisan outcomes would not and should not guide our decision, and that partisan gerrymandering is neither a cognizable nor justiciable legal claim under the Wisconsin Constitution. Id., ¶¶39-63. We further agreed with all the parties and held that when annexation creates municipal islands, "the district containing detached portions of the municipality is legally contiguous even if the area around the island is part of a different district." Id., ¶36.

¶275 Now, a year and a half after the dust settled, the petitioners come to us requesting a do-over. They raise several claims regarding the remedial maps we adopted in Johnson. But in timing and substance, the petitioners have proven their goal is to obtain new maps that give more political power in the state legislature to Democratic Party candidates.[2] The majority has the same goal, but sidestepped taking this issue directly when it chose not to hear the petitioners' partisan gerrymandering claim. Clarke v. Wis. Elections Comm'n, No. 2023AP1399-OA, Order (Wis. Oct. 6, 2023). Rather, the court has chosen to shift the political balance of power indirectly by tossing out the maps adopted barely two years ago and drawing new ones more to its liking.

¶276 The court today rests its conclusion on the grounds that maps must be physically contiguous. Majority op., ¶¶3, 24.

---

[2] The petition alleges that the remedial maps we adopted in Johnson harmed the petitioners because they cannot "achieve a Democratic majority in the state legislature." Clarke v. Wis. Elections Comm'n, 2023AP1399-OA, Petition at 8, ¶5 (Aug. 2, 2023).

The court also holds that it will not confine its remedy to curing the purported unlawfulness, but will fashion new maps from scratch. <u>Id.</u>, ¶56. It sees itself as being empowered to "district anew," even though the constitution gives that responsibility to the legislature. Wis. Const. art. IV, § 3. Further, the court holds that political outcomes should, and will, guide its decision.[3] <u>Id.</u>, ¶¶69-71. Each of these overrules and departs from our decision in <u>Johnson</u>.

¶277 All in all, the court's opinion ignores inconvenient facts and issues, mischaracterizes the relevant arguments, and finds dubious grounds on which to achieve its politically motivated goals.[4] And to boot, the remedial process we now embark on is hazy at best, and perfectly tailored for political manipulation. An odd recipe for "fair" maps.

---

[3] The majority also says that the petitioners' partisan gerrymandering claim is an "unresolved legal question." Majority op., ¶7. It is not. <u>Johnson</u> did address it, because we needed to address <u>all</u> relevant legal requirements necessary to draw lawful maps. 2021 WI 87, ¶¶53-63, 399 Wis. 2d 623, 967 N.W.2d 469. The majority here, like it does elsewhere, simply ignores statements and holdings that do not support its goals——now or in the future.

[4] Take, for example, the majority's conclusion that it is "immediately apparent, using practically any dictionary, that contiguous means 'touching' or 'in actual contact.'" Majority op., ¶16. Seems simple enough. But a cursory look under the hood reveals quite a different picture. As Justice Rebecca Grassl Bradley explains, the respondents pointed us to heaps of dictionaries defining contiguity as "very near" or "close" or "adjoining." Justice Rebecca Grassl Bradley's dissent, ¶199. Maybe those definitions do not comport with the original meaning of the contiguity requirement. But rather than face the issue head-on, the majority ducks for cover.

7

## II. THE MAJORITY'S PROCEDURAL ERRORS

¶278 The majority opinion offers only a perfunctory analysis of the significant procedural objections that should dispose of this case.

¶279 Among them, the majority falls woefully short in supporting its conclusion that the parties met the requirements for standing. "Standing is the foundational principle that those who seek to invoke the court's power to remedy a wrong must face a harm which can be remedied by the exercise of judicial power." Teigen v. Wis. Elections Comm'n, 2022 WI 64, ¶160, 403 Wis. 2d 607, 976 N.W.2d 519 (Hagedorn, J., concurring). Courts do not have the power to "weigh in on issues whenever the respective members of the bench find it desirable." Foley-Ciccantelli v. Bishop's Grove Condo. Ass'n, Inc., 2011 WI 36, ¶131, 333 Wis. 2d 402, 797 N.W.2d 789 (Prosser, J., concurring). As three members of today's majority have previously opined, "standing is important . . . because it reins in unbridled attempts to go beyond the circumscribed boundaries that define the proper role of courts." Fabick v. Evers, 2021 WI 28, ¶92, 396 Wis. 2d 231, 956 N.W.2d 856 (Ann Walsh Bradley, J., dissenting); see also Teigen, 403 Wis. 2d 607, ¶160 (Hagedorn, J., concurring) (standing "serves as a vital check on unbounded judicial power").

¶280 So what is the harm being claimed here? The petitioner-voters say they suffer the harm of a "less responsive and representative" legislature because of the contiguity deficiency. That is, they are claiming that legislators

8

representing districts with municipal islands (the detached parts of a municipality) surrounded by another district are less able to respond to the constituents residing in those islands. Given that almost all of the challenged municipal islands have a population smaller than the roster of the Milwaukee Brewers, and that the citizens living in them are kept in the same district as the rest of their municipality, this alleged harm might charitably be called a head-scratcher. The majority surely recognizes this, so it goes another route. It quotes State ex rel. Reynolds v. Zimmerman for the proposition that the Governor "may challenge the constitutionality of a state reapportionment plan as a violation of state constitutional rights of the citizens."[5] Majority op., ¶39. Then, it argues that because the Governor has standing, there's no need to consider the standing problems of the other parties seeking relief. Id.

¶281 But relying on the Governor here does not work. Under claim preclusion, and other equitable bars,[6] the Governor cannot

_____

[5] 22 Wis. 2d 544, 552, 126 N.W.2d 551 (1964).

[6] My colleagues lay out a convincing case for judicial estoppel as well. Chief Justice Ziegler's dissent, ¶¶143-46; Justice Rebecca Grassl Bradley's dissent, ¶¶247-57. Judicial estoppel generally precludes parties from convincing a court to adopt a position in one case, only to take an inconsistent position in a later case. See State v. Harrison, 2020 WI 35, ¶27, 391 Wis. 2d 161, 942 N.W.2d 310. The majority says the Governor's changed position on contiguity arises from inadvertence or mistake, but as Justice Rebecca Grassl Bradley's dissent explains, his "about-face" is a "textbook example of when judicial estoppel applies." Justice Rebecca Grassl Bradley's dissent, ¶257.

In addition, the Governor and the petitioners deliberately delayed bringing this case until August 2, 2023, the day after a new justice joined the court. Justice Rebecca Grassl Bradley

9

litigate contiguity again and should be dismissed from the case.[7] And it's not a close call.

¶282 The Governor's legal positions throughout this redistricting litigation saga are astonishing; any other litigant in any other lawsuit would be promptly dismissed from the case. In Johnson, the Governor initially argued that the constitution's contiguity requirement mandated physical contiguity, just like the petitioners argue in this case.[8] Then, the Governor changed course and agreed with all the other parties that keeping municipalities together did not violate the contiguity requirement.[9] We agreed and so held, and invited map proposals consistent with our decision. Johnson I, 399 Wis. 2d 623, ¶36; id., ¶87 (Hagedorn, J., concurring). The Governor then submitted proposed remedial maps with municipal islands——the very thing the Governor now argues violates the

_____

lays out a strong case that laches, which bars litigants from sitting on their hands to the detriment of others, also prohibits the relief being sought. Justice Rebecca Grassl Bradley's dissent, ¶¶231-46.

[7] Claim preclusion also bars the Governor's separation-of-powers claim because he could have argued in Johnson that adopting the Legislature's proposed maps would be unlawful on this basis.

[8] In his initial brief in Johnson, he argued that contiguous "means not 'made up of two or more pieces of detached territory.'" Brief of Intervenor-Respondent Governor Tony Evers at 6, No. 2021AP1450-OA (Oct. 25, 2021) (quoting another source).

[9] All parties eventually stipulated that municipal islands "are legally contiguous with the municipality to which the 'island' belongs" and therefore do not affront Article IV's contiguity requirement. Johnson, No. 2021AP1450-OA, Joint Stipulations of Law 15, ¶20 (Nov. 4, 2021).

10

constitution![10]   And in briefing regarding the other map proposals, which also contained municipal islands, the Governor never questioned their legality——even though he was invited to address any and all legal deficiencies in those proposals. Johnson, No. 2021AP1450-OA, Order (Wis. Nov. 17, 2021).

¶283 Yet the Governor now tells us that our judicial remedy violates the constitution's contiguity requirement.   Lady Justice may be blind, but she need not let a party pull the wool over her eyes.   The doctrine of claim preclusion exists to prevent this kind of gamesmanship.   Parties cannot relitigate "any claim that arises out of the same relevant facts, transactions or occurrences" underlying a final judgment on the merits.   Teske v. Wilson Mut. Ins. Co., 2019 WI 62, ¶23, 387 Wis. 2d 213, 928 N.W.2d 555 (quoting another source).   This applies to claims that were litigated, and to claims that could have been litigated.   Id.   Claim preclusion is not concerned simply with the initial cause of action, but rather, the "transaction or factual situation."   Id., ¶31.   A "transaction" involves "a natural grouping or common nucleus of operative facts."   Id., ¶32.   When we ask "if the claims of an action arise from a single transaction, we may consider whether the facts are related in time, space, origin, or motivation."   Id. (quoting another source).

¶284 The Governor's flip-flopping is classic claim preclusion.   The Governor came before this court to litigate how

---

[10] https://www.google.com/maps/d/viewer?mid=1fPl8On9q8ZyTa6A 1V3CJDzry3YR_pGNt&ll=43.04928877881408%2C-89.34731737718982&z=12.

11

to remedy malapportionment; argued that contiguity permits municipal islands; submitted maps (that this court initially adopted) containing dozens of municipal islands; and now, in a subsequent action, complains that this court's remedy violated the constitution because its map contained municipal islands. This argument was litigated in Johnson. And even if it wasn't, it obviously could have been litigated. If the legislature's proposed maps that we ultimately adopted violated the contiguity requirements, the Governor could have said so. He did not; no one did. The Governor is barred by claim preclusion from litigating the issues before us again.

¶285 Courts do not usually welcome Harvey Dent impressions from litigants before them. The majority, however, is just fine with it. It argues that claim preclusion does not apply because the causes of action were different. Majority op., ¶¶47-48. We're told that Johnson was about the 2011 maps, but this case is about the maps we adopted in our Johnson decision. Different maps, different facts, they say. But this makes no sense. Imagine how this would play out in a contract dispute. If parties stipulate to a breach of contract but litigate the contractual remedies, claim preclusion would apply to the remedial claims that were and could have been litigated. A party could not come back later, file a new case, and seek a modified remedy because it made ill-advised arguments about the contractual remedies the first time. So too here.

¶286 The Johnson litigation arose because the 2011 maps were no longer lawful. The case was entirely about the legal

12

and equitable principles that must govern remedial maps, and which remedial maps should be adopted. The petition here is nothing more than a continuation of Johnson. It simply seeks a different remedy to address the ongoing unlawfulness of the last maps enacted into law——those passed in 2011. Contrary to the majority's conclusion, the facts here are part of the same common nucleus of facts: the nature and substance of the judicial remedy that must be in place due to the continued unlawfulness of the 2011 maps.

¶287 If the majority is correct that the only transaction in Johnson was the malapportionment problem with the 2011 maps, then almost everything litigated in that case was part of a different transaction that apparently could not have been litigated in any preclusive way. The Voting Rights Act? Different transaction, despite a decision from the U.S. Supreme Court and two decisions from this court on the matter. Political impact as a relevant consideration in remedial maps? Different set of facts apparently, despite published decisions from this court addressing the issue. If the majority is right that we look only to the narrow legal argument made rather than the factual situation, then everything that this court says and decides in this case, other than the contiguity issue itself, will lack preclusive effect. That's absurd, of course. The majority's attempt to get past claim preclusion by defining the set of facts so narrowly disrupts the law and does not withstand scrutiny.

13

¶288 Given this, I do not see how the court can bypass the voter standing problems by relying on the Governor's purported authority to challenge a districting plan. Even if the Governor has standing to litigate on behalf of Wisconsinites to ensure a districting plan complies with the constitution, this does not end the matter. The question the majority must answer——but does not——is whether the Governor has the right to litigate on behalf of Wisconsin voters over and over again, taking different positions each time, until he gets the result he wants. The ordinary application of claim preclusion prohibits the Governor from relitigating the issues he either raised or could have raised during the last litigation. The majority's standing decision——resting on a party that should be dismissed——once again looks like an outcome in search of a theory.

¶289 Next, the majority ignores the impropriety of the court issuing an injunction on our own injunction. The majority enjoins the Wisconsin Elections Commission from using the legislative maps that we, just 20 months ago, mandated they use. Majority op., ¶¶3, 77. I've never seen anything quite like it. The general rule is that judgments——and injunctions along with them——are final and, absent fraud, cannot be collaterally attacked. Oneida Cnty. Dep't of Soc. Servs. v. Nicole W., 2007 WI 30, ¶28, 299 Wis. 2d 637, 728 N.W.2d 652. This case is exactly that——an impermissible collateral attack on a prior, final case.

¶290 The majority's response is that courts regularly modify prior injunctions in redistricting cases without

14

reopening old cases. Majority op., ¶54. This is true, but only because there is an intervening event every ten years: the U.S. Census. And following completion of the census, the constitution requires that population shifts be accounted for afresh. Wis. Const. art. IV, § 3. So when courts issue a new injunction in new redistricting cases, they do so because the law provides that every districting plan, whether adopted by a court or the legislature, must be updated following the census. Id. That is not the case here.

¶291 The majority also zooms by the question of whether we can even issue a declaratory judgment in the first place. I have serious doubts. The purpose of the Uniform Declaratory Judgments Act is to resolve uncertainty. Wis. Stat. § 806.04(12). The Act evinces a strong preference for that goal. See Wis. Stat. §§ 806.04(5) (the enumerated subject matter upon which courts can declare rights can only be expanded where the judgment would "remove an uncertainty"); 806.04(6) (courts may refuse to render declaratory judgments where the judgment "would not terminate the uncertainty"). These textual clues have been "universally accepted by courts and commentators" as prohibiting courts from issuing declaratory judgments that revisit prior adjudications——a move that perpetuates uncertainty, rather than resolves it (as this case exemplifies). Oregonian Publ'g Co., LLC v. Waller, 293 P.3d 1046, 1052 (Or. Ct. App. 2012); see also Royal v. Royal, 271 S.E.2d 144, 145 (Ga. 1980) ("The Act does not authorize a petitioner to brush aside previous judgments of the same court,

15

and seek a determination of his rights as if they had never been adjudicated.") (cleaned up); E.H. Schopler, <u>Validity and effect of former judgment or decree as proper subject for consideration in declaratory action</u>, 154 A.L.R. 740 (Originally published in 1945) ("As a general observation from the cases, it may be stated that an action for a declaratory judgment cannot be used as a subterfuge for the purpose of relitigating a question as to which a former judgment is conclusive."). True to form, the majority never wrestles with this.

## III. THE MAJORITY'S REMEDIAL ERRORS

¶292 The majority pushes past all these procedural roadblocks and still declares the maps this court adopted unconstitutional. With remarkably little content, it then gives the parties vague directions on what it wants for the new maps it intends to adopt.

¶293 The court first overturns <u>Johnson</u>'s least change approach to redistricting. Majority op., ¶63. The majority then discards the policy choices the legislature made in passing the 2011 districting law still on the books, and determines it can and should draft a new law from scratch, consistent with its own policy concerns. The majority never grapples with the limited remedial powers of courts, which is the main idea animating the least change approach. That's because here, the majority sees itself as a substitute legislature rather than a court. The majority does not try to fix the contiguity

16

problems; it uses its contiguity holding as an excuse to create new maps reflecting its own policy and partisan concerns.

¶294 In particular, the majority says "partisan impact" will guide its decision in selecting new remedial maps. But what does this mean? Should the maps maximize the number of competitive districts? Should the maps seek to achieve something close to proportionate representation?[11] Should the maps pick some reasonable number of acceptable Republican and Democratic-leaning seats in each legislative chamber? I have no idea, and neither do the parties. The court nonetheless invites the submission of maps motivated by partisan goals, just as the petitioners hoped. And with a certain amount of gusto, the majority insists it is being neutral by openly seeking maps aimed at tilting the partisan balance in the legislature. The court announces it does not have "free license to enact[[12]] maps that privilege one political party over another," all the while obliging the wishes of litigants who openly seek to privilege one political party over another. Majority op., ¶70. The irony could not be any thicker.

¶295 The court does not provide any meaningful guidance to the parties on how to satisfy its "political impact" criteria.[13]

---

[11] For an excellent discussion of the problems with this approach, see Justice Rebecca Grassl Bradley's dissent, ¶¶223-25.

[12] Courts do not enact anything, however. The legislature, in our constitutional order, enacts laws.

[13] This even though the petitioners urged us during oral argument to give "clear instructions" regarding the criteria we would use to evaluate proposals.

17

No standards, no metrics, nothing. Instead, it appears the majority wishes to hide behind two "consultants" who will make recommendations on which maps are preferable. Those consultants will presumably use some standards to make this kind of judgment,[14] but the majority will not permit them to be subject to discovery or witness examination.[15] Like the great and powerful Oz, our consultants will dispense wisdom without allowing the parties to see and question what is really behind the curtain. And at the end of this, the consultants will offer options from which the court can choose. This attempt at insulating the court from being transparent about its decisional process is hiding in plain sight.

¶296 The court also fails to interact with the constitutional requirement that districts "be bounded by county, precinct, town or ward lines." Wis. Const. art. IV, § 4. Currently, districts that are not physically contiguous are that way because the legislature (and courts) have attempted to comply with the requirement that counties, towns, and wards not

---

[14] One of the experts has already opined on how he thinks partisan fairness should be measured. Brief of Professors Gary King, Bernard Grofman, et al. as Amici Curiae Supporting Neither Party, League of United Latin American Citizens v. Perry, 548 U.S. 399 (2006), 2006 WL 53994.

[15] To the extent the consultants either pick which party's map is best or compose their own, they may be acting as court-appointed experts. Our rules of evidence expressly give parties the opportunity to depose and cross-examine court-appointed experts. Wis. Stat. § 907.06(1); see Martin v. Mabus, 700 F. Supp. 327, 331 (S.D. Miss. 1988) (permitting parties to depose court-appointed expert who assisted court in drawing new electoral maps).

be split——thus, keeping municipal islands in the same legislative district as the rest of the municipality.  The court now determines that strict compliance with contiguity is required, but it ignores how that may be in tension with the equally required constitutional command to keep county, town, and ward lines sacrosanct.  See State ex rel. Att'y Gen. v. Cunningham, 81 Wis. 2d 440, 521, 51 N.W. 724 (1892).  While absolute compliance with the "bounded by" clause is impossible given the one-person, one-vote decisions of the United States Supreme Court, a return to a more exacting constitutional standard would likely prohibit running districts across county lines, or breaking up towns or wards (of which municipalities are composed) unless necessary to comply with Supreme Court precedent.  This could conflict with strict physical contiguity.

¶297 In the past, the legislature and the courts permitted some play in the joints, allowing deviation from strict physical contiguity to keep towns and municipalities together.  But in demanding perfect adherence to physical contiguity, the court once again pits the two requirements against each other.  Will we receive maps that accomplish physical contiguity, but do not comply with the requirement that county lines not be crossed, towns not be broken up, and ward lines (from which municipalities are constructed) not be split?  If so, will the court bless one constitutional infirmity to remedy the other?  In requiring strict physical contiguity, the majority may end up picking and choosing which constitutional provisions to honor based on which ones will serve its goals.

## IV. WHERE DO WE GO FROM HERE?

¶298 Although this litigation is not yet over, it is clear to me that the Wisconsin Supreme Court is not well equipped to undertake redistricting cases without a set of rules governing the process. In Jensen, this court recognized the need for special procedures governing future redistricting cases. 249 Wis. 2d 706, ¶20. We received a rule petition seeking to do exactly that prior to Johnson, but this court could not come to an agreement about what such a process would look like or whether we should have one. I believed then, and am now fully convinced, that some formalized process is desperately needed before we are asked to do this again.

¶299 The problem with this and the Johnson case is that the parties were and are largely concerned with serving their own interests. In Johnson, for example, we asked the parties to propose constitutionally compliant maps that made the fewest changes from existing law. Johnson I, 399 Wis. 2d 623, ¶87 (Hagedorn, J., concurring). From my vantage point, none of the parties followed our directive well. Each submitted maps that sought their own parochial and partisan interests, making many unnecessary changes, while trying to stay somewhat close to the prior maps. In this case, I have no doubt we will see the same kind of partisan maneuvering, which the court here explicitly invites. This is a mistake.

¶300 Having parties submit maps also leaves little space for factual determinations in adjudicating Voting Rights Act issues. While federal panels handling redistricting cases can

20

take and receive evidence, manage discovery, and are otherwise institutionally equipped to make factual findings, we have no easy mechanism for resolving complicated factual questions. And our process last time simply did not account for the fact-intensive VRA adjudication the Supreme Court said was necessary. See Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. 398, 403-04 (2022) (per curiam). The majority in this case barely mentions the VRA, but that doesn't mean it won't be a problem down the line. Whether the parties submit maps that are race-neutral, or determine the VRA requires race-conscious line drawing, could pose a significant problem. The court gives no instruction on how to handle this, and we have no mechanism in place for resolving these disputes.

¶301 Perhaps a better approach in the future is for the court to draw a politically agnostic and race-neutral base map using the most recent maps enacted into law, and then allow the parties to seek refinements. No matter the approach, without any kind of structure to govern a case that is plainly our responsibility, this court is left to the whims of partisan agendas. This has not——and will not——serve us well. An orderly and predictable process may also incentivize the regular enactment of new maps into law the way the constitution envisions, rather than litigating over every inch of political power.

21

V. CONCLUSION

¶302 In a politically charged world, the judiciary should be a bulwark against the tribalism so prevalent among us. We should neutrally and consistently apply our rules of judicial process, no matter where that leads us. We should have no favored litigants or preferred outcomes. At the end of the day, the majority acts not to vindicate some legal principle, but to achieve a long sought-after goal: the redistribution of political power in the Wisconsin legislature. Rather than start with the law and see it through to the end, the court starts with the goal and works backwards to justify it. This is not faithful judging, and I will have no part of it. I dissent.